**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re EATON CORPORATION SECURITIES LITIGATION,<br><br>This Document Relates to:<br><br>All Actions. | Case No. 16-cv-05894-JGK<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Jury Trial Demanded |

# TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 7

A. Lead Plaintiff .......... 7

B. Defendants .......... 7

IV. CONTROL PERSON ALLEGATIONS .......... 9

V. SUBSTANTIVE ALLEGATIONS .......... 11

A. Eaton's Business Overview .......... 11

B. Start of Class Period: Eaton Acquired Cooper—a Key Step in Its "Transformation" into an Electrical-Focused Company .......... 12

C. Defendants Disclosed the Beneficial Tax Consequences of the Merger, But Not the Harmful Ones .......... 14

D. Analysts and Investors Understood That a Spin-off of Eaton's Vehicle Business Was More Advantageous Than Other Types of Divestitures .......... 15

E. Throughout the Class Period, Defendants Repeatedly Assured the Market that the Merger Did Not Prevent Eaton from "Spinning Off" Its Vehicle or Any Other Business .......... 17

1. May 21, 2012 – Defendants Announced the Merger and Concealed the Tax Consequences on Eaton's Ability to Spin-Off Its Businesses .......... 17

(a) Defendants Misrepresented Eaton's Ability to Spin-Off Its Vehicle Business in Response to Analysts' Direct Questions About It .......... 19

(i) Misstatement No. 1: Cutler Misled by Saying that Such a Spin-off Was Not in Eaton's "Active Planning" .......... 19

(ii) Misstatement No. 2: Cutler Misrepresented that "There [Was] Nothing" in the "Tax Structure" of the Merger that "Would Prevent" a "Spin-off" .......... 20

(b) Analysts' Favorable Reactions to Defendants' Misstatements on the May 21 Call Support the Statements' Materiality ................. 20

2. Eaton's June 22, 2012 Preliminary Proxy Statement Did Not Disclose the Merger's Five-Year Economic "Prohibition" on Spin-Offs Due to Adverse Tax Consequences of the Merger .......................... 22

(a) Defendants Had Directed Analysts' Questions about Tax Consequences of the Merger to Eaton's Proxy Statements......... 22

(b) Misstatement/Omission No. 3: The Preliminary Proxy ............. 23

(c) The Preliminary Proxy Also Revealed that Defendants Had Conducted Tax-Related Due Diligence Before Announcing the Merger, Raising a Strong Inference of Their Knowledge of the Spin-Off Tax "Prohibition" Before Their First Misstatements ... 25

(d) After the Preliminary Proxy, Analysts Further Highlighted the Spin-Off as a Positive "Viable Option," Demonstrating the Materiality of Defendants' Omission ........................................ 26

3. Eaton's September 14, 2012 Proxy Statement Again Did Not Disclose the Merger's Five-Year Economic "Prohibition" on Spin-Offs Due to Adverse Tax Consequences ................................................ 27

(a) Misstatement/Omission No. 4: The Proxy Repeated Defendants' Omission and Misleading Disclosures Regarding the Merger's Economic "Prohibition" on Spin-Offs for Tax Reasons ............ 27

(b) The Proxy Provided New Details About Defendants' Due Diligence, Further Strengthening the Inference that They Knew About the Tax Prohibition on Spin-Offs Before the Class Period ................................................................................. 29

(c) After the Proxy, the Market Continued to React Favorably to Eaton's Purported Spin-off Ability, Further Demonstrating the Materiality of Defendants' Misstatements and Omissions.......... 30

4. Defendants Continued to Mislead the Market with Reassurances Regarding the Viability of a Business Spin-Off as Market Interest Intensified ............................................................................ 31

(a) Misstatement No. 5: Cutler's Misstatement at the October 31, 2012 Earnings Call ................................................................... 31

(b) Misstatement No. 6: Cutler's Misstatement at the November 13, 2012 Goldman Sachs Industrials Conference ............................ 32

(c) Analysts Were Reassured by Defendants' Continued Misstatements and Omissions, Further Underscoring Their Materiality ..... 32

(d) Eaton's February 2013 Restructuring of Its Automotive and Truck Businesses Into a Single "Vehicle Segment" Further Increased Market Focus on a Potential Spin-Off ..... 34

(e) Misstatement No. 7: Cutler's Misstatement at the May 21, 2013 EPG Conference ..... 35

(f) The Market Again Reacted Favorably to Defendants' Misstatements, Further Supporting Their Materiality ..... 36

(g) Misstatement No. 8: Fearon's Misstatement at the November 13, 2013 Goldman Sachs Industrial Conference ..... 37

(h) Additional Developments and Defendants' Repeated Misstatements and Omissions Continued to Fuel Investor Anticipation of a Spin-off ..... 38

F. Defendants Admitted the Truth Regarding the Five-Year "Prohibition" on Eaton's Spin-Off Ability, Which They Were "Well Aware" of "All Along" ..... 39

1. Defendants' Corrective Disclosures on July 29, 2014 ..... 39

2. The Market Was Shocked by Defendants' Disclosures ..... 41

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO ..... 45

A. May 21, 2012 – Conference Call ..... 45

1. Misstatement No. 1 ..... 45

2. Misstatement No. 2 ..... 46

B. Misstatement/Omission No. 3: June 22, 2012 – Preliminary Proxy Statement ..... 47

C. Misstatement/Omission No. 4: September 14, 2012 Proxy Statement ..... 49

D. Misstatement No. 5: October 31, 2012 – Q3 2012 Earnings Call ..... 51

E. Misstatement No. 6: November 13, 2012 – Goldman Sachs Industrials Conference ..... 52

F. Misstatement No. 7: May 21, 2013 – EPG Conference ........ 53

G. Misstatement No. 8: November 13, 2013 – Goldman Sachs Industrial Conference ........ 54

VII. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ........ 55

A. Defendants Engaged in Massive and Highly Suspicious Insider Sales of Their Eaton Stock During the Class Period ........ 56

1. Cutler's and Fearon's Class Period Sales Were Highly Suspicious in Timing and Amount ........ 56

2. Cutler's Pre-Class Period Sales Do Not Render His Class Period Sales Non-Suspicious, and in Fact Confirm a Pattern of Insider Trading ........ 58

B. The "Transformational" Cooper Merger Was Core to Eaton's Operations, and the Individual Defendants Were Directly Involved in It, Including Any Potential Tax Implications ........ 60

VIII. CLASS ACTION ALLEGATIONS ........ 63

IX. LOSS CAUSATION ........ 65

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........ 67

XI. NO SAFE HARBOR ........ 69

A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking ........ 69

B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking" ........ 70

C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language ........ 70

D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made ........ 71

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........ 71

COUNT II Violation of § 20(a) of the Exchange Act Against Defendants Cutler and Fearon ........ 73

COUNT III Violation of § 20A of the Exchange Act (Against Defendant Cutler) ..................... 75

XII. PRAYER FOR RELIEF ............................................................................................. 76

XIII. JURY DEMAND .................................................................................................... 77

Lead Plaintiff South Carolina Retirement Systems Group Trust ("South Carolina" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following against Defendants Eaton Corporation plc. ("Eaton" or the "Company"), and Alexander M. Cutler and Richard H. Fearon (collectively, the "Individual Defendants" and together with Eaton, the "Defendants"), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon, among other things, a review and analysis of (i) press releases, news articles, transcripts, and other public statements issued by or concerning Eaton and the Individual Defendants; (ii) research reports issued by financial analysts concerning Eaton's business; (iii) reports filed publicly by Eaton with the Securities and Exchange Commission (the "SEC"); (iv) news articles, media reports, and other publications concerning the networking technology industry and markets; and (v) other publicly available information and data concerning Eaton, its securities, and the markets therefor. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from May 21, 2012 through July 28, 2014, inclusive (the "Class Period"), purchased the publicly traded common stock of Eaton and/or exchange-traded options on such common stock, and were damaged thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Eaton during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling

interest; (v) Eaton's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act"), specifically, Section 10(b), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, Section 20(a), 15 U.S.C. § 78t(a), and Section 20A, 15 U.S.C. § 78t–1.

2. Eaton is an Ireland-based manufacturer of engineered products marketed to customers in the industrial, agricultural, construction, aerospace, and vehicle markets. The Company's products include hydraulic equipment, fluid connectors, electrical distribution equipment, and engine components.

3. For most of its over-100 year history, Eaton was primarily a U.S.-based vehicle component manufacturer. In the past few decades, however, the Company has been making strategic shifts away from its vehicle business (comprised of the truck and automotive divisions), while growing its electrical component businesses through a series of acquisitions, **spin-offs**,[1] and other divestitures.

4. In 2012, the Company engaged in a merger (the "Merger" or the "Cooper Acquisition") with Irish-headquartered Cooper Industries plc. ("Cooper"), an electrical products manufacturer, and reincorporated in Ireland. This $13 billion acquisition was, by far, the largest in Eaton's history. Defendants repeatedly hailed it as "transformational," particularly because it

[1] "A spinoff is a type of divestiture" that involves a "distribution of new shares of an existing business or division of a parent company…. A corporation creates a spinoff by distributing 100% of its ownership interest in that business unit … to existing shareholders." Definition of Spin-off, INVESTOPEDIA, http://www.investopedia.com/terms/s/spinoff.asp (last visited Jan. 11, 2017).

represented a key step in Eaton's metamorphosis into a company focused on manufacturing electrical products. Indeed, post-Merger, the electrical business generated approximately 60% of Eaton's revenues and profits. Numerous analysts also recognized the "transformational" nature of this Merger and its key role in Eaton's continued transition to an electrical-focused product portfolio.

5. Eaton's continued ability to spin-off or otherwise divest its non-core businesses, most notably the now non-core vehicle segment, was critical to the Company's investors and analysts after the Merger. Indeed, during the Class Period, analysts repeatedly lauded Eaton's "options to potentially **spin-off**" or otherwise divest the vehicle business as a "final step in [its] transition to a more electrical/multi-industry business model," which would be a "positive catalyst" for the stock post-Merger.

6. Further, investors and analysts were also focused on the spin-off or other divestiture of Eaton's vehicle or other non-core businesses as a "viable option" after the Merger because it was a means to help pay off the $6.7 billion of debt that the Company took on to finance the acquisition. Defendants specifically raised this possibility by referencing "**the possible sale of assets**" to refinance this debt in the May 21, 2012 Merger announcement. Investors and analysts understood that a spin-off could also be used to generate capital, and thus help pay off Eaton's debt post-Merger.

7. Investors and analysts viewed a potential **spin-off** as the most advantageous divestiture option because, unlike most other corporate divestitures such as subsidiary stock sales and asset sales, spin-offs often qualify as tax-free events.[2]

[2] Spin-offs can be executed on a tax-free basis if they meet certain statutory and non-statutory criteria as set forth in 26 U.S. §355, related Internal Revenue Service ("IRS") regulations and judicial decisions.

8. Under these circumstances, throughout the Class Period, investors and analysts repeatedly asked Defendants whether Eaton would spin-off or otherwise divest its vehicle (or other) businesses, including specifically whether anything about the Merger limited Defendants' ability to do so. The ability to engage in a tax-free spin-off of Eaton's vehicle or other businesses was thus important to investors' and analysts' valuation of the Company.

9. However, throughout the Class Period, in response to such investor and analyst questions, Defendants repeatedly assured them that nothing, including **tax implications**, "constrained" the Company's ability to do a post-Merger spin-off. For example, on May 21, 2012, the start of the Class Period when Eaton announced the Merger, an analyst specifically asked if the Company was "precluded by any element of the **tax structure of the deal to spin off** the truck and automotive part at any time?" In response, Eaton's CEO, Alexander Cutler, falsely affirmed that "***[t]here is nothing in the deal per se that would prevent us from taking portfolio moves***."[3]

10. Although Defendants told investors that they had no **current** plans to divest the vehicle business, such statements failed to inform investors that it simply **was not economically possible** for Eaton to spin-off that or any other business until late 2017 because, as Defendants knew from the beginning of the Class Period but failed to disclose, such a spin-off was not possible due to the economically prohibitive tax consequences of the Merger. Defendants' statements implied that Eaton **could** do the spin-off in the next year or two, when in fact Defendants knew they **could not**. That omission rendered many of Defendants' statements

[3] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

during the Class Period about their current plans for their vehicle business or their ability to spin-off that business materially misleading.

11. Defendants also repeatedly invited investors and analysts to review the Proxy Statements for the Merger for more information regarding tax consequences of the transaction, including broader tax consequences beyond the taxation of the Cooper Acquisition itself. The Proxy Statements did not, however, disclose that a spin-off of Eaton's businesses was not possible for five years after the Merger due to economically prohibitive tax consequences of the Merger. Although the Proxy Statements contained risk warnings regarding **other** tax consequences of the Merger, such disclosures were inadequate and misleading because of Defendants' omission of the adverse facts regarding the economic prohibition on spin-offs.

12. As the Proxy Statements also revealed, Defendants performed due diligence and an in-depth analysis of the tax consequences of the Merger **before** its announcement on May 21, 2012. Accordingly, they knew of Eaton's inability to spin-off its businesses due to economically prohibitive tax consequences of the Merger from the outset of the Class Period, as Defendants, in fact, later admitted.

13. As a result, Defendants' material misstatements and omissions as alleged herein artificially inflated the price of Eaton stock, which reached a Class Period high of $79.44 **less than two weeks** before the end of the Class Period.

14. On July 29, 2014, Defendants, after years of misleading the market regarding Eaton's supposedly unfettered ability to undertake a tax-free spin-off, finally disclosed to investors that, contrary to their prior assurances, Eaton could not, in fact, spin-off its vehicle or other businesses until late 2017 due to economically prohibitive tax consequences of the Merger.

Defendant Cutler further revealed that Defendants had been "**well aware**" of this "prohibition" "**all along**" and that this was "**not new knowledge**."

15. On this news, the price of Eaton shares dropped from $76.75 per share to $70.51 per share, or over 8 percent, erasing nearly $**3 billion** from the Company's market capitalization.

16. Because of Defendants' material misstatements and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

19. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this district. Eaton has operations in this district and division, including the listing of the Company's stock on an exchange located in this District, the New York Stock Exchange ("NYSE").

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of NYSE, the world's largest stock exchange by market capitalization.

## III. PARTIES

### A. Lead Plaintiff

21. On December 13, 2016, this Court appointed South Carolina to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 45).

22. South Carolina, established in 1945, is a group trust that encompasses five defined-benefit retirement plans that provide retirement benefits to employees of state and local agencies, public school districts, police officers and firemen of the state and its political subdivisions, members of the General Assembly, judges, solicitors, circuit public defenders of the state and administrative law court judges, and certain members who served in the South Carolina National Guard. Specifically, South Carolina consists of (1) the South Carolina Retirement System, (2) the South Carolina Police Officers Retirement System, (3) the Retirement System for Members of the General Assembly of the State of South Carolina, (4) the Retirement System for Judges and Solicitors of the State of South Carolina, and (5) the South Carolina National Guard Supplemental Retirement Plan. As of June 30, 2016, South Carolina had more than $29.8 billion in total assets held in trust for pension benefits. As of the same date, South Carolina had 1,020 participating employers and more than 563,000 individual members. As set forth in its amended PSLRA certification attached hereto as Exhibit A, South Carolina purchased Eaton common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### B. Defendants

23. Defendant Eaton is an Irish corporation with principal executive offices at Eaton House, 30 Pembroke Road, Dublin 4, Ireland. Eaton was reincorporated under the laws of Ireland on May 10, 2012 in connection with the Company's acquisition of Ireland-based Cooper,

as of November 30, 2012. Prior to its 2012 reincorporation in Ireland, the Company had been incorporated in Ohio. As of December 31, 2015, Eaton had approximately 97,000 employees in over 60 countries and sold products to customers in more than 175 countries. Throughout the Class Period, Eaton common stock traded actively on the NYSE under the ticker symbol "ETN." During the Class Period, there were approximately 337 million to 476 million shares of Eaton common stock outstanding.

24. Defendant Alexander M. "Sandy" Cutler ("Cutler") was at all relevant times Eaton's Chairman and Chief Executive Officer ("CEO"). Cutler served as Eaton's Chairman and CEO from August 2000 until May 2016, when he retired. Prior to being elected Chairman and CEO in August 2000, he was Eaton's President and Chief Operating Officer from September 1995. Cutler was also a member of Eaton's Board of Directors from September 1993 until May 2016. Prior to September 1995, he had served in a variety of positions at Eaton since 1979, when Eaton acquired Cutler-Hammer, a company he had joined in 1975 as a financial analyst. Cutler was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Eaton's SEC filings (including proxy statements), quarterly conference calls, industry events, and events for analysts, investors, and the media.

25. Defendant Richard H. Fearon ("Fearon") was at all relevant times Eaton's Vice Chairman and Chief Financial and Planning Officer ("CFO"). Fearon has been Eaton's Vice Chairman and CFO from April 24, 2002 through the present. He became a member of the Board of Directors in September 2015. Prior to joining Eaton in 2002, he was a partner and founder of Willow Place Partners LLC since 2001. From 1997 to 2000, he served as the Senior Vice President of Corporate Development for Transamerica Corporation, a financial services company

that provides insurance and investment for organizations. Fearon was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Eaton's SEC filings (including proxy statements), quarterly conference calls, industry events, and events for analysts, investors, and the media.

## IV. CONTROL PERSON ALLEGATIONS

26. The Individual Defendants, by virtue of their high-level positions at Eaton, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of their collective actions.

27. Defendants Cutler and Fearon were closely involved in all aspects of the Company's operation. For example, Cutler was described in the Company's March 15, 2013 Proxy Statement as having "**detailed knowledge** of Eaton's businesses, customers, end markets, sales and marketing, technology innovation and new product development, supply chains, manufacturing operations, talent development, policies and internal functions."

28. Further, as described on Eaton's website, in Fearon's role as Chief Financial and Planning Officer, "he has responsibility for the **accounting**, control, corporate development, information systems, internal audit, investor relations, **strategic planning, tax** and treasury functions" at Eaton. Accordingly, Fearon was closely involved in all aspects of the Company's financials, including accounting, tax matters and "strategic planning." Fearon's responsibilities thus included the financial and tax due diligence for the Merger, and determining any adverse tax

implications, including tax implications preventing any potential strategic portfolio divestiture of the Company's vehicle or other businesses.

29. The Individual Defendants, as senior executive officers, and Cutler as a director, of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws, each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, so that the market prices of Eaton's publicly-traded common stock would be based on accurate information. Cutler and Fearon violated these requirements and obligations during the Class Period.

30. The Individual Defendants, because of their positions of control and authority as senior executive officers of Eaton, and Cutler as a director of the Company, were able to, and did, control the content of the SEC filings (including proxy statements), press releases, and other public statements issued by Eaton during the Class Period. Both were provided with copies of the statements at issue in this action before they were made to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Cutler and Fearon are responsible for the accuracy of the public statements detailed herein.

31. The Individual Defendants, because of their positions of control and authority as senior executive officers, and Cutler as a director, of Eaton, knew about the adverse tax implications of the Merger. They had access to the adverse undisclosed information about Eaton's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at Eaton management and Board of Directors meetings and committees thereof, and

via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Eaton materially false and misleading.

32. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Eaton common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public about the tax consequences of the Merger, including Eaton's ability to conduct tax-free divestitures; (ii) deceived the investing public regarding Eaton's products, business, operations, and management, and the intrinsic value of Eaton's common stock and options; and (iii) caused Lead Plaintiff and members of the Class to purchase Eaton common stock and options at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

### A. Eaton's Business Overview

33. Eaton began in 1911 as the Torbensen Gear & Axle Company, a New Jersey corporation. It produced patented truck axles, including the first ever gear-driven rear truck axle. To be closer to the automotive industry it served, the Company moved to Ohio in 1915 under the name Torbensen Axle Co., where it reincorporated in 1916. For most of its history, Eaton was primarily a vehicle component manufacturer.

34. More recently, however, Eaton adopted a business model of growing and pruning its product portfolio through mergers, acquisitions, asset sales, spin-offs and other divestitures in order to focus more on its electrical components businesses and less on its vehicle business. For example, in 1994, Eaton acquired the Westinghouse Electric Corporation Distribution and Control Business Unit for approximately $1.1 billion, gaining product lines in industrial controls and power distribution markets. In 1997, it divested part of its legacy truck axle and brake

business to Dana Corporation for $287 million. In 1999, Eaton acquired Aeroquip-Vickers, a manufacturer of industrial and aerospace hydraulics, for approximately $1.7 billion. In 2000, it spun off its semiconductor equipment subsidiary Axcelis Technologies Inc. for proceeds of approximately $300 million on a tax-free basis. In 2008, it added further to its presence in electrical products and services markets when it acquired the power supply company Phoenixtec Power for approximately $568 million, followed by the Moeller Group (an electrical components company) for nearly $2.0 billion. Through these acquisitions and divestitures, the Company's products broadened significantly to include electrical hardware (such as powerline equipment), electrical systems and services for power distribution and control (such as grid maintenance and metering) and other non-vehicle products.

35. The market reacted favorably to this strategy, and Eaton's share price grew steadily over time. From Eaton's announcements of the Westinghouse acquisition on August 12, 1993, to the announcement of the Moeller Group acquisition on December 20, 2007, the Company's adjusted share price quintupled (from adjusted close stock price of $9.84 per share to $47.44 per share).

36. By the start of the Class Period, Eaton sold its products through five business segments: Electrical, Hydraulics, Aerospace, Automotive, and Truck.

### B. Start of Class Period: Eaton Acquired Cooper—a Key Step in Its "Transformation" into an Electrical-Focused Company

37. The Company's strategic shift toward electrical products culminated in the Company's May 21, 2012 announcement of its acquisition of, and related Merger, with Irish-headquartered Cooper, for $11.8 billion. Cooper was primarily an electrical products manufacturer. According to Defendants, the acquisition was intended to "significantly increase the capabilities and geographic breadth of the combined company's power management portfolio

and electrical business." As a result of the Merger, **approximately 60%** of the combined Company's revenues and profits would be generated by its electrical businesses.

38. Indeed, Defendant Cutler repeatedly stated that the Cooper transaction was "a **game changer**," a "**transformational** acquisition," and "an **enormously transformative** deal for Eaton," particularly for its transition to an electrical products-focused portfolio. For example, on the May 21, 2012 conference call, he stated: "We believe that the bringing together of these two companies results in an enterprise that is increasingly well-positioned for growth, **as we focus on this continuing theme of power management**" and "about 45% of Eaton in 2011 is our **electrical** business. Post the acquisition of Cooper, you can see that moves to 59%. So **a real growth of our electrical capability** and quite an impact on our mix."

39. Similarly, at the May 31, 2012 Sanford C. Bernstein & Co. Strategic Decisions Conference, Cutler emphasized:

> "[The Cooper acquisition] **is an enormously transformative deal for Eaton** and one that we are really quite excited about. And perhaps the easiest way to think about this is if you think about Eaton's electrical business today, which is a little less than 50% of the Company, it will become based on 2011 sales approximately 59% of the Company. **This forms a very powerful electrical Company** within Eaton…."

40. The following year, at the May 21, 2013 Electrical Products Group ("EPG") Conference, Cutler delivered a presentation hailing the Cooper transaction as "**transformational**," specifically in the context of how its product "**portfolio has changed very substantially**."

41. Eaton's announcement of the Merger was consistent with investor expectations that the Company would continue realigning its product portfolio away from legacy truck and automotive products, and toward electrical products and services. For example, on November

27, 2012, after the merger was approved by the Irish High Court, a Wells Fargo analyst report summarized the Company's transformation as follows:

> **ETN has undergone a metamorphosis to generating a majority of its revenue and operating profit from its Electrical businesses**…. **With the addition of Cooper, ETN's business mix becomes further weighted to Electrical and shifts away from exposure to vehicle markets.** Ultimately, we expect this to have a positive impact on earnings growth trajectory over the next few years and potentially lead to higher stock price valuation levels.

42. As a Morgan Stanley analyst report from July 14, 2014 stated, "[g]iven that management has clearly pointed to the non-Vehicle businesses as its core strategic focus, **the question regarding a possible spin[-off] of Auto & Truck has come up in many investor events"** since the Merger.

43. In short, the market expected Eaton to further its strategic realignment towards its electrical business, and thus increase return on their investment, by divesting at least part of its vehicle segment.

### C. Defendants Disclosed the Beneficial Tax Consequences of the Merger, But Not the Harmful Ones

44. The Merger had significant tax consequences. Under the agreement, Eaton would acquire Cooper through the formation of a new Irish holding company. The transaction resulted in Eaton's re-domiciling its headquarters and reincorporating from Cleveland, Ohio to Dublin, Ireland. The Company stated that this change would allow Eaton to lower its corporate tax rate, resulting in tax benefits of $160 million a year to shareholders. Indeed, Defendants repeatedly touted these tax benefits in announcing the Merger. For example, on the May 21, 2012 call, Cutler stated: "The **financial benefits [of the Merger]**, as I mentioned, **are attractive and substantial**; $375 million of operating synergies with over 80% of them realized by the third

year, and **$160 million of** global cash management and **resultant tax benefits** in the mature year. And as you'll see, those come on board very quickly."

45. On November 30, 2012, Eaton completed the acquisition of Cooper for **$13 billion**, $1.2 billion more than the amount stated in its initial announcement of the transaction. In Eaton's related press release on November 30, Cutler described the Merger as follows: "The $13 billion acquisition of Cooper, the largest in Eaton's 101-year history, is a **transformational milestone** that expands our market segment reach, broadens our portfolio of products, services, and solutions, and strengthens our global geographic footprint."

46. By the end of 2012, the Company reported a corporate tax rate of roughly 8% – even lower than most analysts expected. By the end of 2013, the tax rate was down to 5%. Defendants continued to tout these tax benefits of the Merger throughout the Class Period. For example, at the February 5, 2013 earnings call, Cutler highlighted Eaton's tax rate by the end of 2012: "Tax rate of 7% to 9%, in line with our expectations when we announced the Cooper deal last spring and reflects the -- as you remember, the **$160 million of synergies that we said we would get on the tax line**."

47. Accordingly, Defendants disclosed the beneficial tax consequences and other beneficial aspects of the Merger, but not the negative consequences related to Eaton's ability to spin-off its businesses.

### D. Analysts and Investors Understood That a Spin-off of Eaton's Vehicle Business Was More Advantageous Than Other Types of Divestitures

48. Throughout the Class Period, analysts and investors understood that a spin-off of Eaton's vehicle businesses would be far more beneficial than a sale, for the simple reason that a spin-off would be tax-free while a sale would incur high taxes. For instance, on June 7, 2012,

shortly after Eaton announced the Merger, a Vertical Research Partners analyst report considered the outcome if the legacy businesses were sold rather than spun-off tax-free:

> **Spin-offs could even be more compelling [than a sale] and create the potential for additional creative strategic combinations**…. We estimate Auto and Tools could provide **gross pre-tax proceeds of ~$1.6B[illion]**.... We would note however that Auto is legacy ETN Segment so **there is a chance an outright sale would have significant tax leakage**. In the face of higher post deal leverage and difficult 2013 outlook, the cash hit from tax leakage may make management more hesitant to pursue a sale in the near term.

Thus, the report specifically concluded that a tax-free spin-off of Eaton's vehicles businesses was superior to a taxed sale of the same.

49. An October 31, 2012 Vertical Research analyst report reiterated this point: "We continue to believe that ETN **should spin-off** Auto and Truck (and maybe Hydraulics) after the CBE deal closes. **A spin eliminates tax leakage associated with a sale** and the new spincos would be Irish."

50. Similarly, in a February 5, 2013 analyst report, Jefferies saw "**the potential** sale or **spin of the auto and truck businesses (the new Vehicle segment) as a final step in Eaton's transition to a more electrical/multi-industry business model**." The report conducted a detailed analysis of the tax implications if Eaton were to sell its "less core" businesses and concluded that **a sale of the Vehicle Segment "would appear to make less sense at present"** because of the large tax liability it would incur:

> Increasingly investors are focusing on the potential value that could be unlocked from the divesting of the Truck and Auto Components businesses as they appear to be less "core" now that nearly 60% of earnings will be attributed to the Electrical business. **We have run a scenario (Exhibit 7) in which both businesses are sold at 1.0x LTM Sales incorporating a 35% tax rate, and using half the proceeds to pay down debt and half in share repurchases. Given the recent strong performance of ETN stock, this divestiture would appear to make less sense at**

> **present**, but could still remain a longer term option, in our view, if the stock should hit a patch of underperformance.

51. Similarly, a July 15, 2014 report from Deutsche Bank explained: "Because the Vehicle business dates back so many years (remaining segment acquisitions such as Ag Transmissions have been relatively few), the associated book value would appear to be extremely low. As such, a **sale** of Truck would face **significant U.S. and (other jurisdiction) tax** applied to the gains. In turn, we believe it ultimately would make **more sense to spin the business off to shareholders (on a tax-free basis).**"

52. Moreover, analysts also recognized that a spin-off could generate capital to help pay off Eaton's substantial debt and offer other strategic and economic benefits. For instance, as the June 7, 2012 Vertical Research analyst report explained:

> While spins would not bring sale proceeds per se, ETN could push debt down onto these entities and/or pull dividends out. We [believe] spin-offs are the most interesting scenario because the auto/truck spinco(s) could be Irish companies and therefore open up a strategic pathway for a suitor to redomicile just as ETN is doing with CBE and Pentair is doing with Tyco Flow.

53. Accordingly, analysts and investors understood that for Eaton, a tax-free spin-off of its Vehicle business was far more advantageous than a sale or other form of divestiture.

### E. Throughout the Class Period, Defendants Repeatedly Assured the Market that the Merger Did Not Prevent Eaton from "Spinning Off" Its Vehicle or Any Other Business

#### 1. May 21, 2012 – Defendants Announced the Merger and Concealed the Tax Consequences on Eaton's Ability to Spin-Off Its Businesses

54. On May 21, 2012, Eaton announced the Merger and held a conference call with investors to discuss it. On the call, Cutler implied that the Company had conducted a full assessment of the Merger's tax consequences, touting "resultant tax benefits of $160 million a year."

55. In the May 21 press release announcing the Merger, the Company raised the possibility of future asset sales as a means of refinancing the large amount of debt that Eaton took on to finance the acquisition: "Eaton has secured a $6.75 billion fully underwritten bridge financing commitment from Morgan Stanley Bank, N.A., Morgan Stanley Senior Funding, Inc. and Citibank, N.A. to finance the cash portion of the Acquisition. Eaton plans to later refinance these bridge borrowings through a new term debt issuance, use of cash on hand, **and the possible sale of assets**."

56. Further, Defendant Cutler's remarks on the call were accompanied by a slideshow presentation, in which a slide described Eaton's long-term strategy, yet conspicuously omitted any reference to the Company's vehicle businesses. Based on this information, together with the May 21 press release noting "the possible sale of assets" for a future refinancing, numerous analysts made a reasonable connection between the Merger and a potential, future spin-off or other divestiture of Eaton's vehicle businesses.

57. Several analysts questioned Defendants about this very possibility on the call. Indeed, a news article on June 4, 2012 by *Crain's Cleveland Business* titled "Eaton Shift Away From Trucks Long In Coming; Acquisition Continues Manufacturer's Focus On Electrical Business," stated that "in viewing a slideshow presentation on Eaton's website that served as a companion to its May 21 teleconference, a few analysts made note during the call that references to the company's Truck and Automotive segments were conspicuous by their absence in a slide discussing Eaton's long-term strategy." Investors and analysts thus recognized the value-creating potential of such a spin-off.

### (a) Defendants Misrepresented Eaton's Ability to Spin-Off Its Vehicle Business in Response to Analysts' Direct Questions About It

#### (i) Misstatement No. 1: Cutler Misled by Saying that Such a Spin-off Was Not in Eaton's "Active Planning"

58. Given Defendants' statements in the May 21, 2012 press release and earnings call presentation raising the possibility of a future divestiture of its vehicle business, a Vertical Research analyst asked Defendant Cutler the following on the May 21 call: "And then finally, just thinking about we'll all fast forward to what's next in the portfolio after the dust settles here today. You mentioned electrical hydraulic era. **You obviously didn't mention truck or auto**. You're looking a lot more like an electrical company. **Should we expect more portfolio evolution over time?**" Cutler responded that there was "***not in our active planning any substantial, additional change in the portfolio as a result of this transaction.***" Thus, Cutler indicated that the lack of changes to Eaton's portfolio was a fully informed, "active planning" choice, further confirming the implication that the Company was fully aware of the tax consequences of the Merger. This statement was misleading because he failed to disclose the reason why the Company had no planned divestments, active or otherwise: it was prevented, by economically prohibitive tax consequences of the Merger, from doing a spin-off for five years, a fact that Defendants knew "all along" but concealed from investors. In addition, by omitting this adverse information, Cutler created the false impression that Eaton **could** spin-off the vehicle business, but simply was **choosing** not to do so at this time, when in reality it **could not** do so because of the economically prohibitive tax consequences of the Merger.

#### (ii) Misstatement No. 2: Cutler Misrepresented that "There [Was] Nothing" in the "Tax Structure" of the Merger that "Would Prevent" a "Spin-off"

59. The fact that Defendants were fully aware of the tax consequences of the Merger was made explicit by an interaction with an analyst from Gabelli & Co. later on the same call. Following up on Cutler's prior misstatement, he asked Cutler directly: "**Are you precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time**?" Defendant Cutler falsely answered: "***There is nothing in the deal per se that would prevent us from taking portfolio moves***," repeating that the only limitation was the fact that they "have no such plans." Cutler's statement was false and misleading because it omitted that Eaton was not able to spin-off the vehicle business for five years after the Merger due to economically prohibitive tax consequences of the Merger. Contrary to Cutler's assurance, Eaton was in fact economically "prevent[ed] from taking portfolio moves," *i.e.* spinning off the business, by the "tax structure of the deal."

60. Moreover, as discussed *infra* at ¶66, a third analyst (from Bank of America Merrill Lynch) later asked Defendants on that May 21 call for specifics about the tax consequences of the Merger. In response, Fearon directed him to the forthcoming proxy statement, creating the reasonable expectation that the proxy statement would outline all material tax consequences of the Merger, as discussed *infra* at Section V.E.2.(a).

### (b) Analysts' Favorable Reactions to Defendants' Misstatements on the May 21 Call Support the Statements' Materiality

61. The market reacted positively to Defendants' representation on the May 21 call that "nothing in the deal per se would prevent" Eaton from divesting any of its businesses and similar assurances. A Wells Fargo analyst report issued on the same day reiterated its "Outperform" rating and price target and favorably noted: "To fund the approximate $6.3 billion

cash portion of the transaction, ETN has secured a $6.75 billion bridge loan, which it plans to refinance later through new term debt issuance, use of cash on hand **and possible asset divestitures**."

62. A Vertical Research Partners analyst report issued on June 7, 2012 maintained its "Buy" rating, stressing the Company's "**potential**" for a **tax-free spin-off** of its Automotive and Truck businesses as a "compelling" catalyst for the stock, which would "likely" occur in 2013:

> **Ultimately Asset Sales or Spin-offs Should be Expected –** We think ETN will continue to move its portfolio away from cyclical exposures toward more electrical.... **[W]e see ETN's Auto and Truck business as potential candidates for sale or spin-off. Any disposition of Auto and/or Truck is likely a 2013 event**. The potential to spin Auto and or Truck as new Irish companies, providing a path for a suitor to re-domicile just as ETN is doing with CBE and Pentair is doing with Tyco Flow, could be a very compelling proposition.... **Spin-offs could even be more compelling and create the potential for additional creative strategic combinations**.

Further, in highlighting a spin-off as a catalyst for the stock, the report noted the Company's statement in its May 21, 2012 press release that it planned to refinance the acquisition in part through "the possible sale of assets":

> **Asset Sales or Spin-Offs Could Follow Acquisition[.]**... **[U]ltimately we believe the Auto and or Truck segment could be divested or spun-off** although the timing of when that might happen is less certain. Post close we do expect management to confront questions about **future divestitures given language in the acquisition press release about asset sales** along with a continued portfolio migration towards electrical. Selling Auto post deal would put ETN's late cycle exposure (Aero + Electrical) at >70% of total revenues and would reduce the overall cyclicality of the business even more so. Selling Truck and Auto would put late cycle revenues above 80%.

63. Similarly, news reports after the May 21 conference call also described investors' and analysts' interest in the potential for a spin-off after the Merger. For instance, a June 4, 2012 article by *Crain's Cleveland Business* titled "Eaton Shift Away From Trucks Long In Coming;

Acquisition Continues Manufacturer's Focus On Electrical Business," reported on Cutler's statements at the May 21, 2012 conference call and the public's continued questions regarding "whether Eaton might sell or spin off either its Automotive or Truck segments," despite Defendants' statements that they had no current plans to do so.

### 2. Eaton's June 22, 2012 Preliminary Proxy Statement Did Not Disclose the Merger's Five-Year Economic "Prohibition" on Spin-Offs Due to Adverse Tax Consequences of the Merger

64. On June 22, 2012, Eaton filed with the SEC a Preliminary Proxy Statement in connection with its Form S-4 registration statement under the Securities Act of 1933 for the Merger (the "Preliminary Proxy"). The filing included a communication to shareholders inviting them to attend a special meeting (on an undetermined date) for a vote on whether to approve the Merger, and recommending that they vote to approve it.

#### (a) Defendants Had Directed Analysts' Questions about Tax Consequences of the Merger to Eaton's Proxy Statements

65. Eaton's May 21, 2012 press release announcing the Merger specifically directed the market "<u>TO READ … CAREFULLY</u>" the forthcoming joint proxy statement for further details about the Merger.

66. Likewise, when an analyst from Bank of America Merrill Lynch asked for specifics regarding the tax consequences of the Merger on the May 21, 2012 call, Fearon directed him to the upcoming Proxy statement because, even though the legal structure of the deal was already determined and vetted, it was complex:

> [Analyst:] And then the second question on tax structure. I thought one of the issues with making a large acquisition or an acquisition of foreign domiciled entity, because Eaton's tax mechanism[s] are structured in a very specific way. So how do you buy Cooper and reincorporate without undoing all the tax systems that you have inside the Company?

[Fearon:] Andrew, **we will detail out the precisely [sic] legal structure [in] the proxy** that will be filed within the next few weeks. **I think you really do need to go through the detail to understand how the legal structure works for the transaction.** We are very comfortable with the transaction, and it's been thoroughly vetted by many more lawyers than I care to count.

In directing the analyst to the upcoming Proxy for "detail" of the deal's "precise[] legal structure" to be filed "within the next few weeks," Fearon further confirmed that Defendants had completed due diligence and knew about, and would disclose, the Merger's full tax implications. Stated differently, in directing investors and analysts to the upcoming Proxy statement, Fearon created a reasonable expectation that the Proxy would outline all material risks of the Merger, including any tax regulations that could limit Eaton's ability to engage in a spin-off of its businesses.

**(b) Misstatement/Omission No. 3: The Preliminary Proxy**

67. In the Preliminary Proxy, Eaton's directors (including Cutler as Chairman of the Board) "accept[ed] responsibility for the information contained" in the Preliminary Proxy, "[t]o the best of the knowledge and belief of the directors of Eaton (who have taken all reasonable care to ensure such is the case)," including specifically that its information "**is in accordance with the facts and *does not omit*** anything likely to affect the import of such information." This statement was false and misleading because the Preliminary Proxy **did omit** adverse, material facts regarding Eaton's inability to spin-off its businesses for five years after the Merger due to economically prohibitive tax consequences of the Merger, which rendered their other disclosures misleading, as discussed below.

68. The Preliminary Proxy outlined numerous risk warnings, including an extensive discussion of the Merger's tax consequences, with sections titled, for example, "U.S. Federal Income Tax Considerations," "Tax Consequences of the Transaction to Eaton and New Eaton,"

and "Irish Tax Considerations." These warnings regarding tax consequences were not limited to the taxation of the acquisition itself, but included broader tax implications from the Merger, such as those implicated by Internal Revenue Code Section 7874:

> Section 7874 provides an exception under which a foreign incorporated entity may, in certain circumstances, be treated as a U.S. corporation for U.S. federal income tax purposes.
>
> …
>
> Following the acquisition of a U.S. corporation by a foreign corporation, section 7874 can limit the ability of the acquired U.S. corporation and its U.S. affiliates to utilize U.S. tax attributes (including net operating losses and certain tax credits) to offset U.S. taxable income resulting from certain transactions.

In discussing these broader tax consequences, the Preliminary Proxy also reassured investors: "A corporation generally is considered a tax resident in the jurisdiction of its organization or incorporation for U.S. federal income tax purposes. **Because New Eaton is an Irish incorporated entity, it would be classified as a foreign corporation (and, therefore, a non-U.S. tax resident) under these rules.**"

69. However, the Preliminary Proxy made no mention of Eaton's inability to spin-off its businesses for five years after the Merger due to economically prohibitive tax consequences of the Merger. The Preliminary Proxy omitted this information even though it outlined numerous risk warnings regarding tax consequences that were not limited to the taxation of the acquisition itself, but included broader tax implications from the Merger, and was an issue analysts had raised with Defendants at the May 21, 2012 conference call discussing the Merger, to which Defendants responded by directing them to the Preliminary Proxy, *see* Section V.E.2.(a), *supra*. Thus, the Preliminary Proxy failed to disclose to investors what Defendants knew "all along"—that Eaton was not able to spin-off any business for five years from the

Merger due to economically prohibitive tax consequences of the Merger under applicable Internal Revenue Code tax laws.

70. Further, Defendants' various risk warnings in the Preliminary Proxy regarding the potential tax consequences of the transaction were inadequate and themselves misleading in that they omitted to disclose this adverse information that was known to Defendants by that time. In particular, Defendants' risk warnings did not enable Eaton investors and analysts to learn about the negative tax implications of the Merger that would economically prohibit Eaton from doing a tax-free spin-off for five years, as demonstrated by continued investor and market interest in such a spin-off as a "viable option" throughout the Class Period.

#### (c) The Preliminary Proxy Also Revealed that Defendants Had Conducted Tax-Related Due Diligence Before Announcing the Merger, Raising a Strong Inference of Their Knowledge of the Spin-Off Tax "Prohibition" Before Their First Misstatements

71. The Preliminary Proxy contained new details about the Company's due diligence, including Defendants' (and specifically Cutler's) scrutiny into the tax consequences of the Merger as early as March 2012. Specifically, Defendants represented that:

> **On March 26, 2012, Mr. Cutler** contacted Mr. Hachigian [Cooper's CEO] to express Eaton's need to understand more about Cooper's **corporate and tax structure** in order to further evaluate the terms of a potential transaction. As a result of this conversation, **on March 29 and 30, 2012**, representatives of Eaton[4] and of its outside tax advisor met with representatives[5] of Cooper in Houston, Texas **for purposes of conducting due diligence with respect to tax matters**.

[4] A subsequent disclosure in Eaton's Definitive Proxy Statement identified the Eaton "representatives" as follows: John S. Mitchell, Eaton's Senior Vice President – Taxes; and Patricia L. Hennis, Eaton's Vice President – Federal Tax Strategy. *See* Section V.E.3, *infra*.

[5] A subsequent disclosure in Eaton's Definitive Proxy Statement identified the Cooper "representatives" as follows: John B. Reed, Cooper's Vice President, Taxes; David A. Barta, Cooper's Senior Vice President and Chief Financial Officer; and Bruce M. Taten Jr., Cooper's Senior Vice President, General Counsel and Chief Compliance Officer. *See* Section V.E.3, *infra*.

This "due diligence **with respect to tax matters**" included a full analysis of normally anticipated tax issues, including an analysis of issues about which the Company was on notice, such as restrictions on its ability to conduct acquisitions or divestitures – an important part of its business model, *see* ¶34, and an issue that analysts raised with Defendants since the Merger was announced. *See* Section V.E.1, *supra*.

72. Thus, the Company's due diligence for the Merger resulted in Defendants being informed of a tax consequence as important as a five-year economic prohibition on spin-offs by **March 29-30, 2012**, and certainly no later than the deal's announcement on May 21, 2012. This is consistent with Defendants' subsequent revelation almost two years later, on July 29, 2014, that Defendants knew "**all along**"—*i.e.* before they announced the Merger and made their false and misleading statements on the May 21, 2012 call—that as a result of the Merger, the Company faced a tax-related "prohibition" making it "not able to do a tax-free spin[-off] of any business for five years."

**(d) After the Preliminary Proxy, Analysts Further Highlighted the Spin-Off as a Positive "Viable Option," Demonstrating the Materiality of Defendants' Omission**

73. In the months after Eaton's May 21, 2012 announcement of the Merger and release of its Preliminary Proxy, stock analysts continued to highlight Eaton's ability to spin-off the vehicle business after the Merger as a positive for the Company's stock.

74. For example, a July 24, 2012 MKM Partners report reiterated its "Buy" rating on Eaton, commenting that the "greater electrical exposure and the potential for sufficient critical mass to warrant a sale or **spin of the vehicle businesses could be a positive for ETN's valuation**."

75. Likewise, an August 21, 2012 KeyBanc Capital Markets analyst report reiterated its "Buy" rating on Eaton and raised its price target (from $56 to $58), "highlighting ETN as a

top idea ahead of the CBE [Cooper] acquisition" and noting a future **spin-off** of the "non-core" vehicle businesses as a "**viable option**," notwithstanding Defendants' statements that they had no plans to do so at the time: "**We see options to potentially spin-off assets deemed as potentially non-core over time (namely Truck and Auto),** while aligning resources/focus on its core Electrical, Aerospace and Hydraulic platforms." With respect to time frame, the report further explained that Defendants may "**spin-off**" the vehicle businesses after "the next year or two" from the Merger—*i.e.* **in late 2013 or 2014**—given that such "portfolio changes would further underscore ETN's shift to a multi-industry company," and noting specifically that "**a spin-off** of the Truck/Auto segments would result in Electrical becoming an increasingly larger piece of the business at nearly 75% of the mix, with Hydraulics at 15% and Aerospace at 10%."

### 3. Eaton's September 14, 2012 Proxy Statement Again Did Not Disclose the Merger's Five-Year Economic "Prohibition" on Spin-Offs Due to Adverse Tax Consequences

76. On September 14, 2012, Eaton filed with the SEC a Definitive Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Proxy") inviting shareholders to attend a special meeting on October 26, 2012, and recommending that they vote to approve the Merger.

77. As noted above, Defendants pointed investors and analysts to the Proxy for answers about their questions concerning the Merger's tax implications. *See* Sectin V.E.2.(a), *supra*.

#### (a) Misstatement/Omission No. 4: The Proxy Repeated Defendants' Omission and Misleading Disclosures Regarding the Merger's Economic "Prohibition" on Spin-Offs for Tax Reasons

78. The Proxy contained substantially similar statements to those in the Preliminary Proxy. Specifically, it provided substantially similar descriptions of the structure of the proposed

transaction to merge with Cooper in detail and outlined numerous risk warnings, including an extensive discussion of the Merger's tax consequences, which were insufficient and themselves misleading for the reasons stated above. *See supra* ¶¶67-70. Eaton's directors (including Cutler as Chairman of the Board) continued to "accept responsibility for the information contained" in the Proxy, "[t]o the best of the knowledge and belief of the directors of Eaton (who have taken all reasonable care to ensure such is the case)," including specifically that this information "**is in accordance with the facts and *does not omit*** anything likely to affect the import of such information."

79. Further, the Proxy contained new details about Defendants' due diligence, including its scrutiny into the tax consequences, of the Merger after the tax-related due diligence on March 29-30, 2012 that had been discussed in the Preliminary Proxy (*see* ¶71, *supra*). For example, the Proxy stated that "after the Eaton board meeting **on April 5, 2012**, Mr. Cutler sent a letter to [Cooper CEO] Mr. Hachigian setting forth a proposal for the acquisition of Cooper," including that post-Merger "the surviving parent entity would be incorporated outside the United States" because of the "advantages currently enjoyed by Cooper as a result of its non-United States incorporation," such as "**greater flexibility** and lower cost of cash management . . . as well as a lower worldwide effective tax rate." The Proxy further explained the tax-related "flexibility and associated financial benefits" that Eaton would enjoy post-Merger by incorporating in Ireland, "**without negative tax effects**:"

> **It was ultimately concluded** that incorporating in Ireland would provide the combined entities with enhanced global cash management and **flexibility and associated financial benefits,** including increased global liquidity and free global cash flow among the various entities of the combined enterprise **without negative tax effects. Eaton also considered all the requirements of section 7874 of the Code**, including the requirement that former stockholders of Eaton own less than 80%,

> by vote and value, of the stock of New Eaton, as well as other applicable laws.

80. However, although the Proxy stated that there were "**no negative tax effects**" of the Merger, like the Preliminary Proxy, it omitted that Eaton was not able to spin-off its businesses for five years after the Merger due to economically prohibitive tax consequences of the Merger. Thus, it repeated Defendants' omission as to what Defendants knew "all along"—that Eaton was economically prohibited from engaging in a spin-off of any business for five years from the Merger due to adverse Internal Revenue Code tax laws.

#### (b) The Proxy Provided New Details About Defendants' Due Diligence, Further Strengthening the Inference that They Knew About the Tax Prohibition on Spin-Offs Before the Class Period

81. The Proxy also provided new information detailing Cutler's and Fearon's involvement in the Merger due diligence efforts after Cutler's April 5 letter. Specifically, it stated that "on **April 12, 2012**, Mr. **Cutler**, Richard H. **Fearon**," and other Eaton senior executives[6] met with Cooper's CEO and other senior executives "for purposes of conducting due diligence as to various matters."

82. Further, Defendants specifically represented that Eaton subsequently engaged in additional "due diligence with respect to **tax matters**":

> On April 23, 2012, Mr. Mitchell and Ms. Hennis of Eaton, Mary E. Huber, **Eaton's mergers and acquisitions counsel, and Eaton's outside tax advisor** met with Messrs. Reed and Monesmith of Cooper in Houston, Texas for purposes of conducting **due diligence with respect to tax matters.** Over the course of the following weeks, **additional diligence discussions occurred**

---

[6] Specifically: "Eaton's Vice Chairman and Chief Financial and Planning Officer, Mark M. McGuire, Eaton's Executive Vice President and General Counsel, Thomas S. Gross, Eaton's Vice Chairman and Chief Operating Officer—Electrical Sector, and Cynthia K. Brabander, Executive Vice President and Chief Human Resources Officer."

**between members of Eaton and Cooper management and their outside advisors**.

83. Eaton's conclusion "that incorporating in Ireland would provide the combined entities with enhanced global cash management and flexibility and associated financial benefits," *see* ¶79, *supra*, and its related due diligence, including specifically the "due diligence **with respect to tax matters,**" would have included a full analysis of normally anticipated tax issues, including an analysis of issues about which the Company was on notice, such as economic prohibitions on its ability to conduct acquisitions or divestitures -- an important part of its business model, *see* ¶34, and an issue analysts raised with Defendants since the Merger was announced. *See* Section V.E.1, *supra.*

84. Thus, the Company's due diligence for the Merger resulted in Defendants being informed of a tax consequence as important as a five-year economic prohibition on spin-offs by **late March or April of 2012**, and certainly no later than "the following weeks" pending the deal's announcement on May 21, 2012. Again, this is consistent with Defendants' subsequent revelation almost two years later, on July 29, 2014, that Defendants knew "**all along**"— that as a result of the Merger, the Company faced a tax "prohibition" making it "not able to do a tax-free spin[-off] of any business for five years."

**(c) After the Proxy, the Market Continued to React Favorably to Eaton's Purported Spin-off Ability, Further Demonstrating the Materiality of Defendants' Misstatements and Omissions**

85. After the filing of the Proxy and before the shareholder meeting on October 26, 2012 to approve the Merger, analysts continued to highlight Eaton's ability to divest its vehicle businesses as a positive for the Company's valuation. For example, on October 10, 2012, an MKM Partners analyst report stated that it had "downgraded the sector" that included Eaton, as a whole, but then highlighted "**[w]hat we need to get positive**" (emphasis in original) on Eaton

specifically: "the [valuation] multiple expansion **potential**" driven by the "**potential Auto/Truck sale**."

### 4. Defendants Continued to Mislead the Market with Reassurances Regarding the Viability of a Business Spin-Off as Market Interest Intensified

86. Throughout the Class Period, Defendants misrepresented and created the misleading impression that Eaton was not prohibited from divesting its assets, including by any economically prohibitive tax consequences of the Merger. Such reassurances became increasingly important after the closing of the Merger as new facts emerged, which indicated to investors and analysts that the time was right for strategic spin-offs, particularly for Eaton's vehicle business.

#### (a) Misstatement No. 5: Cutler's Misstatement at the October 31, 2012 Earnings Call

87. On October 31, 2012, Eaton held an earnings call to discuss its financial results for the third quarter of 2012. The Company's sales from its Truck segment were down 23% on a year-to-year basis, and fell in the quarter by 12% compared to the previous quarter. Similarly, sales volumes from its Automotive segment decreased 12% year-to-year and 8% from the previous quarter. In contrast, the Company's electrical businesses experienced what Cutler termed "an outstanding quarter, a record quarter in terms of revenues and operating profits," and "a real headline quarter."

88. During the call, an analyst from Jeffries & Company asked Defendant Cutler what he called a "bigger question" than those he previously asked: "In 2013 is there **anything from a regulatory basis vis-a-vis, I guess, the acquisition of Cooper that would prevent you from doing additional divestitures** if you wanted to?" In response, Defendant Cutler stated, in full: "***No. There wouldn't be any—no regulatory restrictions***." Cutler's statement was false and

misleading because it omitted that Eaton was not able to spin-off any business for five years from the Merger due to economically prohibitive tax consequences of the Merger under applicable tax regulations, which effectively imposed "regulatory restrictions" on Eaton's spin-off ability.

### (b) Misstatement No. 6: Cutler's Misstatement at the November 13, 2012 Goldman Sachs Industrials Conference

89. Shortly thereafter on November 13, 2012, Cutler attended the Goldman Sachs Industrials Conference. A member of the audience, presumably an analyst, observed that "[t]here is a lot of talk of the ability to divest businesses that you may not necessarily think are core any more or to change the profile of the Company." The speaker went on to ask Cutler, "what is the thought in terms of **the ability** if you decided to sell some of those businesses? **Is it a spin out**? There is a market to be able to sell and what's your thought on things like that?" In response, Cutler falsely assured: "Yes, ***there is nothing structural in our deal structure or any of our covenants that, it prevents us from making changes in our portfolio***." Cutler's statement was false and misleading because it omitted that Eaton was not able to spin-off any business for five years from the Merger due to economically prohibitive tax consequences of the Merger. Thus, contrary to Cutler's assurance, there were undisclosed "structural" aspects of the "deal" that "prevent[ed]" Eaton "from making changes in [its] portfolio" – *i.e.* spinning off the non-core businesses – for five years after the Merger.

### (c) Analysts Were Reassured by Defendants' Continued Misstatements and Omissions, Further Underscoring Their Materiality

90. The market reacted positively to these reassurances. For instance, an October 31, 2012 Vertical Research analyst report, issued immediately after Eaton's October 31, 2012 earnings call, reiterated its "Buy" rating on Eaton and its continued belief that Eaton "**should**

**spin-off Auto and Truck** (and maybe Hydraulics) after the CBE [Cooper] deal closes." The report explained that "[e]xiting Auto/Truck [w]ould [h]elp" Eaton's valuation, noting that a spin-off in particular was compelling because it was tax-free (as opposed to a taxable sale) and "the new spincos would be Irish," which "would likely attract[] a suitor looking for a vehicle (no pun intended) to re-incorporate"—thus, making it "**a move [that] would accelerate and cement the [positive] re-rating of ETN shares.**"

91. Similarly, a December 26, 2012 MKM Partners analyst report reiterated its "Buy" rating and increased its price target to $61 (from $57), citing the Cooper Acquisition as "transformational" and the analysts' belief that Eaton "has multiple paths to value creation as it unlocks synergies [from the Cooper Acquisition] and receives credit in valuation for the electrical-focused portfolio." The belief was based in part on the analysts' conviction that Eaton "may hasten this appreciation [in value] through **further shifting of the portfolio by spinning off noncore assets**," which it estimated would occur over the next "**several quarters**."

92. Further, a later analyst report specifically referenced Defendant Cutler's November 13, 2012 misstatement above that "***there [was] nothing structural in our deal structure or any of our covenants that [] prevents us from making changes in our portfolio***" as fueling the market's continued interest in in the possibility of a Vehicle business spin-off for Eaton. Specifically, an April 2, 2013 Morgan Stanley report stated:

> Since management has clearly pointed to Electrical, Aerospace and Hydraulics as its key growth units, **the question regarding a possible spin of Eaton's Auto and Truck businesses has come up** at many conferences and investor events. **In response, management has stated that while the Cooper transaction does not have any covenants that prevent it from taking any further strategic actions**, it **currently** has no plans to make material changes to Eaton's portfolio.

**(d) Eaton's February 2013 Restructuring of Its Automotive and Truck Businesses Into a Single "Vehicle Segment" Further Increased Market Focus on a Potential Spin-Off**

93. After the Merger, Eaton's realignment of its product portfolio – towards the electrical business and away from the automotive and truck businesses – continued. On February 5, 2013, the Company issued a press release announcing a major reorganization: going forward, Eaton would consolidate the truck and automotive business segments into only one "Vehicle segment," while expanding the electrical business into "two segments, the first named Electrical Products and the second named Electrical Systems and Services." Thereafter, the Company's five business segments were Electrical Products, Electrical Systems and Services, Hydraulics, Aerospace, and Vehicle.

94. As a result of Eaton's restructuring, analysts grew even more focused on their belief that Eaton was preparing to spin-off its Vehicle business. For example, a Jefferies analyst report issued on February 5, 2013 maintained its "Hold" rating on the stock, commenting: "**we still see the potential sale or spin of the auto and truck businesses (the new Vehicle segment) as a final step in Eaton's transition** to a more electrical/multi-industry business model." The report further noted that "**[i]ncreasingly investors are focusing on the potential value that could be unlocked from the divesting of the Truck and Auto Components businesses** as they appear to be less 'core' now that nearly 60% of earnings will be attributed to the Electrical business."

95. Likewise, a February 6, 2013 MKM Partners analyst report stated, under the heading "**Packing up the Cars and Trucks?**," that "[w]hile management did not offer much in the way of an explanation around the Truck and Auto combination into the new Vehicle segment," the market saw it as signaling **"a spinoff as an additional opportunity to expand**

**the [valuation] multiple."** The analyst viewed such a spin-off as "a move [that] would be **positively received**" by the market.

96. Moreover, a March 14, 2013 Barclays analyst report specifically connected investor positivity about potential divestitures to the Company's own statements. Under the heading "**We also like what we hear from management**," the report stated that "it also seems inevitable that ETN **will further prune its relatively complex portfolio**" because Eaton was "**not likely**" to "**still be in the truck or auto businesses in ~3 years ... particularly if its strategy in electrical proves out**." The report further echoed Defendants' statements that the Merger was "a transformational deal," concluding that Eaton "will likely continue to be re-rated towards higher end peers" if it, *inter alia*, "**further prunes the portfolio**."

**(e) Misstatement No. 7: Cutler's Misstatement at the May 21, 2013 EPG Conference**

97. As the subject of a Vehicle business spin-off continued to come up, Defendants fueled investor enthusiasm for the possibility of a tax-free divestiture rather than disclose the truth that such an action would be economically prohibitive from a tax perspective. For example, at the May 21, 2013 EPG Conference, where Eaton was a participant, Cutler again mispresented Eaton's ability to engage in potential spin-offs from a **tax** perspective in the following exchange with an audience member (presumably an analyst):

> [Audience Member:] **Anything about the way the tax structure has formed over time would constrain things you might do strategically**, whether that were **a larger-scale divestiture** or anything else?..."
>
> [Cutler:] "***On the tax issue, no***, we are domiciled outside the US. ***We've got great flexibility in terms of how we are able to move cash around the world, and that really is the issue that gives us our great strategic flexibility. So I would say no on that one.***"

Cutler's statement was false and misleading because it omitted that Eaton was not able to do a spin-off of any business for five years from the Merger due to economically prohibitive tax consequences of the Merger. Thus, contrary to Cutler's assurance, there were undisclosed, adverse consequences of the Merger's "tax structure" that did "constrain" Eaton's ability to do "a larger-scale divestiture," such as a spin-off, for five years.

**(f) The Market Again Reacted Favorably to Defendants' Misstatements, Further Supporting Their Materiality**

98. The market reacted favorably to Defendants' statements reaffirming Eaton's continued ability and "great strategic flexibility" to engage in future strategic divestitures, including a spin-off of the Vehicle business. For instance, a May 22, 2013 Jefferies analyst report stated that the potential divesture of the Vehicle business was one of three key items for its "Bull Case" on Eaton stock: "1/ A self-help story with the integration of Cooper, including greater synergies than currently targeted; 2/ **Higher valuation multiples as the company's business mix shifts – including a potential [divesting] of the Vehicles business**; and 3/ a cyclical story given exposure to depressed end markets."

99. Further, approximately three weeks after Defendant Cutler's May 21, 2013 misstatement, a Bloomberg news article on June 10, 2013, titled "Eaton Said to Consider Sale of Auto-Parts Business," reported that "**Eaton Corp. is weighing a sale of its auto parts unit** to focus on its growing power and lighting operations, said people with knowledge of the matter." The article explained that "Eaton, which started in 1911 building truck axles, is shifting its focus away from its transportation roots," and included the following commentary from a stock analyst at Longbow Securities who recommended buying Eaton's stock:

> **Without the auto unit, Eaton's valuation could improve because 'electrical companies are valued incredibly higher than more diversified, more cyclical kinds of companies,'** he said in a telephone interview.

The article also quoted a market participant, John Sini, a fund manager and principal at Douglas C. Lane & Associates, which oversees more than $3 billion in assets, including Eaton shares, as stating that such a divestiture would make sense because "[f]rom a strategic standpoint, especially as they're integrating Cooper, **the auto-parts segment doesn't really fit anymore**, given the size of the electrical end market."

100. A Wells Fargo analyst report later that day also commented on the June 10, 2013 Bloomberg press report, noting Defendants' prior misstatements: "When previously asked about the topic, **ETN management did not rule out a potential separation of Automotive from the rest of the company**."

101. Further, a June 11, 2013 analyst report issued by Langenberg & Company discussed the June 10 Bloomberg article, and concluded as its "take-away" that a divestiture of this business "**makes sense to consider now**." The report elaborated as follows, highlighting the advantages of a divestiture of the automotive business:

> - We would not be surprised if an internal discussion is underway. And, speaking as a former Navy Intelligence Officer, the words "no basis for speculation" does NOT mean "no." **Divestiture would be consistent with where company is going (power, lighting).**
> **- Everybody has been asking about divesting the machinery pieces**. . . .

#### (g) Misstatement No. 8: Fearon's Misstatement at the November 13, 2013 Goldman Sachs Industrial Conference

102. As time passed and Defendants continued to conceal the truth, analysts increasingly anticipated that Eaton was nearing a spin-off of its Vehicle business. For example, an October 28, 2013 UBS analyst report raised its price target (from $66 to $72), affirming that "[w]e [ ] believe **a spin-off** or sale of the [Eaton] Vehicle segment **is possible over the next 12-18 months** and could be a **positive catalyst for the stock**."

103. Several weeks later, at the November 13, 2013 Goldman Sachs Industrial Conference, Defendant Fearon again reaffirmed to the market that Eaton retained the ability to make strategic spin-offs and other divestitures when a worthy opportunity presented itself. Specifically, in response to an analyst question about whether the Company was considering divesting its vehicle business or viewed the vehicle business as a "sacred cow," Fearon stated: "In terms of your second question ***about vehicle***, is it a sacred cow? Well, first of all, I'd say ***nothing is a sacred cow***." He added, "when the opportunity naturally arises for a transaction, ***we can act***.... ***If we believe that a business is better owned by somebody else, we will not be afraid to act on that***." Fearon's statement was misleading because it omitted that a spin-off of the Vehicle business was not possible for five years after the Merger due to economically prohibitive tax consequences of the Merger, and it created the false impression that Eaton "***can act***" to spin-off its Vehicle business "when the opportunity" presented itself, while in reality Eaton **could not so "act"** for five years after the Merger.

### (h) Additional Developments and Defendants' Repeated Misstatements and Omissions Continued to Fuel Investor Anticipation of a Spin-off

104. Investor interest in the possibility of a favorable spin-off of the Vehicle business continued after two additional developments given Defendants' continued misstatements and omissions, which left the false impression that such a spin-off remained possible after the Merger. On January 20, 2014, Eaton announced a taxable, cash sale of two of its aerospace businesses to Safran S.A. for $270 million. Then, on June 23, 2014, the Company announced a $500 million legal settlement with Meritor, a competitor in its Vehicle business, which resolved antitrust claims against the Company.

105. Analysts reasonably interpreted these developments as signaling that the Defendants now would "act" on Eaton's purported ability to spin-off the Vehicle business given

their repeated misstatements and omissions that Eaton ***could*** so "**act** . . . when the opportunity naturally arises." For example, on January 21, 2014, a J.P. Morgan analyst report explained that the announced aerospace asset sale "highlights management's willingness to sell assets that are no longer considered strategic" and "**raise[s] anticipation of a larger divestiture/spin-off of [Eaton's] Vehicle business**" which was **"an attractive asset that could garner a premium valuation**" for an estimated price of about $6 billion.

106. Similarly, after the Meritor settlement was announced, a July 16, 2014 Wells Fargo analyst report commented on investors' "widely discussed" interest in a divestiture of the Vehicle business, which it viewed as a positive move that would help Eaton "realize favorable future performance:" "ETN could continue to prune its portfolio of businesses and potentially create value independent of end market demand trends (***i.e.*, potential complete or partial separation of its Vehicle business that has been widely discussed by investors** with no comment from management)."

### F. Defendants Admitted the Truth Regarding the Five-Year "Prohibition" on Eaton's Spin-Off Ability, Which They Were "Well Aware" of "All Along"

#### 1. Defendants' Corrective Disclosures on July 29, 2014

107. Two weeks later, on July 29, 2014, in response to the mounting investor and analyst anticipation about a strategic Vehicle business spin-off, Defendants finally disclosed that Eaton was prohibited from making such a profitable divestiture until November 30, 2017 at the earliest because of economically prohibitive tax consequences of the Merger under applicable regulations.

108. Specifically, on July 29, 2014, during the second quarter 2014 earnings call with investors, Defendant Cutler admitted that "**we are not able to do a tax-free spin[-off] of any business for five years post the acquisition date of the Cooper transaction**." He went on to

explain "that limitation means that any spin[-off] would result in a very significant tax liability" and "this five year kind of **prohibition** ... means that there is not really a compelling economic rationale for further business portfolio transformation."

109. Cutler also acknowledged that "there's been a lot of speculation about whether it would make sense for Eaton to spinoff any of our business in light of the transformation that we've been undergoing over the past 14 years." He further recognized that they had been receiving an increasing number of investor inquiries on this subject, referencing "**a number of questions that a number of investors have either asked or written about over the last month.**"

110. After Cutler's revelation, the conference call was opened to questions. A Vertical Research analyst asked Cutler for more "color" regarding his announcement, noting in particular that although "there's obviously been some fresh speculation from myself and others, [] **these questions have been out there before**" and demanding "**why we're kind of learning of a five year limitation now**."

111. Fearon responded first, revealing that the news was the result of a complex analysis undertaken by an internal team at Eaton, and confirmed by Eaton's external experts. Specifically, he stated: "Because of the legal steps we had to do to complete the transaction for Cooper, there are a couple of code sections that make it **not possible** to do a tax free spin for five years." He then clarified "it's a conclusion our team came to" based on "**not a simple analysis**, but they came to it and then several outside advisors corroborated that, so we're very certain that that analysis is accurate."

112. Crucially, Cutler also responded and confirmed that Defendants knew about these economically prohibitive tax consequences of the Merger from the outset of the Class Period: "It's **not new knowledge**. We've been **well aware of this all along**."

113. Cutler's answer further clarified "that **it's not simply an issue of will**" – *i.e.*, Eaton had no choice regarding its inability to engage in tax-free spinoffs after the Merger.

114. In answering a follow-up question, Fearon further revealed that any spinoff would actually be taxed at an **even higher tax rate** than a traditional asset sale. In other words, Fearon disclosed that any expectedly tax-free spin-off would instead be prohibitively expensive, rendering it impossible. Fearon further implied that the unexpectedly higher tax rate was due to reasons too "complex" to explain to investors:

> [Vertical Analyst]: "And if you were to proceed with a spin or a similar transaction, the spin would just be treated as an asset sale? You could still spin something but it would be treated as a sale for tax purposes?"
>
> Rick Fearon: "**It actually would be taxed higher than just an asset sale for some complex reasons**."

115. Had the market known what Defendants revealed they knew "all along" – namely, that Eaton was "not able to do a tax-free spin[-off] of any business for five years post the acquisition date of the Cooper transaction" – analysts would not have been able to support their investment theses, as described in ¶¶48-53, 61-63, 74-75, 85, 90-92, 94-96, 98-102, and 105-06, *supra*.

**2. The Market Was Shocked by Defendants' Disclosures**

116. Eaton's stock dropped more than 8% as a result of Defendants' July 29, 2014 disclosures, falling from a close of $76.75 per share on July 28, 2014 to $70.51 per share on July 29, 2014, on 10.5 million shares traded, and wiping out nearly $**3 billion** in shareholder value.

117. Analysts were shocked by Defendants' disclosures. For instance, at least three analyst firms (Goldman Sachs, J.P. Morgan, and Deutsche Bank) immediately downgraded their ratings for Eaton as a result of Defendants' disclosures regarding the Company's inability to do a spin-off due to economically prohibitive tax consequences of the Merger, and substantially reduced their price targets on its stock.

118. Specifically, a Goldman Sachs report issued the same day downgraded Eaton stock to Neutral from Buy and lowered its price target substantially (to $74 from $81) due to the news of Eaton's inability to spin-off the Vehicle business: "**a potential catalyst has been removed** as ETN cited today that it cannot do a tax-free spin-off of any part of its portfolio for five years post Cooper (4Q12)."

119. Similarly, a July 30, 2014 J.P. Morgan analyst report downgraded Eaton stock to Neutral from Overweight, substantially lowering its price target (from $85 to $75) and estimates. The report supported its decision to downgrade Eaton's stock "**especially in light of management comments on the spin-off of the Vehicle business**." The report elaborated on its reasoning:

> In response to a question on the call, management noted that it would not be able to achieve a tax-free spin-off of its Vehicle business for at least five years following the CBE acquisition. **We viewed this potential transaction as a potential catalyst for the stock as it could have driven multiple expansion by removing one of the company's most cyclical businesses from the portfolio.**

120. Likewise, a Deutsche Bank report issued on the same day downgraded Eaton to "Hold" from "Buy" and greatly decreased its price target (from $90 to $77) based on the spin-off disclosure. The report explained: "**Perhaps more importantly, the company threw cold water on the opportunity for further meaningful portfolio change** citing tax code items that require Eaton to wait 5 years after the close of the Cooper acquisition (Nov 30/12). **Previously,**

**the prospects for significant portfolio action had provided a basis of our ETN investment thesis**." Crucially, the report noted that "**Eaton had not previously publicly discussed these items**" and elaborated on its negative reaction to the news as follows:

> **A key element to our previous ETN recommendation had been the prospect for the company to possibly pursue additional portfolio change** – prospectively in advance of CEO Sandy Cutler's expected retirement in less than 2 years. Now this appears off the table, as does the opportunity for activist investors to elicit portfolio change (**presuming Eaton cannot spin off its businesses tax-free** nor sell them without incurring substantial tax leakage).

121. Moreover, other analyst reports following the Company's July 29 disclosure similarly showed the market's negative reactions to the news. For instance, a KeyBanc analyst report from July 29, 2014 stated that Eaton stock price was "hit" on Defendants' statements on the conference call regarding the "**clarity on inability to spin off vehicle business**," – namely, the disclosures "concerning the unlikelihood of any business divestiture or spin-off (*e.g.*, Vehicle Systems segment) given the immense tax inefficiency that would ensue until late 2017."

122. Likewise, a Jefferies analyst report on July 29, 2014 described the "**8% fall**" in the stock price as a "**large negative reaction in the stock**" resulting from Defendants' disclosures that "**any spin-offs would need to wait five years from the Cooper acquisition to qualify as tax-free**," which dashed investors' "lingering expectations" for such a spin-off.

123. A July 30, 2014 Wells Fargo analyst report specifically criticized Defendants for not previously disclosing "that it could not spin off any businesses for at least five years without triggering tax consequences." The report highlighted that this news caused the substantial stock price drop on July 29: "**we believe a more proactive stance by the company may have helped mitigate the sell-off that occurred (ETN dropped 8.13%** vs. S&P 500 0.45% contraction on 7/29)." Accordingly, Wells Fargo reduced its valuation range on Eaton stock to $80-83 from

$87-90," based on "**the removal of optionality related to a potential business segment spin-off.**"

124. A July 30, 2014 Oppenheimer analyst report similarly discussed the "diminished prospects for a Vehicle spin-off" due to Defendants' disclosures that "**tax-free spin-offs are essentially barred for five years** post the Cooper close," which "**pressured shares 8%**, erasing $3B in market value."

125. Similarly, a Morgan Stanley report on the same day, aptly titled "Taking the Spin Out of the Story," described Defendants' disclosure of an "**unexpected** lack of portfolio optionality" as "**breaking news** that a tax-free Vehicle spin-out cannot be contemplated until at least Nov 2017 (5Y post-Cooper close due to IRS regulations re the inversion transaction) **[which] drove the sharp sell-off post-2Q [earnings call]**."

126. A later "initiating coverage" analyst report by Buckingham Research Group on September 4, 2014 summarized investors' **surprise** on Defendants' July 29 disclosures as follows: "investors had been clinging to the value creating potential of a Vehicle spinout, which is now off the table…. **[T]he revelation** that ETN cannot effect a tax-free spin of Vehicle for at least 5 years after the Cooper deal **came as a surprise to investors** looking for ETN to shed the cyclical assets and create an additional Irish domiciled company." Moreover, a follow-up report by the same analyst on the next day elaborated that "the recent revelation by management" regarding the inability to do the spin-off "**has broken the thesis for many investors**" on Eaton.

127. News coverage of Defendants' disclosures also confirmed the market's negative reactions. For example, a *Wall Street Journal* article on the same day, titled "Eaton CEO Says No Plans to Spin Off Businesses," reported that Cutler said that "the company's move to Ireland will block it from divesting businesses through tax-free spinoffs." The article elaborated: "Cutler

said Eaton would face severe tax consequences for the next five years if it were to spin-off any of its businesses. Eaton's tax liability stems from the decision to relocate its corporate registration to Ireland from Cleveland when it acquired Cooper Industries PLC, which was based in Ireland."

128. Given Cutler's May 21, 2012 assurance that the Merger had "nothing in the deal per se that would prevent us from taking portfolio moves," and Defendants' repeated assurances to the same effect, the market's surprise and negative reaction to Cutler's July 29, 2014 disclosure – that "we are not able to do a tax-free spin[-off] of any business for five years post the acquisition date of the Cooper transaction" – shows that Defendants' assurances were false and misleading. Specifically, the market reasonably understood that Eaton's ability to engage in tax-free spin-offs was valuable to the Company, and reasonably lowered its valuation of the Company after learning the truth on July 29 that there was a five-year "**prohibition**" on spin-offs due to adverse tax consequences from the Merger, which Defendants had been "**well aware of** [] **all along**."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO

129. During the Class Period, Defendants made the following materially false and misleading statements and omissions.

### A. May 21, 2012 – Conference Call

#### 1. Misstatement No. 1

130. On May 21, 2012, Eaton held an investor call to discuss the Merger. During the call, numerous analysts asked about a potential spin-off or other divestiture of the Vehicle business, based on Defendants' statements in the May 21, 2012 press release referencing "the possible sale of assets" (*see* ¶¶55-56, *supra*) and a slide used by Cutler on the call, which omitted any reference to that business in describing Eaton's long-term strategy (*see* ¶¶56-57, *supra*). For

example, a Vertical Research analyst asked Defendant Cutler the following: "And then finally, just thinking about we'll all fast forward to what's next in the portfolio after the dust settles here today. You mentioned electrical hydraulic era. **You obviously didn't mention truck or auto**. You're looking a lot more like an electrical company. **Should we expect more portfolio evolution over time?**" Cutler responded that there was "***not in our active planning any substantial, additional change in the portfolio as a result of this transaction***."

131. Cutler's statement was knowingly or recklessly misleading at the time made because, as he subsequently admitted on July 29, 2014, he failed to disclose material facts regarding what he knew "all along"—that Eaton was not able to do a spin-off of any business for five years from the Merger, *i.e.* until late 2017, due to economically prohibitive tax consequences of the Merger, that would have made his statement not misleading. In addition, Cutler's statement indicated that the lack of changes to Eaton's portfolio was the result of a fully informed, "active planning" choice, implying that Eaton was not prohibited from doing so from a tax perspective. Cutler's statement was misleading because, in reality, the Company was prevented by economically prohibitive tax consequences of the Merger from doing a spin-off for five years.

**2. Misstatement No. 2**

132. On the same conference call, analysts later sought to confirm that the Merger would **not** prevent Eaton from engaging in a lucrative spin-off of its vehicle business. Specifically, during the call, a Gabelli & Co. analyst asked Defendant Cutler whether any tax implications of the Merger would limit Eaton's ability to spin-off its Vehicle business in the future: "**Are you precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time**?" In response, Cutler stated: "***There is nothing in the deal per se that would prevent us from taking portfolio moves,*** but we have no such plans."

133. Cutler's statement was knowingly or recklessly false at the time made because, as he subsequently admitted on July 29, 2014, he knew "all along" that Eaton was not able to do a spin-off of any business for five years from the Merger, *i.e.* until late 2017, due to economically prohibitive tax consequences of the Merger, and/or he knowingly or recklessly failed to include the adverse material facts regarding these economically prohibitive tax consequences of the Merger, which effectively "prevent[ed]" Eaton from spinning off its businesses for five years, that would have made his statement not misleading.

134. As noted above, the market reacted favorably to Defendants' statements on the May 21, 2012 conference call regarding the continued viability of Eaton's potential spin-off or other divestiture of its businesses after the Merger, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.1.(b), *supra*.

**B. Misstatement/Omission No. 3: June 22, 2012 – Preliminary Proxy Statement**

135. On the May 21, 2012 conference call and in the related press release, Defendants repeatedly directed the analysts to the upcoming proxy statements for details, including any potential tax implications, as alleged more fully in Section V.E.2.(a), *supra*. On June 22, 2012, Eaton filed with the SEC the Preliminary Proxy, which included the following statement by which Eaton directors, including Defendant Cutler, "accept[ed] responsibility" for the Eaton-related information in the Preliminary Proxy, including that it "is in accordance with the facts and does not omit anything likely to affect the import of such information":

> **The directors of Eaton accept responsibility for the information contained in this document**, other than that relating to Cooper, its Associates (as defined in paragraph 4 below) and the directors of Cooper and members of their immediate families, related trusts and persons connected with them. To the best of the knowledge and belief of the directors of Eaton **(who have taken all reasonable care to ensure such is the case)**, the information contained in this document for which they accept responsibility is

> **in accordance with the facts** ***and does not omit anything likely to affect the import of such information***.

This statement was knowingly or recklessly false and misleading because the Preliminary Proxy **did omit** adverse, material facts regarding Eaton's inability to spin-off its businesses for five years after the Merger due to economically prohibitive tax consequences of the Merger, which rendered Defendants other disclosures in the Preliminary Proxy misleading, as discussed below.

136. The Preliminary Proxy described in detail the proposed Merger and outlined numerous risk warnings, including an extensive discussion of its tax consequences, with sections titled, for example, "U.S. Federal Income Tax Considerations," "Tax Consequences of the Transaction to Eaton and New Eaton," and "Irish Tax Considerations." *See* ¶68, *supra*. As noted above, these warnings regarding tax consequences were not limited to the taxation of the acquisition itself, but instead included broader tax implications from the Merger, for example, those implicated by Internal Revenue Code Section 7874 (*see* ¶¶68-69, *supra*). In discussing these broader tax consequences, the Preliminary Proxy also reassured investors: "A corporation generally is considered a tax resident in the jurisdiction of its organization or incorporation for U.S. federal income tax purposes. **Because New Eaton is an Irish incorporated entity, it would be classified as a foreign corporation (and, therefore, a non-U.S. tax resident) under these rules.**" However, the Preliminary Proxy omitted that it was not possible for Eaton to spin-off its businesses for five years after the Merger due to economically prohibitive tax consequences of the Merger.

137. The inclusion of these detailed tax-related sections in the Preliminary Proxy created a duty to disclose **all** of the material tax consequences of the Merger known to Defendants at that time, including that Eaton would not be able to do a spin-off of any business for five years from the Merger due to economically prohibitive tax consequences of the Merger.

The Preliminary Proxy, however, failed to disclose any such information which, as Defendant Cutler admitted on July 29, 2012, was known to Defendants "all along." Further, Defendants' various risk warnings in the Preliminary Proxy, including those noted above, regarding the potential tax consequences of the Merger were inadequate and themselves misleading in that they omitted to disclose this adverse information that was known to Defendants by that time. Defendants' risk warnings did not enable Eaton investors and analysts to learn about the Merger's effect of economically prohibiting Eaton from conducting spin-offs for five years after the Merger due to these adverse tax consequences.

138. As noted above, after the filing of the Preliminary Proxy, the market continued to view favorably Eaton's supposed ability to conduct tax-free spin-offs after the Merger, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.2.(d), *supra*.

**C. Misstatement/Omission No. 4: September 14, 2012 Proxy Statement**

139. On September 14, 2012, Eaton filed its Proxy, inviting shareholders to attend a special meeting on October 26, 2012, and recommending that they vote to approve the Merger. As noted above, Defendants had previously pointed investors to the proxy statements for answers about their questions concerning the Merger's tax implications. *See* Section V.E.2.(a), *supra*.

140. The Proxy contained statements substantially similar to those in the Preliminary Proxy described in ¶78, *supra*, including that Eaton directors, including Defendant Cutler, "accept[ed] responsibility" for the Eaton-related information in the Proxy, which was "**in accordance with the facts *and does not omit anything likely to affect the import of such information*.**" This statement was knowingly or recklessly false and misleading because the Proxy **did omit** adverse, material facts regarding Eaton's inability to spin-off its businesses for

five years after the Merger due to economically prohibitive tax consequences of the Merger, which rendered Defendants other disclosures in the Proxy misleading, as discussed below.

141. Further, the Proxy contained other, new statements regarding Defendants' due diligence, including its scrutiny into the tax consequences, of the Merger. For example, the Proxy stated that "after the Eaton board meeting on April 5, 2012, Mr. Cutler sent a letter to Mr. Hachigian [Cooper CEO] setting forth a proposal for the acquisition of Cooper," including that post-Merger "the surviving parent entity would be incorporated outside the United States" because of the "advantages currently enjoyed by Cooper as a result of its non-United States incorporation," such as "**greater flexibility** and lower cost of cash management . . . as well as a lower worldwide effective tax rate." The Proxy further explained the tax-related "flexibility and associated financial benefits" that Eaton would enjoy post-Merger by incorporating in Ireland, "**without negative tax effects**:"

> **It was ultimately concluded** that incorporating in Ireland would provide the combined entities with enhanced global cash management and **flexibility and associated financial benefits,** including increased global liquidity and free global cash flow among the various entities of the combined enterprise **without negative tax effects. Eaton also considered all the requirements of section 7874 of the Code**, including the requirement that former stockholders of Eaton own less than 80%, by vote and value, of the stock of New Eaton, as well as other applicable laws.

Such substantially similar statements to those in the Preliminary Proxy, specifically, the various risk warnings regarding the potential tax consequences of the Merger, and the new statements in the Proxy described above were inadequate and themselves misleading for the same reasons as those in the Preliminary Proxy—namely, they omitted that it was not possible for Eaton to spin-off its businesses for five years after the Merger due to economically prohibitive tax consequences of the Merger. *See* ¶136, *supra.* Defendants had a duty to disclose all of the

material tax consequences of the Merger known to Defendants at that time, including that Eaton would not be able to conduct a spin-off of any business for five years from the Merger due to economically prohibitive tax consequences of the Merger, for the same reasons as the Preliminary Proxy did. *See* ¶137, *supra*. The Proxy, likewise, failed to disclose that adverse information even though, as Defendant Cutler admitted on July 29, 2012, it was known to Defendants "all along." *Id.*

142. After the filing of the Proxy and before the shareholder meeting on October 26, 2012, analysts continued to highlight Eaton's supposed ability to spin-off its vehicle business as a positive for the Company's valuation, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.3.(c), *supra*.

**D. Misstatement No. 5: October 31, 2012 – Q3 2012 Earnings Call**

143. On October 31, 2012, Eaton held an earnings call with analysts and investors to discuss its third-quarter 2012 financial results. During the call, a Jeffries analyst asked Defendant Cutler the following "bigger question" regarding Eaton's continued ability to spin-off or otherwise divest one of its businesses: "**In 2013** is there anything from **a regulatory basis** vis-a-vis, I guess, the acquisition of Cooper that would **prevent you from doing additional divestitures** if you wanted to?" Cutler responded, in full: "***No. There wouldn't be any—no regulatory restrictions***."

144. Cutler's statement above was knowingly or recklessly false at the time made because, as he subsequently admitted on July 29, 2014, he knew "all along" that Eaton was not able to do a spin-off of any business for five years from the Merger, *i.e.* until late 2017, due to economically prohibitive tax consequences of the Merger under applicable tax regulations, and/or he knowingly or recklessly failed to include the adverse material facts regarding these economically prohibitive tax consequences of the Merger, which effectively imposed

"***regulatory restrictions***" on Eaton's ability to spin-off any of its businesses for five years after the Merger, that would have made his statement not misleading.

145. Analysts reacted positively to Defendants' reassurance that there were no restrictions that would prohibit Eaton from conducting a tax-free spin-off of its vehicle business after the Merger, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* ¶90, *supra*.

**E. Misstatement No. 6: November 13, 2012 – Goldman Sachs Industrials Conference**

146. On November 13, 2012, at the Goldman Sachs Industrials Conference, which Cutler attended, a member of the audience, presumably an analyst, asked him the following question:

> There's obviously a lot of consideration from the sell-side in terms of change in business model, which you guys have stressed that the three core businesses are now our majority. **There is a lot of talk of the ability to divest businesses that you may not necessarily think are core any more or to change the profile of the Company**. The stock, it seems to be reflecting a lot of that, I mean what is the thought in terms of **the ability** if you decided to sell some of those businesses**? Is it a spin out?** There is a market to be able to sell and what's your thought on things like that?

In response, Cutler stated: "***Yes, there is nothing structural in our deal structure or any of our covenants that, it prevents us from making changes in our portfolio***...."

147. Cutler's statement was knowingly or recklessly false at the time made because, as he subsequently admitted on July 29, 2014, he knew "all along" that Eaton was not able to do a spin-off of any business for five years from the Merger due to economically prohibitive tax consequences of the Merger, and/or he knowingly or recklessly failed to include the adverse material facts regarding these economically prohibitive tax consequences of the Merger, which were "***structural***" aspects of the Merger's "***deal structure***" that effectively "***prevent[ed]***" Eaton

from "***making changes in [its] portfolio***"—*i.e.* spinning off its businesses for five years after the Merger—that would have made his statement not misleading.

148. After Cutler's November 13, 2012 statement and the closing of the Cooper Acquisition on November 30, 2012, the market continued to view Eaton's ability to spin-off its vehicle businesses as a positive catalyst for the stock, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.4.(c), *supra*.

**F. Misstatement No. 7: May 21, 2013 – EPG Conference**

149. On May 21, 2013, Eaton participated in the EPG Conference, with Cutler attending on its behalf. During this conference, analysts and investors again voiced their continued interest in Eaton's potential spin-off of its Vehicle business. That interest had grown in the preceding months following the February announcement of Eaton's consolidation of its Auto and Truck segments into one Vehicle segment, as described above. *See supra* Section V.E.4.(c). In particular, at the conference, an audience member (presumably an analyst), asked Cutler about the tax consequences of the Cooper Acquisition, including specifically whether there was "anything" about its resultant impact on Eaton's "tax structure" that "would constrain" Eaton's ability to do "**a larger-scale divestiture**" such as a spin-off, as follows:

> [Audience Member:] **Anything about the way the tax structure has formed over time would constrain things you might do strategically, whether that were a larger-scale divestiture** or anything else?..."
>
> [Cutler:] "***On the tax issue, no, we are domiciled outside the US. We've got great flexibility in terms of how we are able to move cash around the world, and that really is the issue that gives us our great strategic flexibility. So I would say no on that one***."

150. Defendant Cutler's statement that there was ***not*** "***anything about the way the tax structure has formed***" after the Cooper acquisition that "***would constrain***" Eaton's "***great strategy flexibility***" to do "***a larger-scale divestiture***," such as a spin-off, was knowingly or

recklessly false at the time made because, as he subsequently admitted on July 29, 2014, he knew "all along" that Eaton was not able to do a spin-off of any business for five years from the Cooper merger, *i.e.* until late 2017, due to economically prohibitive tax consequences of the Merger, and/or he knowingly or recklessly failed to include the adverse material facts regarding these economically prohibitive consequences of the Merger that would have made his statement not misleading.

151. Analysts reacted favorably to Defendants' statements reaffirming Eaton's continued ability to spin-off the Vehicle business, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.4.(f) and ¶102, *supra*.

### G. Misstatement No. 8: November 13, 2013 – Goldman Sachs Industrial Conference

152. On November 13, 2013, Defendants once again reaffirmed Eaton's continued ability to engage in a Vehicle business spin-off. At the Goldman Sachs Industrial Conference on that day, in response to an analyst question about whether the Company was considering divesting its Vehicle business and whether it viewed the business as a "sacred cow," Defendant Fearon stated:

> In terms of your second question about **vehicle**, is it a sacred cow? Well, first of all, I'd say ***nothing is a sacred cow***. You have seen us over the last 15 years make pretty major portfolio shifts. We have sold or spun businesses that had roughly $1.5 billion of revenues. We've bought businesses that had $12 billion of revenues. And so we have had [sic] made major changes. We have a systematic process of looking at where those kinds of actions would benefit us and a process, particularly on the acquisition side, of keeping our hand in various situations ***so that when the opportunity naturally arises for a transaction, we can act***. . . . ***[W]e are continuing those processes. If we believe that a business is better owned by somebody else, we will not be afraid to act on that.***

153. Defendant Fearon's statement was knowingly or recklessly false at the time made because, contrary to his assurances that "when the opportunity" for such a divestiture of "vehicle" "naturally arises… ***we can act***," as he and Defendant Cutler subsequently admitted on July 29, 2014, they knew "all along" that Eaton was not able to so "***act***" because a spin-off or any business for five years from the Merger was impossible due to economically prohibitive tax consequences of the Merger, and/or he knowingly or recklessly failed to include the adverse material facts regarding these economically prohibitive tax consequences of the Merger that would have made his statement not misleading.

## VII. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

154. At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements and omissions during the Class Period discussed above. The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter as discussed above. The following additional allegations further support a strong inference of scienter.

155. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Eaton, their control over, receipt, and/or modification of Eaton's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Eaton, participated in the fraudulent scheme alleged herein. The scheme deceived the investing public regarding Eaton's business, operations, and management and the intrinsic value of Eaton

securities and caused Plaintiff and members of the Class to purchase Eaton securities at artificially inflated prices.

### A. Defendants Engaged in Massive and Highly Suspicious Insider Sales of Their Eaton Stock During the Class Period

156. During the Class Period, Defendants Cutler and Fearon made massive insider sales of their personally-held Eaton common stock, which were highly suspicious in timing and amount. Collectively, Cutler and Fearon sold Eaton shares that were worth approximately **$40.4 million**. As a result, Cutler and Fearon personally benefited from the artificial inflation of Eaton's stock price caused by their materially false and misleading statements to investors. These facts further support a strong inference of scienter.

#### 1. Cutler's and Fearon's Class Period Sales Were Highly Suspicious in Timing and Amount

157. Specifically, Cutler and Fearon made the following sales of Eaton stock on the following dates during the Class Period, and reaped the following proceeds from those sales:

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| CUTLER | 2/20/2013 | 199,535 | $61.02 | $12,176,344.03 |
| CUTLER | 2/25/2013 | 32,107 | $60.65 | $1,947,295.97 |
| CUTLER | 3/4/2014 | 199,535 | $74.32 | $14,829,441.20 |
| CUTLER | 3/7/2014 | 29,280 | $75.55 | $2,212,104.00 |
| **CUTLER Totals** | | **460,457** | | **$31,165,185.20** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| FEARON | 12/10/2012 | 20,000 | $52.27 | $1,045,400.00 |
| FEARON | 5/3/2013 | 65,470 | $61.99 | $4,058,485.30 |
| FEARON | 11/21/2013 | 57,086 | $72.28 | $4,126,450.09 |
| **FEARON Total** | | **142,556** | | **$9,230,335.39** |

158. These stock sales represented a profit of approximately **$17.45 million** for Cutler and **$5.038 million** for Fearon.

159. Cutler's and Fearon's Class Period stock sales were suspicious in timing because they made these sales while in possession of the material, non-public adverse information that Eaton could not perform a "tax-free spin[-off] of any business for five years" after the Cooper merger. As Cutler admitted in July 2014, this was "not new knowledge" and "[w]e've been aware of this all along." Because of this awareness, under the securities laws, Cutler and Fearon were required to either disclose the adverse non-public information or abstain from trading in Eaton stock. They did neither.

160. Cutler's and Fearon's Class Period stock sales were also suspicious in amount. By any reasonable measure, Eaton stock sales in the total amounts of $31.165 million and $9.230 million by the Company's two most senior executives are large and significant to Eaton investors and to Cutler's and Fearon's personal wealth.

161. Cutler's and Fearon's stock sales are also highly suspicious in amount in comparison to their base salaries. Cutler's total base salary for the years 2012, 2013 and 2014 (which is over-inclusive because the Class Period starts in May 2012 and ends in July 2014) was $3.6 million. Cutler's $31.165 million in insider sales was a staggering 8.79 times that amount. Similarly, Fearon's total salary for the years 2012, 2013 and 2014 (which, again, is over-inclusive) was $2.2 million, and Fearon's $9.230 million in insider sales was a dramatic 4.2 times that amount.

162. Cutler's and Fearon's stock sales are also suspicious in amount in comparison to the amounts of Eaton stock that they sold during a control period of the same length as the Class Period, from March 15, 2010 through May 20, 2012 ("the Control Period"). Specifically, during

the Control Period, Fearon sold only approximately half of the Eaton shares that he sold during the Class Period (*i.e.*, 84,616 shares for total proceeds of $4,748,185). This renders the 142,556 shares valued at $9.23 million that Fearon sold during the Class Period highly suspicious.

### 2. Cutler's Pre-Class Period Sales Do Not Render His Class Period Sales Non-Suspicious, and in Fact Confirm a Pattern of Insider Trading

163. During the Control Period, Cutler sold more Eaton shares than he did during the Class Period, **but those sales are themselves suspicious in timing and amount**. As a result, Cutler's pre-Class Period sales do not render his Class Period sales non-suspicious. Rather, they evidence his pattern of selling Eaton stock at opportune times before negative information about the Company is likely to be released.

164. Indeed, Cutler made his pre-Class Period sales during a time when Eaton faced significant public scrutiny over its alleged role in influencing a Mississippi state judge in a trade secret litigation that Eaton had filed against Frisby Aerospace. For example, on April 29, 2010, Cutler sold $18.3 million of Eaton stock. As the financial magazine *Barron's* reported, the sale on May 4, 2010 was "the first out-of-pocket sale by the top executive since May 2008, and the largest sale of any kind by Eaton insiders in at least the past seven years." On December 22, 2010, after Cutler's April 2010 stock sale, Hinds County Circuit Judge Swan Yerger sanctioned Eaton by dismissing its case against Frisby due to the conduct of the Company, its counsel, and its use of former Hinds County District Attorney Ed Peters. The court found:

> It is clear, when considering the totality of the circumstances, that Peters was hired due to Eaton's being assured that he was the "closest possible associate" of then-Judge DeLaughter, to work on Eaton's behalf. Exhibit 5047. Further, in the subject case, the Court finds that Peters' intentional misconduct and attempts to influence then-Judge DeLaughter were made solely to influence judicial decisions in Eaton's favor....
>
> Eaton and its counsel knew of the serious improprieties occurring, on its behalf, between Peters and DeLaughter, and stood by "with

> blind eyes." In the opinion of this Court, there is only one sanction that will sufficiently deter this type of unacceptable and unethical behavior that strikes at the very core of our judicial system: a dismissal of the Plaintiffs' [Eaton's] claims with prejudice.

*Eaton v. Frisby*, No. 251-04-642, slip op. at 16-17, 25 (Miss. Hinds Cty. Cir. Ct. 1st. Jud. Dist., Dec. 22, 2010).

165. Very shortly after the December 2010 ruling in *Eaton v. Frisby*, on January 28, 2011, Cutler appeared on Jim Cramer's CNBC *Mad Money* program and discussed Eaton's financial quarter and his bullish expectations for further growth in the Company's business. In response, the price of Eaton stock shot up, from a closing price of $52.13 on January 28, 2011 to a closing price of $55.39 on February 9, 2011, an increase of more than 6.25%. On February 9, 2011, Cutler sold another $26 million of his Eaton stock, less than two weeks after he touted the Company's prospects on *Mad Money*.

166. In early 2012, Cutler made another massive, pre-Class Period sale of Eaton shares. This occurred around the time that Eaton learned internally that it committed what Cutler would later refer to as "discovery failures," and the *Eaton v. Frisby* court described as "documents, which are years overdue for production" that "included [email] communications from Ed Peters about conversations and/or communications with Judge DeLaughter." *Eaton v. Frisby*, No. 251-04-642, slip op. at 2 & 5 (Miss. Hinds Cty. Cir. Ct. 1st. Jud. Dist., May 10, 2012). Eaton's Vice President and Chief Counsel – Litigation, Victor Leo, swore in an affidavit that he learned about these unproduced but responsive documents on February 13, 2012. Then, on February 27, 2012, Cutler sold 505,090 shares of Eaton stock for total proceeds of $26.29 million. Shortly thereafter, on April 17, 2012, Eaton provided the email chains in question to the *Eaton v. Frisby* court. After these details came to light, in May 2012, that court required Cutler to personally "provide full and detailed explanations" why, *inter alia*, "the withholding of the

newly discovered documents" occurred "and exactly why the documents were not previously discovered," which he did in a sworn affidavit. Affidavit of Alexander M. Cutler at 2-3, *Eaton Corp. v. Frisby*, No. 251-04-642 (Miss. Hinds Cty. Cir. Ct. 1st. Jud. Dist., May 21, 2012). Cutler's sworn affidavit disclosed that they first learned of the withheld emails "during a February 2012 briefing made by counsel for the Special Committee of Eaton's Board" "—the **same month** that he had sold $26.29 million worth of Eaton stock—wherein Eaton's outside counsel discovered an Eaton email "that [outside counsel] had not seen referenced before and that [he] had become concerned as to whether the email had been turned over to the Court." *Id.*

167. Cutler's history of trading Eaton stock on insider information, both during the Class Period and during the Control Period, demonstrates a pattern of selling opportunistically after stock price highs and before negative information would be released to the public. Accordingly, this series of events renders the timing of Cutler's pre-Class Period, late February 2012 stock sale **highly suspicious**, and insufficient to render Cutler's Class Period sales non-suspicious. Far from excusing his Class Period sales, this history further evidences a pattern of insider trading on material, non-public information. Thus, Cutler's pre-Class Period trading history shows that his Class Period stock sales were also **highly suspicious.**

### B. The "Transformational" Cooper Merger Was Core to Eaton's Operations, and the Individual Defendants Were Directly Involved in It, Including Any Potential Tax Implications

168. Cutler and Fearon were at all times fully informed about the details of the Merger, including any potential adverse tax implications on Eaton's subsequent ability to do a tax-free spin-off of any of its business, given the importance and size of the transaction for Eaton. Eaton acquired Cooper for **$13 billion**, the largest acquisition in the Company's 106-year history, to "significantly increase the capabilities and geographic breadth of the combined company's power management portfolio and electrical business." During the Class Period, Cutler

repeatedly stated that the Cooper transaction was "a **game changer**," a "**transformational** acquisition," "an **enormously transformative** deal for Eaton," and "a **major acquisition**."

169. Indeed, the Cooper acquisition grew Eaton's size and revenues by nearly **34%**, bringing its overall portfolio to $21.8 billion in revenue, compared to $16 billion pre-Merger, and 103,000 employees, compared to 73,000 employees pre-Merger. Additionally, as a result of the Merger, nearly 60% of the combined Company's revenues and profits were generated by its electrical business, compared to only 45% pre-Merger. The Cooper Acquisition made "Eaton the fourth largest electrical giant in the world."

170. The Merger was thus a defining event in Eaton's history. Accordingly, its implementation – including the effects of the Merger on Eaton's core business model of managing its product portfolio through mergers, acquisitions, asset sales, spin-offs and other divestitures – was a core operation of the Company.

171. The Merger also had significant tax consequences. Under the agreement, Eaton would acquire Cooper through the formation of a new Irish holding company. Following Eaton's re-domiciling of its headquarters from Cleveland to Dublin, the transaction resulted in Eaton's reincorporation in Ireland. Fearon stated, in a September 13, 2013 interview with CFO.com, that the reincorporation was "[t]he **only way** to make the transaction happen from a legal and financial standpoint…." The reincorporation allowed Eaton to significantly lower its corporate tax rate and gain resultant tax benefits of $160 million a year.

172. Cutler was described in the Company's March 15, 2013 Proxy Statement as having "**detailed knowledge** of Eaton's businesses, customers, end markets, sales and marketing, technology innovation and new product development, supply chains, manufacturing operations, talent development, policies and internal functions." In his capacity as Chairman and

CEO of Eaton, and as a member of the Board of Directors, he was closely involved in all aspects of the transformative Cooper Acquisition. Certainly, he would have been informed of the adverse tax consequences that would limit Eaton's future ability to do an advantageous, tax-free spin-off the Vehicle business or any other business.

173. Further, as described on Eaton's website, in Fearon's role as the Vice Chairman and Chief Financial and Planning Officer, "he has responsibility for the **accounting**, control, corporate development, information systems, internal audit, investor relations, **strategic planning, tax** and treasury functions" at Eaton. Accordingly, by virtue of his position at Eaton, Fearon was closely involved in all aspects of the Company's financials, including accounting, tax matters and "strategic planning," such as financial and tax due diligence, including the adverse tax implications for the Cooper Acquisition, the largest acquisition in the Company's history, and the adverse implications for any potential strategic portfolio divestiture of the Vehicle business.

174. During Cutler's and Fearon's ten years of leadership, Eaton made significant strategic shifts away from its Vehicle business, while growing its electrical component and other businesses through mergers, acquisitions, asset sales, and spin-offs, which culminated in the Merger.

175. Accordingly, by virtue of Cutler's and Fearon's positions at Eaton and their abundant experience with mergers, acquisitions, and divestures (including spin-offs) during their long tenure at the Company, the Individual Defendants were closely involved and knowledgeable in all aspects of the Merger, including the financial and tax due diligence required to be conducted by the Board of Directors and the adverse tax implications that would arise from any spin-off of the Vehicle or other businesses.

## VIII. CLASS ACTION ALLEGATIONS

176. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that, during the period from May 21, 2012 through July 28, 2014, inclusive, purchased the publicly traded common stock of Eaton and/or exchange-traded options on such common stock, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Eaton during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Eaton's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

177. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Eaton had approximately 337 to 476 million shares of common stock outstanding and actively trading on the NYSE with the ticker symbol "ETN." As of September 30, 2016, Eaton had 451.7 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the tens of thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Eaton or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

178. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

179. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

180. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether and to what extent the market price of Eaton's common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(f) whether the Individual Defendants were controlling persons of Eaton;

(g) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(h) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

181. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. LOSS CAUSATION

182. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Eaton common stock and operated as a fraud or deceit on Class Period purchasers of Eaton common stock and exchange-traded options on such common stock by failing to disclose and misrepresenting the adverse facts detailed herein. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Eaton common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

183. As a result of their purchases of Eaton's common stock and exchange-traded options on such common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Eaton common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $79.44 per share at

the close of the market on July 16, 2014 – less than two weeks before Defendants' corrective disclosure on July 29, 2014.

184. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Eaton's business and prospects. As the truth about the Company was revealed to the market, the price of Eaton's common stock fell dramatically. These declines removed the artificial inflation from the price of Eaton's common stock, causing economic loss to investors who had purchased Eaton common stock and exchange-traded options on such common stock during the Class Period.

185. The decline in the price of Eaton common stock after the corrective disclosure on July 29, 2014 came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Eaton's common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

186. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Eaton common stock and the subsequent material decline in the value of Eaton common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

187. Specifically, on July 29, 2014, Defendants disclosed that, as a result of the Merger, the Company faced a five-year economic "prohibition" on spin-offs after the Merger due to adverse tax consequences of the Merger. In other words, for the five years following the date of the Merger, *i.e.* until November 30, 2017, "any spin[-offs] would result in a very significant

tax liability." Defendants also revealed that this five-year "prohibition" on spin-offs was a result of a complex analysis of "very technical issues" conducted by Eaton's internal team and corroborated by "several outside advisors." Moreover, Defendants admitted that this was "**not new knowledge**," as that they were "**well aware of this all along**."

188. On these disclosures, the Company's stock price fell nearly 8.13%, from $76.75 per share to $70.51 per share, on highly unusual trading volume of 10.5 million shares traded (as compared to only 2.6 million shares traded the day before).

189. Likewise, subsequent analyst reports and news coverage further revealed the market's surprise to Defendants' corrective disclosures on July 29, 2012, as detailed above. *See* Section V.F.2, *supra*.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

190. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

191. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a) Eaton's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period;

(b) Eaton's common stock traded at high weekly volumes during the Class Period;

(c) as a regulated issuer, Eaton filed periodic public reports with the SEC;

(d) Eaton regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) The market reacted promptly to public information disseminated by Eaton;

(f) Eaton's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote analyst reports on Eaton during the Class Period included, but are not necessarily limited to, the following: Argus Research, Bank of America, Bank of America Merrill Lynch, Barclays, Bernstein, Buckingham Research, Citigroup, Credit Suisse, Deutsche Bank, Evercore ISI, FBR Capital Markets, Gabelli & Co, Goldman Sachs, J.P. Morgan, Jefferies & Co., KeyBanc, Langenberg & Co., Longbow Research, MKM Partners, Morgan Stanley, Morningstar, Nomura Securities International, Northcoast Research, Oppenheimer, Robert Baird, S&P Capital IQ, Stifel Nicolaus, SunTrust Robinson Humphrey, UBS, Vertical Research, Wells Fargo, and William Blair & Co.;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Eaton's common stock; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Eaton's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XI. NO SAFE HARBOR

192. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint. *First*, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions. *Second*, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. *Third*, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. *Fourth*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking

193. Defendants' false and misleading statements and omissions alleged herein, *e.g.*, ¶¶130, 132, 135-37, 140-41, 143, 146, 149, and 152, (1) relate to historical or current facts; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives. Specifically, they relate to Eaton's current ability to do a tax-free spin-off of any of its businesses and the historical tax consequences of the Merger on Eaton's ability to do so (*see, e.g.*, *id.*).

194. To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

### B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking"

195. The PSLRA imposes an additional burden on "oral" forward-looking statements, requiring defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and failed to include the language required by the PSLRA. For example, the following oral statements made by Cutler and Fearon were neither identified as forward-looking pursuant to the PSLRA nor accompanied by *any* cautionary language, and thus to the extent that any such statement may be considered forward-looking, they are not afforded immunity by the PSLRA:

- Cutler's statements at the November 13, 2012 Goldman Sachs Industrial Conference (¶146); and
- Fearon's statements at the November 13, 2013 Goldman Sachs Industrial Conference (¶152).

### C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language

196. None of Defendants' alleged false statements or omissions were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

197. Additionally, to the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already manifested. As detailed herein, at the time Defendants assured investors that nothing in the Merger, including tax implications, prohibited the Company from engaging in spin-offs of its businesses, Defendants knew "all along" that such spin-offs were not possible for five years post-Merger due to economically prohibitive tax consequences of the Merger. *See* ¶¶108, 111-

12. Thus, vague warnings regarding, for example, changes in government regulations that ***could*** adversely affect operating results, were insufficient because they failed to warn that the risks at issue here had already occurred when Defendants made their false and misleading statements.

198. To the extent Defendants included any cautionary language, that language was not precise and did not relate directly to any forward-looking statements at issue.

### D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made

199. Even if the alleged statements were forward-looking, sufficiently identified as such, and accompanied by adequate cautionary language at the time they were made, each speaker knew that the statement was false or misleading, as discussed above. In addition, all such statements were authorized or approved by Eaton executive officers who actually knew that the statements were false or misleading when made. Accordingly, Defendants remain liable even for forward-looking statements.[7]

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

200. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

---

[7] Defendants' false and misleading statements and omissions alleged herein are not opinions, as defined in *Omnicare*. However, even if they contain statements of opinion, they would nevertheless be misleading because they could not fairly align with the information in Defendants' possession at the time – namely, that Defendants knew "all along" that the Company could not conduct spin-offs for five years after the Merger due to economically prohibitive tax consequences of the Merger. *See* Section V.F.1, *supra*. Similarly, they contain actionable omissions because they imply that nothing prevented Eaton from conducting spin-offs after the Merger, which conflicts with what Defendants knew about such spin-offs being economically prohibitive from a tax pespective, and conflicts with what a reasonable investor would take from Defendants' statements. Finally, any such statements of supposed opinion would be false because Defendants could not have sincerely believed them while making them.

201. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

202. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Eaton common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Eaton common stock and options on such common stock at artificially inflated prices.

203. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

204. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Eaton common stock and options during the Class Period.

205. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Eaton common stock and options, Lead Plaintiff and other members of the Class purchased Eaton common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Eaton common stock and options at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Eaton common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Eaton common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth was disclosed.

206. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**Violation of § 20(a) of the Exchange Act**
**Against Defendants Cutler and Fearon**

207. Lead Plaintiff repeats, incorporates, and realleges each of the allegations set forth above as if fully set forth herein.

208. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Cutler and Fearon.

209. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Eaton's common stock and options on such common stock and by

participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus, Eaton is primarily liable under Section 10(b) of the Exchange Act.

210. As set forth above, Defendants Cutler and Fearon were controlling persons of Eaton during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including the Merger and any related material tax consequences, including on the Company's ability to do a tax-free spin-off of any of its businesses following the Merger.

211. By virtue of the foregoing, Defendants Cutler and Fearon each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Eaton, including the content of its public statements with respect to the Company's ability to engage in a tax-free spin-off of any of its businesses following the Merger.

212. Defendants Cutler and Fearon acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Eaton common stock and options during the Class Period.

213. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Eaton common stock and options, Lead Plaintiff and other members of the Class purchased Eaton common stock and options at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Eaton common stock and options at artificially inflated prices. As set forth herein, when the true

facts were subsequently disclosed, the price of Eaton common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Eaton common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth began to be disclosed.

214. By reason of the foregoing, Defendants Cutler and Fearon are liable to Lead Plaintiff and the members of the Class as controlling persons of Eaton in violation of Section 20(a) of the Exchange Act.

**COUNT III**
**Violation of § 20A of the Exchange Act**
**(Against Defendant Cutler)**

215. Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

216. This Count is asserted pursuant to Section 20A of the Exchange Act against Defendant Cutler, on behalf of Lead Plaintiff and all members of the Class who purchased Eaton stock contemporaneously with any of Cutler's sales of Eaton stock during the Class Period.

217. Cutler sold substantial numbers of shares of Eaton stock during the Class Period while in possession of material, adverse, nonpublic information. This conduct violated Section 20A of the Exchange Act.

218. As set forth in the amended PSLRA certification attached hereto as Exhibit A, Lead Plaintiff purchased shares of Eaton stock on the same day as or close in time to sales of Eaton stock made by Cutler while he was in possession of material, adverse, nonpublic information. These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

219. Numerous other Class members also purchased Eaton stock contemporaneously with Cutler's sale of stock during the Class Period.

220. Cutler violated Section 10(b) of the Exchange Act by selling securities while in possession of material, nonpublic information, as described herein. *See* Section VII, *supra*.

221. Accordingly, under Section 20A of the Exchange Act, Cutler is liable to Lead Plaintiff and the Class for all profits gained and losses avoided by him as a result of his stock sales.

222. Cutler is required to account for all such stock sales and disgorge his profits or ill-gotten gains.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Ordering an accounting of Defendant Cutler's insider trading proceeds;

D. Disgorgement of Defendant Cutler's insider trading proceeds;

E. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

F. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

G. Granting such other and further relief as the Court deems just and proper.

## XIII. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: January 13, 2017

**LABATON SUCHAROW LLP**

By: *\/s/ Thomas A. Dubbs*
Thomas A. Dubbs

Louis Gottlieb
Irina Vasilchenko
Jeffrey A. Dubbin
Wendy Tsang
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: lgottlieb@labaton.com
ivasilchenko@labaton.com
jdubbin@labaton.com
wtsang@labaton.com

***Lead Counsel for the Class***

**CERTIFICATE OF SERVICE**

I, the undersigned, state that I am employed in the City and County of New York, State of New York, that I am over the age of eighteen (18) years and not a party to the within action, that I am employed at Labaton Sucharow LLP, 140 Broadway, New York, New York 10005, and that on January 13, 2017, I caused to be served a copy of the attached **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** to the parties by the following means of service:

[X] BY E-FILE: I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record registered with the Court's electronic filing system.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct. Executed on the 13th day of January, 2017.

*/s/ Thomas A. Dubbs*
THOMAS A. DUBBS