**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE EATON CORPORATION SECURITIES LITIGATION

16-cv-5894 (JGK)

OPINION AND ORDER

---

**JOHN G. KOELTL, District Judge:**

This is a consolidated securities action purportedly
brought on behalf of a class of all purchasers of publicly
traded common stock and/or exchange-traded options on such
common stock of Eaton Corporation PLC ("Eaton" or the "Company")
between May 21, 2012 through June 28, 2014 (the "class period").
The lead plaintiff, South Carolina Retirement Systems Group
Trust (the "plaintiff"), filed a Consolidated Class Action
Complaint ("CCAC") on January 13, 2017. The plaintiff asserted
violations of Section 10(b) of the Securities Exchange Act of
1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5
promulgated thereunder, 17 C.F.R. § 240.10b-5, against Eaton and
two senior executives of the Company, namely, Alexander M.
Cutler and Richard H. Fearon (collectively, the "individual
defendants" and together with Eaton, the "defendants"). The
plaintiff also asserted control person liability under Section
20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the
individual defendants. The defendants now move to dismiss the
CCAC pursuant to Federal Rule of Civil Procedure 12(b)(6).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-

4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937

F.2d 767, 773-74 (2d Cir. 1991); see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V., 89 F. Supp. 3d 602, 607-08 (S.D.N.Y. 2015); Silsby v. Icahn, 17 F. Supp. 3d 348, 353-54 (S.D.N.Y. 2014), aff'd sub nom., Lucas v. Icahn, 616 F. App'x 448 (2d Cir. 2015).

## II.

The following facts alleged in the CCAC are accepted as true for purposes of the defendants' motion to dismiss.

Eaton is an Ireland-based manufacturer of engineered products such as hydraulic equipment, fluid connectors, electrical distribution equipment, and engine components, which are marketed to customers in the industrial, agricultural, construction, aerospace, and vehicle markets. (CCAC ¶ 2.) Cutler was Eaton's Chairman and Chief Executive Officer ("CEO") from August 2000 until his retirement in May 2016. (CCAC ¶ 24.) Fearon is Eaton's Vice Chairman and Chief Financial and Planning Officer ("CFO"). (CCAC ¶ 25.)

The plaintiff alleges that Eaton has historically been a vehicle component manufacturer based in the United States, but in the past few decades has been making strategic shifts away from its vehicle and automotive business. (CCAC ¶ 3.) On May 21, 2012, the Company announced plans to merge with Irish-headquartered Cooper Industries plc. ("Cooper"), an electrical products manufacturer, and reincorporate in Ireland.

4

(CCAC ¶¶ 4, 6.) Upon announcement of the merger, analysts began wondering whether there would be a "potential, future spin-off or other divestiture of Eaton's vehicle business." (CCAC ¶ 56.)

On an earnings call on May 21, 2012, the day the merger was announced, an analyst noted that Eaton was "looking a lot more like an electrical company" and asked Cutler if analysts "should . . . expect more portfolio evolution over time." (CCAC ¶ 58.) Cutler responded by stating: "We have continued and will continue to grow our 2 vehicle businesses, primarily through internal investment. . . . It was really consistency with our historical business. At this point . . . we are not anticipating, it's not in our active planning, any substantial additional change in the portfolio as the result of this transaction." (Hammel Decl. Ex. 2 at 11; CCAC ¶ 58.)[1]

On that same call, another analyst asked if the Company was "precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time?" (CCAC ¶ 59.) Cutler answered: "Yes, there's nothing in the deal per se that would prevent us from taking portfolio moves. But we have no such plans." (Hammel Decl. Ex. 2 at 12; CCAC ¶ 59.)

---

[1] The CCAC quotes only select portions of the statements made by the defendants, but the Court is "entitled to consider the full text of those documents in ruling on the motion to dismiss." San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 809 (2d Cir. 1996).

On June 22, 2012, Eaton filed with the SEC a Preliminary
Proxy Statement in connection with the merger and, on September
14, 2012, filed with the SEC a Definitive Proxy Statement
inviting shareholders to attend a special meeting on October 26,
2012 and recommending that they vote to approve the merger.
(CCAC ¶¶ 64, 76.)  Eaton completed the merger with Cooper on
November 30, 2012.  (CACC ¶ 45.)

On November 13, 2012, Cutler attended a conference where a
member of the audience noted that "[t]here is a lot of talk of
the ability to divest businesses that you may not necessarily
think are core any more or to change the profile of the
Company," and asked "what is the thought in terms of the ability
if you decided to sell some of those businesses? Is it a spin-
out? There is a market to be able to sell and what's your
thought on things like that?"  (CCAC ¶ 89.)  Cutler responded
that "there is nothing structural in our deal structure or any
of our covenants that, it prevents us from making changes in our
portfolio [but] that is not our plan at this point.  I've spoken
about that in a number of forums.  We really like the balance of
the businesses as we have and we've never been more bullish on
the prospects in our automotive and our truck business."
(Hammel Decl. Ex. 3 at 6; CCAC ¶ 89.)

During an investor conference call on February 5, 2013, an
analyst stated that "the combination of the vehicle assets has

6

some of us kind of speculating on what the future might hold"
and asked if there was "[a]nything you could share there about
what's next for the Eaton portfolio?" (Hammel Decl. Ex. 4 at
10.) Cutler responded by stating that there was "nothing
different . . . than I've said in numerous forums. Really,
since we announced the Cooper transaction . . . . But it doesn't
presage any other moves at this point. So we like the portfolio
we're with." (Hammel Decl. Ex. 4 at 10.)

Cutler participated in another conference on May 21, 2013,
where an audience member asked if there was "[a]nything about
the way the tax structure has formed over time [that] would
constrain things you might do strategically, whether that were a
larger-scale divestiture or anything else? . . ." (CCAC ¶ 97.)
Cutler answered by stating: "On the tax issue, no, we are
domiciled outside the US. We've got great flexibility in terms
of how we are able to move cash around the world, and that
really is the issue that gives us our great strategic
flexibility. So I would say no on that one." (CCAC ¶ 97.)

On June 10, 2013, a news article titled "Eaton Said to
Consider Sale of Auto-Parts Business" reported that the Company
was "weighing a sale of its auto parts unit." (CCAC ¶ 99.) On
June 12, 2013, the Company responded by issuing a press release
titled "Eaton Not in Discussions to Sell Its Automotive
Business." (Hammel Decl. Ex. 5.) It stated that "there was no

basis for published reports involving speculation on the sale of Eaton's automotive business." (Hammel Decl. Ex. 5.) The press release further quoted Cutler as stating that the Company was "not, and have not been in the process of discussions to sell [the] automotive business," that Cutler had "answered this question repeatedly since [Eaton] did the acquisition of Cooper," that the "vehicle business" was "a very important part of Eaton," "a very strong franchise," and that it was "a very strong profit-producing portion of [the] [C]ompany." (Hammel Decl. Ex. 5.)

At a November 13, 2013 conference, Fearon responded to a question regarding the automotive business by stating: "[I]s it a sacred cow? Well, first of all, I'd say nothing is a sacred cow," and went on to note that "[i]f we believe that a business is better owned by somebody else we will not be afraid to act on that, but at this juncture we really think that the structure of the portfolio works. The automotive business, for example, is a very high return business and throws off a lot of cash and a lot of . . . talent and management . . . and we really don't see a strong case to be made for changing right now, but we will continue to follow that." (Hammel Decl. Ex. 6 at 8; CCAC ¶ 103.)

On July 29, 2014, Eaton held an earnings call. As the presentation portion of the call was winding down, Cutler again addressed the "speculation about whether it would make sense

[for] Eaton to spinoff any of our businesses in light of the
transformation that we've been undergoing over the past 14
years." (Hammel Decl. Ex. 7 at 5.) He stated that:

> [A]s I have commented in many different
> forums . . . each of our businesses remain
> really . . . key contributors to our results
> . . . . But we also want to clarify that we
> are not able to do a tax free spin of any
> business for five years post the acquisition
> date of the Cooper transaction and that that
> limitation means that any spin would result
> in a very significant tax liability. So for
> the two reasons we think of our power
> management strategy and obviously this five
> year kind of prohibition that any form of
> kind of economic benefit means that . . .
> there is not a really compelling economic
> rationale for further portfolio
> transformation. So we hope that provide[s]
> some clarification to a number of questions
> that a number of investors have either asked
> or written about over the last month.

(Hammel Decl. Ex. 7 at 5; CCAC ¶¶ 107-09.) And in response to a
follow-up question from an analyst, Cutler elaborated that:

> Because of the legal steps we had to do to
> complete the Transaction for Cooper, there
> are a couple of code sections that make it
> not possible to do a tax free spin for five
> years, and it's a conclusion our team can do
> it, it's not a simple analysis, but they
> came to it and then several outside advisors
> corroborated that. So, we are very certain
> of that analysis is accurate. And . . .
> it's not new knowledge, we've been well
> aware of this all along and I have tried to
> indicate that, we had no intent to do any
> such actions, we're just trying to help make
> it clear for people that it's not simply an
> issue of will, it's also an issue of some
> very technical issues at this point.

(Hammel Decl. Ex. 7 at 13-14; CCAC ¶¶ 112-13.) Both parties agree that Eaton never sold its automotive business and it remains part of Eaton's portfolio. Both parties also agree it would have been possible under the tax code to complete the spin-off, but that it would not have been possible to complete the spin-off tax-free.

Nearly two years later, on July 22, 2016, the first complaint in this action was filed asserting a class period of November 13, 2013 through July 28, 2014. (See Dkt. No. 1 ¶ 1.) On November 4, 2016, an Amended Complaint was filed expanding the class period to encompass May 21, 2012 through July 28, 2014. (See Docket No 33 ¶ 1.). After appointment of the lead plaintiff, the CCAC was filed on January 13, 2017 alleging the same expanded class period of May 21, 2012 through July 28, 2014. (CCAC ¶ 1.) On February 13, 2017, the defendants moved to dismiss the CCAC pursuant to Federal Rule of Civil Procedure 12(b)(6).

### III.

The defendants argue that purchasers of Eaton securities in CCAC's expanded class period are barred from recovery by the statute of limitations. A securities fraud claim is "timely if filed no more than two years after the plaintiffs 'discover[ed] the facts constituting the violation.'" Merck & Co. v.

Reynolds, 559 U.S. 633, 637 (2010) (quoting 28 U.S.C. §
1658(b)(1)).

Here, the plaintiff claims that the alleged fraud was
disclosed on July 29, 2014. (CCAC ¶ 107.) Accordingly, the
two-year statute of limitations expired on July 29, 2016. The
initial complaint in this action, filed on July 22, 2016,
alleged a class period from November 13, 2013 through July 28,
2014. The CCAC, filed on January 13, 2017, expands the class
period to encompass claims by purchasers of Eaton securities
from May 21, 2012 through July 28, 2014. (CCAC ¶ 1.)

The defendants argue that the claims of class members in
the expanded class period in the CCAC – namely from May 12, 2012
through November 12, 2013 – are time barred because they were
not asserted before the statute of limitations expired on July
29, 2016. The plaintiff argues that the claims of those new
class members should relate back to the filing of the original
complaint on July 22, 2016.[2]

Judge Gardephe recently analyzed the question of whether a
class period can be expanded to include plaintiffs whose claims
were otherwise barred by the statute of limitations, and whether
those claims should relate back to the filing of the original

_____

[2] The CCAC was filed on January 13, 2017, after the statute of
limitations had expired. The statute of limitations had also
expired on November 4, 2016 when the Amended Complaint was
filed.

complaint. In a persuasive opinion, relying on the decision in Levy v. U.S. General Accounting Office, No. 97-cv-4016 (MBM), 1998 WL 193191, at *5 (S.D.N.Y. Apr. 22, 1998), aff'd, 175 F.3d 254 (2d Cir. 1999) (per curiam), Judge Gardephe found that the new class members' claims could relate back to the filing of the original complaint only if the new pleading satisfied Federal Rule of Civil Procedure 15(c)(1)(C), and only if the plaintiff omitted potential plaintiffs in their original complaint because of a "mistake" concerning the identity of the omitted plaintiffs. Wilder v. News Corp., No. 11-cv-4947 (PGG), 2015 WL 5853763, at *14-17 (S.D.N.Y. Oct. 7, 2015), reconsideration denied, 2016 WL 5231819 (S.D.N.Y. Sept. 21, 2016); see also Dial Corp. v. News Corp., No. 13-cv-6802 (WHP), 2016 WL 690895, at *2 (S.D.N.Y. Feb. 9, 2016).

Under Federal Rule of Civil Procedure 15(c)(1)(C), an amendment to a pleading that "changes the party or the naming of the party against whom a claim is asserted" relates back to the original pleading only when, as relevant here, there was a "mistake concerning the proper party's identity." Consistent with the 1966 Advisory Committee Note to the Amendment to Rule 15, this provision of the Rule has been applied to efforts to amend pleadings to add plaintiffs as well as defendants. See Wilder, 2015 WL 5853763, at *15. The plaintiff contends that Rule 15(c)(1)(C) is inapplicable in this case because the

unnamed class members from the expanded class period alleged in the CCAC are not "part[ies]" to the action.[3]

---

[3] The plaintiff also alleges that the claims of the newly added proposed members of the expanded class should relate back to the filing of the original complaint pursuant to Federal Rule of Civil Procedure 15(c)(1)(B) which applies if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading . . . ." That Rule does not apply because the plaintiff has attempted to add new parties rather than new claims based on the same "conduct, transaction, or occurrence" set out in the original pleading. See Dial, 2016 WL 690895, at *2. The plaintiff attempts to blur the distinction by arguing that the original complaint and the amended class complaint challenged "misstatements . . . directly related to the tax prohibition arising from the Merger . . . ." Pl.'s Mem. in Opp'n of Def.'s Mot. to Dismiss 5. But the securities claims in this case concern purchases of securities during a specific time period, based on alleged misstatements made during that time on which the plaintiffs allegedly relied. The defendants did not in fact have notice from the filing of the original complaint that they would be sued by an expanded class of plaintiffs relying on additional misstatements outside the original class period. See Fogel v. Wal-Mart de Mexico SAB de CV, No. 13-cv-2282 (KPF), 2017 WL 751155, at *13 (S.D.N.Y. Feb. 27, 2017). The plaintiffs allege that, in addition to alleged misstatement 8 on November 13, 2013, which was plainly alleged in the original complaint, the plaintiff also alleged misstatements 2, 5, and 6 from the CCAC in the original complaint. These were alleged misstatements or omissions by Cutler on May 21, 2012, October 31, 2012, and November 13, 2012. Pl.'s Br. Opp'n Defs.' Mot. Dismiss 5 (citing July 22, 2016 Compl. ¶¶ 21-23). But this is simply not true. While the initial complaint did indeed include those statements as part of the allegations, the original complaint was clear that the plaintiff only sought to recover for the fact that the defendants allegedly made false statements and omissions during the Class Period between November 13, 2013 and July 28, 2014. See July 22, 2016 Compl. ¶¶ 26-29. This was understandable because a defendant is only liable for alleged misstatements made during the Class Period. See Lattanzio v. Deloitte and Touche, LLP, 476 F.3d 147, 153 (2d Cir. 2007).

The Second Circuit Court of Appeals has noted that for
statute of limitations purposes, "[t]he theoretical basis on
which American Pipe rests is the notion that class members are
treated as parties to the class action." In re WorldCom Sec.
Litig., 496 F.3d 245, 255 (2d Cir. 2007); see also American Pipe
& Const. Co. v. Utah, 414 U.S. 538, 551 (1974) (noting that "the
claimed members of the class stood as parties to the suit until
and unless they received notice thereof and chose not to
continue" and concluding that the commencement of a class action
tolls the statute of limitations for all asserted class members
"who would have been parties had the suit been permitted to
continue as a class action"). The Second Circuit Court of
Appeals has also previously denied an attempt by investors to
relate back claims to an earlier class action complaint in which
the investors were not defined class members, because doing so
"would not accord with one of the rationales of American Pipe,"
namely that "commencement of the class action adequately
notifies the defendants . . . 'of the number and generic
identities of the potential plaintiffs who may participate in
the judgment.'" Arneil v. Ramsey, 550 F.2d 774, 782 (2d Cir.
1977) (quoting American Pipe, 414 U.S. at 554) overruled on
other grounds by Crown, Cork & Seal Co. v. Parker, 462 U.S. 345
(1983); see also Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d
1113, 1132 (11th Cir. 2004) (citing Arneil and "echo[ing] the

sentiments of the Second Circuit" in rejecting an attempt to relate back an expanded class with new unnamed members); cf. In re Direxion Shares ETF Tr., 279 F.R.D. 221, 237–38 (S.D.N.Y. 2012) (relying on Arneil and American Pipe in denying an attempt to intervene because the proposed intervenor was "never an 'asserted member'" of the original class).

These cases indicate that unnamed purported class members should be considered "parties" for the purposes of the statute of limitations. Therefore, expanding the class definition adds class members who are treated as parties for purposes of the statute of limitations. Accordingly, Federal Rule of Civil Procedure 15(c)(1)(C) is applicable in the context where, as here, a lead plaintiff attempts to expand the class period by amending the complaint to add new class members after the statute of limitations has expired.[4]

The plaintiff does not argue that there was a "mistake concerning the . . . identity" of the purported new class

---

[4] The plaintiff cites to Smith v. Bayer Corp., 564 U.S. 299, 313 (2011), where the Court rejected an argument that "an unnamed member of a proposed but uncertified class – qualifies as a party to the [] litigation." But the Court did so in the context of rejecting an attempt to expand the doctrine of nonparty preclusion and to stray from the general rule that "[a] court's judgment binds only the parties to a suit." Id. (noting the "narrowness of [the] exceptions" to the general rule and that the Court has taken a "constrained approach to nonparty preclusion" (citation omitted)). Accordingly, Smith is inapposite to the issue of whether unnamed purported class members -- who would be added to the class as a result of an expanded class period in an amended complaint filed after the statute of limitations has expired -- would be considered "part[ies]" under Federal Rule of Civil Procedure 15(c)(1)(C).

members. Rather, the plaintiff argues that even if expanded class members are "part[ies]" under Rule 15(c)(1)(C), the Rule's requirement that "[a]n amendment to a pleading relates back to the date of the original pleading" only if there was a "mistake concerning the proper party's identity" is inapplicable here. But the Second Circuit Court of Appeals has enforced the mistake requirement when newly added plaintiffs have attempted to relate back time-barred pleadings to a timely complaint. See Levy, 175 F.3d at 255; see also Wilder, 2015 WL 5853763, at *14-16 (rejecting under Rule 15(c)(1)(C) an amended complaint's attempt to expand the alleged class period, noting that "[n]umerous courts in this Circuit have followed Levy and imposed a mistake requirement where a plaintiff has added new plaintiffs and argues that 'relation back' applies under Rule 15(c)," and collecting cases); see also Dial, 2016 WL 690895, at *2; In re Bennett Funding Grp., Inc. Sec. Lit., No. M21-72, 2000 WL 565187 (JES), at *2 (S.D.N.Y. May 8, 2000).

Here, the plaintiff does not attempt to argue that the failure to include the purported class members who purchased Eaton securities prior to November 13, 2013 -- the beginning of the class period as alleged in the original complaint -- was the result of a mistake in identity. Accordingly, the CCAC's expansion of the class period to include such purchasers does not relate back to the original complaint, and any class period

beginning prior to November 13, 2013 is barred by the applicable statute of limitations. See Wilder, 2015 WL 5853763 at *16 (collecting cases). Thus, the plaintiff's claims based upon alleged misstatements or omissions made prior to the beginning of the class period as asserted in the original complaint -- prior to November 13, 2013 -- are time-barred because "[a] defendant . . . is liable only for those statements made during the class period." Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007) (quoting In re IBM Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998)); see also Wilder, 2015 WL 5853763, at *2.

IV.

The defendants move to dismiss the claims asserted in Count One for a violation of Section 10(b) and Rule 10b-5 based on alleged misrepresentations and omissions on the grounds that the plaintiff has failed to allege adequately (1) any material misstatements or omissions; and (2) scienter. Of the eight alleged misstatements or omissions cited in the CCAC, only one – alleged misstatement No. 8 – occurred during the original class period. That statement was Fearon's statement at a November 13, 2013 conference, described above, in which he stated in reference to the automotive business that "nothing is a sacred cow," and that "we really don't see a strong case to be made for changing that right now, but we will continue to follow that."

17

(CACC ¶¶ 103, 152.)  None of the other alleged misstatements
could be actionable because they were not made during the class
period.  Nevertheless the Court will consider all of its alleged
misstatements for purpose of completion because none of them are
actionable.

A.

Section 10(b), as effectuated by Rule 10b-5, makes it
"unlawful for any person . . . [t]o make any untrue statement of
a material fact or to omit to state a material fact necessary in
order to make the statements made, in the light of the
circumstances under which they were made, not misleading."  17
C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and
Rule 10b-5, the plaintiff must allege that the defendants, in
connection with the purchase or sale of securities, made a
materially false statement or omitted a material fact, with
scienter, and that the plaintiffs' reliance on the defendants'
action caused injury to the plaintiffs.  Ganino v. Citizens
Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also City of
Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F.
Supp. 2d 395, 409 (S.D.N.Y. 2011).

An alleged omission of fact is material if there is "a
substantial likelihood that the disclosure of the omitted fact
would have been viewed by the reasonable investor as having
significantly altered the 'total mix' of information made

18

available." Basic, Inc. v. Levinson, 485 U.S. 224, 231–32 (1988) (internal citation omitted). "Put another way, a fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 92–93 (2d Cir. 2010) (internal citation and quotation marks omitted); see also Silsby, 17 F. Supp. 3d at 358.

"A[n] omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Even though Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008); see also City of Roseville, 814 F. Supp. 2d at 410. However, corporations are "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting In re Time Warner, 9 F.3d at

267); see also In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239-40 (2d Cir. 2016); In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013), aff'd, 566 F. App'x 93 (2d Cir. 2014); ); Silsby, 17 F. Supp. 3d at 358.

B.

The plaintiff argues that the CCAC adequately alleges that the defendants misrepresented or omitted that the tax consequences of the merger between Eaton and Cooper made it economically prohibitive for Eaton to spin off its automotive business for a period of five years after the merger because the spin-off would not be tax free.

"The Supreme Court has instructed that '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5.'" Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100-01 (2d Cir. 2015) (quoting Basic, 485 U.S. at 239 n.17). And the Second Circuit Court of Appeals has "consistently held that 'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'" Id. (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)). Moreover, when the omitted information concerns a contingent or speculative event, "the materiality of those events depends on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of

20

the company activity." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks and citations omitted); In re Alliance Pharmaceutical Corp. Sec. Litig., 279 F. Supp. 2d 171, 196 (S.D.N.Y. 2003); see also In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 586 (S.D.N.Y. 2005). "The Supreme Court has expressly stated that in such circumstances no single event or factor is necessarily determinative of the materiality inquiry." Castellano, 257 F.3d at 180 (2d Cir. 2001) (quoting Basic, 485 U.S. at 239).

Here, the defendants were under no duty to disclose the hypothetical tax consequences of a potential spin-off of Eaton's automotive business because the defendants themselves repeatedly made clear that the "indicated probability" of such a spin-off was zero. See Castellano, 257 F.3d at 180.

For example, in response to an analyst question on the day the merger was announced on May 21, 2012, Cutler stated explicitly that Eaton "will continue to grow our 2 vehicle businesses, primarily through internal investment" and that Eaton was "not anticipating" or "active[ly] planning[] any substantial additional change in the portfolio as the result of this transaction."[5]  (Hammel Decl. Ex. 2 at 11; Am. Compl ¶ 58.)

---

[5] The plaintiff argues that it was materially misleading when, on May 21, 2012, Cutler was asked whether Eaton was "precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time," and Cutler answered that "there is nothing in the deal per se that would prevent us from taking portfolio

And on November 13, 2012, while Cutler noted that "there is
nothing structural in our deal structure or any of our covenants
that . . . prevents us from making changes in our portfolio", he
immediately followed that statement by noting that it was "not
our plan at this point" to spin off the automotive business and
that the Company "really like[d] the balance of the businesses
as we have and we've never been more bullish on the prospects in
our automotive and our truck business." (Hammel Decl. Ex. 3 at
6; CCAC ¶ 89.) Cutler reiterated the point during an investor
conference call on February 5, 2013, stating that there was
"nothing different . . . than I've said in numerous forums.
Really, since we announced the Cooper transaction. . . . But it
doesn't presage any other moves at this point. So we like the
portfolio we're with." (Hammel Decl. Ex. 4 at 10.) The
defendants thus made clear from the day the merger was announced

---

moves." See Pl.'s Mem. in Opp'n of Def.'s Mot. to Dismiss 13. But
the plaintiff truncates Cutler's full answer, in which he stated in
the very next sentence: "But we have no such plans." (Hammel Decl. Ex.
2 at 12.) When viewed in light of the numerous statements on May 21,
2012 that Eaton had no plans to spin off its automotive business, and
the fact that the five-year post-merger limitation period only
restricted Eaton's ability to spin off its business in a tax-
advantaged way -- rather than limit its ability to do spin-offs in
general (a fact with which the plaintiff agrees) -- the statement was
not materially misleading. See In re Nokia Oyj (Nokia Corp.) Sec.
Litig., 423 F. Supp. 2d 364, 396 (S.D.N.Y. 2006) (concluding that when
"selectively edited" statements were read "in context," the statements
were "not actionable").

that there were no plans to spin off Eaton's automotive business.

And while "[a] company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company," State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 850 (2d Cir. 1981), the Company attempted to do so when it issued a press release on June 12, 2013 unequivocally titled "Eaton Not in Discussions to Sell Its Automotive Business." (Hammel Decl. Ex. 5.) The press release explicitly stated that the Company was "not, and ha[s] not been in the process of discussions to sell [the] automotive business," that Cutler had "answered this question repeatedly since [Eaton] did the acquisition of Cooper," that the automotive business was "a very strong franchise" that was "a very important part of Eaton," and that it was "a very strong profit-producing portion of [the] [C]ompany." (Hammel Decl. Ex. 5.)

Fearon further explained that the Company had no plans to spin off the automotive business at a November 13, 2013 conference, stating that "at this juncture we really think that the structure of the portfolio works. The automotive business, for example, is a very high return business and throws off a lot of cash and a lot of management [and] talent . . . and we really don't see a strong case to be made for changing right now, but

we will continue to follow that."[6] (Hammel Decl. Ex. 6 at 8; CCAC
¶ 103.)

These repeated and explicit statements made by the
defendants themselves plainly indicated that Eaton was not
actively or seriously considering any plans to spin off its
automotive business -- a business which both parties admit Eaton
continues to own today.  See In re Time Warner Inc. Sec. Litig.,
9 F.3d 259, 268 (2d Cir. 1993) (noting that a company may be
obligated to disclose alternative approaches to reaching a
business goal "when those approaches are under active and
serious consideration").  This is not a case where the alleged
materiality of misstatements or omissions is undercut by
available market information.  Instead, information repeatedly

_____

[6] The plaintiff argues that Fearon's statement at this November
13, 2013 conference "that the vehicle business was not a 'sacred cow .
. . so that when the opportunity naturally arises for a transaction,
we can act" was misleading because it omitted that Eaton could not act
to spin it off until late 2017.  Pl's Mem. in Opp'n of Def.'s Mot. to
Dismiss 14 n.6.  In context, Fearon stated: "is [the automotive
business] a sacred cow? Well, first of all I'd say nothing is a sacred
cow. . . . We have a systematic process of looking at where those
kinds of actions would benefit us and a process, particularly on the
acquisition side, of keeping our hand in various situations so that
when the opportunity naturally arises for a transaction, we can act. .
. . [W]e are continuing those processes. If we believe that a business
is better owned by somebody else, we will not be afraid to act on
that."  (CCAC ¶ 152.)  This was followed by the statement quoted in
the text to the effect that Eaton did "not see a strong case for
changing that."  (Hammel Decl. Ex. 6 at 8; CCAC ¶ 103.)  The plaintiff's
argument is without merit because such statements regarding the
general ability of Eaton to perform acquisitions or spin-offs -- when
coupled with Fearon's statements at that same conference that Eaton
had no intention of spinning off the automotive business -- were not
materially misleading.  The plaintiff alleges no facts to show that
Eaton was actively pursuing a spin-off of the automotive business and
they admit that such a spin-off never occurred.

disseminated directly from the defendants about Eaton's lack of
any intention to spin off the automotive business puts into
context the same alleged misstatements or omissions on which the
plaintiff purports to rely. See Beleson v. Schwartz, 419 F.
App'x 38, 40 (2d Cir. 2011) (concluding that, based in part on
previous disclosures and "the totality of the available
information," the "market was adequately informed" and thus the
defendant "was not required to disclose this information because
it was not material").

Indeed, another court has already dismissed a similar
putative class action alleging a breach of fiduciary duty based
on Eaton's alleged fraud against fiduciaries of an ERISA plan
invested primarily in Eaton stock. See Graham v. Fearon, No. 16-
cv-2366 (PAG), 2017 WL 1113358, at *1-2 (N.D. Ohio Mar. 24,
2017) (noting that "on the day the Cooper acquisition was
announced, Cutler denied that the company had such plans. After
the acquisition, Eaton executives continued to inform analysts
that the company did not have plans to sell its vehicle
business"), appeal docketed, No. 17-3407 (6th Cir. Apr. 20,
2017). Accordingly, the theoretical tax consequences of a
hypothetical transaction that was never planned and never
occurred is not material, and the defendants were under no duty

to disclose them.[7] See In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d at 586-87 (determining that there was no duty to disclose a possible franchising model because the plaintiffs failed to allege "that any affirmative steps had been taken to implement a franchising plan"); see also S.E.C. v. Wyly, 33 F. Supp. 3d 290, 300 (S.D.N.Y. 2014) (noting that for details of a merger negotiation to be material, "this Circuit's cases establish that something beyond desire to transact is necessary").

The plaintiff argues that Cutler's own statements establish falsity, claiming that his July 29, 2014 statements clarifying that Eaton was "aware all along" that it was "not able to do a tax free spin[-off] of any business for five years post the acquisition date of the Cooper Transaction" is an admission. (See Hammel Dec. Ex. 7 at 5, 13-14; CCAC ¶¶ 107-09, 112-13.) The argument is without merit because the plaintiff fails to point to any statement made by any of the defendants to the effect that Eaton would in fact be able to spin off its automotive business on a tax-free basis. See In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 532 (S.D.N.Y. 2015) (noting that "a single purported admission by one individual defendant" was not actionable because it was "not inconsistent with defendants'"

_____

[7] Because the defendants were under no duty to disclose the hypothetical tax consequences of a conjectural spin-off of its automotive business, the plaintiff's argument that the defendants materially omitted this information from the June 22, 2012 Preliminary Proxy Statement and the September 14, 2012 Definitive Proxy Statement is without merit.

previous statements), aff'd sub nom. Tongue v. Sanofi, 816 F.3d
199 (2d Cir. 2016).[8] Moreover, Cutler's statement in no way
refutes the explicit and repeated statements that the Company
was never considering spinning off its automotive business.[9]

In sum, the plaintiff has failed to establish that the
defendants made any material misstatements, and has also failed
to establish that the Company was "subject to a duty to
disclose" the hypothetical tax consequences of a theoretical
spin-off of Eaton's automotive business that the Company
repeatedly disclaimed it had any intention to do, and never did.

C.

The defendants also argue that the plaintiff's Section
10(b) and Rule 10b-5 claim should be dismissed because the
plaintiff has not alleged facts supporting a strong inference of

_____

[8] Because the plaintiff has failed to show that this statement
was false, it is also not a basis to show knowing falsity for the
purposes of establishing scienter. See Glaser v. The9, Ltd., 772 F.
Supp. 2d 573, 597 (S.D.N.Y. 2011) (noting that to establish scienter
based on an alleged admission, "the later, allegedly corrective,
statement" should "directly contradict the earlier, allegedly false,
statement").
[9] The plaintiff also argues that rather than simply material
omissions, it has also pleaded an affirmative misstatement, namely,
that on May 21, 2013, an analyst asked Cutler whether there was
"[a]nything about the way the tax structure has formed over time would
constrain things you might do strategically, whether that were a
large-scale divestiture or anything else? . . ." (CCAC ¶ 149.)
Cutler responded: "On the tax issue, no, we are domiciled outside the
US. We've got great flexibility in terms of how we are able to move
cash around the world, and that really is the issue that gives us
great strategic flexibility. So I would say no on that one." (CCAC ¶
149.) While the plaintiff elides the quote into promoting the
flexibility "to do such spin-offs", Pl.'s Mem. 12, the flexibility
that was discussed was the flexibility to move cash and there are no
facts alleged to indicate that the statement was false.

scienter. The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99; see also City of Roseville, 814 F. Supp. 2d at 418–19 (same).

In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant. See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the

facts alleged." Id. at 324; see also Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010); Silsby, 17 F. Supp. 3d at 364-65.

The plaintiff argues that there is a strong inference of scienter based on the allegation that Cutler and Fearon, as high-level executives at Eaton, were closely involved in the planning of the merger and were thus presumably aware of the tax consequences of a potential future spin-off of the automotive business. But this does not constitute strong circumstantial evidence of conscious misbehavior or recklessness because there was no reason for any executive to be dishonest about the tax consequences of a hypothetical merger that the Company repeatedly and explicitly stated it had no plans to do. In essence, these are merely "general allegations regarding . . . the organizational role of a defendant" that "by themselves . . . are insufficient to raise a strong inference of a defendant's scienter." In re Marsh & Mclennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (collecting cases).

The plaintiff also contends that it has established a strong inference of scienter based on allegedly suspicious stock sales by the individual defendants. "[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995). Thus, to

establish a motive and opportunity to commit fraud based on a
defendant's stock sales, "the plaintiff must establish that the
sales were 'unusual' or suspicious.'" In re Gildan Activewear,
Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009)
(collecting cases); see also Acito, 47 F.3d at 54 (concluding
that there was no strong inference of scienter because an
individual defendant's stock sales were not "unusual"). "Factors
considered in determining whether insider trading activity is
unusual include the amount of profit from the sales, the portion
of stockholdings sold, the change in volume of insider sales,
and the number of insiders selling." In re Scholastic Corp.
Sec. Litig., 252 F.3d 63, 74-75 (2d Cir. 2001). "Insider stock
sales are unusual where the trading was in amounts dramatically
out of line with prior trading practices and at times calculated
to maximize personal benefit from undisclosed inside
information." In re Gildan, 636 F. Supp. at 270 (citation
omitted).

Even examining the individual defendants' stock sales
during the time-barred expanded class period, the plaintiff has
failed to establish that the two individual defendants' stock
sales were unusual.

During the 799-day expanded class period of May 21, 2012
through July 28, 2014, the plaintiff alleges that Cutler sold
460,457 shares of Eaton stock in the amount of $31,165,185.20.

(CCAC ¶ 157.) But the defendants have established that Cutler
sold $91,594,062 in Eaton stock during the 799 day period prior
to the expanded class period and the alleged fraud, and
$31,493,801 in the 799-day period after the expanded class
period when the alleged fraud was revealed and the stock price
had declined. (See Hammel Decl. Exs. 10-22; see also Def.'s
Mem. in Supp. of Mot. to Dismiss at 18-19.) The plaintiff has
not disputed the accuracy of the number of shares Cutler sold in
these periods. Accordingly, Cutler's stock sales during the
expanded class period were not unusual or suspicious, and do not
establish a motive to commit fraud that would lead to a strong
inference of scienter. See Malin v. XL Capital Ltd., 499 F.
Supp. 2d 117, 151 (D. Conn. 2007) (concluding that there was no
strong inference of scienter because certain defendants "sold
significantly more stock in the twenty-two month period prior to
the twenty-three-month Class Period than they did during it"),
aff'd, 312 F. App'x 400 (2d Cir. 2009); In re Glenayre Techs.,
Inc. Sec. Litig., No. 96-cv-8252(HB), 1998 WL 915907, at *4
(S.D.N.Y. Dec. 30, 1998) (determining that there was no strong
inference of scienter in part because the individual defendants
"sold more stock" in the year before the class period), aff'd,
Kwalbrun v. Glenayre Techs., Inc., 201 F.3d 431 (2d Cir. 1999).

As to Fearon, the plaintiff alleges that he sold 142,556
shares of Eaton Stock for $9,230,335.39 during the expanded

class period. (CCAC ¶ 157.) But the defendants have
established that Fearon actually sold $10,692,505 in stock in
the 799-day period after the alleged fraud was revealed and the
stock price declined, and increased the amount of Eaton shares
held from 285,069 shares at the beginning of the expanded class
period to 289,309 shares at the end of the expanded class
period. (See Hammel Decl. Exs. 23-39). Again, the plaintiff has
not disputed the accuracy of the number of shares Fearon sold or
bought in these periods. Fearon's stock sales during the
expanded class period were thus not unusual or suspicious. See
In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97-cv-1865(HB),
1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) (concluding that
there was no strong inference of scienter when individual
defendants sold significant amounts of their shares after the
alleged fraud was revealed and the share price declined); In re
Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561
(S.D.N.Y. 2004) (noting that individual defendants increased
their holdings during the class period, "a fact wholly
inconsistent with fraudulent intent").

While the amount of stock sales by the individual
defendants during the expanded class period were substantial,
the "portion of stockholdings sold" and the "change in volume of
insider sales" of Cutler and Fearon do not establish unusual
insider trading activity. See In re Scholastic Corp., 252 F.3d

at 74-75.  In sum, the CCAC fails to allege sufficient facts

that would support an "inference of scienter cogent and at least

as compelling as any opposing inference one could draw from the

facts alleged."  Tellabs, 551 U.S. at 323.  The compelling

opposing inference is that neither Cutler nor Fearon thought

that they had any obligation to discuss the possible tax

consequences of a theoretical spin-off that Eaton had no plans

to make, and that neither executive intended to deceive anyone

about such tax  consequences.

V.

In Count Two, the plaintiffs allege that the individual

defendants are liable under Section 20(a) of the Exchange Act

because they controlled Eaton, which in turn violated Section

10(b) and Rule 10b-5.  Section 20(a) provides:

> Every person who, directly or indirectly,
> controls any person liable under any
> provision of this chapter or of any rule or
> regulation thereunder shall also be liable
> jointly and severally with and to the same
> extent as such controlled person to any
> person to whom such controlled person is
> liable . . . unless the controlling person
> acted in good faith and did not directly or
> indirectly induce the act or acts
> constituting the violation or cause of
> action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control

person liability, a plaintiff must show (1) a primary violation

by the controlled person, (2) control of the primary violator by

33

the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108; see also In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016).  In this case, the plaintiff has not alleged a plausible primary violation of Section 10(b) and Rule 10b-5. Accordingly, the plaintiff has not satisfied the first element of a Section 20(a) claim, and that claim must also be dismissed.

**CONCLUSION**

The Court has considered all of the remaining arguments of the parties. To the extent not specifically addressed above, they are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss is **granted.**  The plaintiff's request for leave to replead is denied without prejudice to filing a formal motion that includes a copy of the proposed amended pleading. If the plaintiff does not file such a motion within twenty-one days of the date of this Opinion, or if the defendants successfully oppose that motion, all claims will be dismissed with prejudice.  The Clerk is directed to close all pending motions.

**SO ORDERED.**

**Dated:    New York, New York**
**September 20, 2017**

_____
**John G. Koeltl**
**United States District Judge**