**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re EATON CORPORATION SECURITIES LITIGATION,<br><br>This Document Relates to:<br><br>All Actions. | Case No. 16-cv-05894-JGK<br><br><u>CLASS ACTION</u><br><br>SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>Jury Trial Demanded |

# TABLE OF CONTENTS

Page


I. NATURE OF THE ACTION ..... 1

A. Background on Eaton and the Cooper Merger ..... 2

B. Investors and Analysts Repeatedly Focused on the Possibility of a Spin-off of the Vehicle Business During the Class Period as a "Powerful Catalyst" for the Stock ..... 3

C. A Tax-Free Spin-off Was the Only Economically Feasible Way of Divesting the Vehicle Business ..... 5

D. Defendants Repeatedly Made Misstatements and Misleading Half-Truths Regarding Eaton's Ability and Plans to Divest the Vehicle Business ..... 8

E. Eaton Finally Disclosed the "Prohibition" on Its Ability to Do Tax-Free Spin-Offs Post-Merger, Which Made a Divestiture Economically Unworkable ..... 11

II. JURISDICTION AND VENUE ..... 14

III. PARTIES ..... 15

A. Lead Plaintiff ..... 15

B. Defendants ..... 15

IV. CONTROL PERSON ALLEGATIONS ..... 17

V. SUBSTANTIVE ALLEGATIONS ..... 19

A. Eaton's Business Overview ..... 19

B. Start of Class Period: Eaton Acquired Cooper—a Key Step in Its "Transformation" into an Electrical-Focused Company ..... 20

C. Defendants Disclosed the Beneficial Tax Consequences of the Merger, But Not the Harmful Ones ..... 22

D. Analysts and Investors Understood That a Tax-Free Spin-off of Eaton's Vehicle Business Was More Advantageous Than Other Types of Divestitures and Repeatedly Raised This PossibilityDuring the Class Period ..... 24

1. Analyst Reports: Vertical Research Partners ..... 24

2. Analyst Report: Jefferies .......... 24

3. Analyst Report: Deutsche Bank .......... 27

4. Expert Analyses Confirm that a Taxable Sale Was Economically Unworkable .......... 28

5. Analyst Report: Vertical Research Partners .......... 31

E. Throughout the Class Period, Defendants Repeatedly Assured the Market that the Merger Did Not Constrain Eaton from "Spinning Off" Its Vehicle or Any Other Business .......... 31

1. May 21, 2012 – Defendants Announced the Merger and Omitted the Tax Consequences on Eaton's Ability to Spin-Off Its Businesses .......... 31

(a) Defendants Misrepresented Eaton's Ability to Spin-Off Its Vehicle Business in Response to Analysts' Direct Questions About It .......... 32

(i) Misleading Statement or Omission No. 1: Cutler Misled Investors by Saying that Such a Spin-off Was Not in Eaton's "Active Planning" .......... 32

(ii) Misleading Statement or Omission No. 2: Cutler Misrepresented that "There [Was] Nothing" in the "Tax Structure" of the Merger that "Would Prevent" a "Spin-off" .......... 34

(b) Analysts' Favorable Reactions to Defendants' Misstatements on the May 21 Call Support the Statements' Materiality .......... 35

(i) Analyst Report: Wells Fargo .......... 35

(ii) Analyst Report: Vertical Research Partners .......... 35

(iii) News Report: *Crain's Cleveland Business* .......... 36

2. Eaton's June 22, 2012 Preliminary Proxy Statement Did Not Disclose the Merger's Five-Year Economic Constraint on Spin-Offs Due to Adverse Tax Consequences of the Merger .......... 37

(a) Defendants Had Directed Analysts' Questions about Tax Consequences of the Merger to Eaton's Proxy Statements .......... 38

(b) Misstatement/Omission No. 3: The Preliminary Proxy .......... 39

(c) The Preliminary Proxy Also Revealed that Defendants Had Conducted Tax-Related Due Diligence Before Announcing the

Merger, Raising a Strong Inference of Their Knowledge of the Spin-Off Tax "Prohibition" Before Their First Misstatements ... 41

(d) After the Preliminary Proxy, Analysts Further Highlighted the Spin-Off as a Positive "Viable Option," Demonstrating the Materiality of Defendants' Omission ... 42

3. Eaton's September 14, 2012 Proxy Statement Again Did Not Disclose the Merger's Five-Year Economic Constraint on Spin-Offs Due to Adverse Tax Consequences ... 43

(a) Misstatement/Omission No. 4: The Proxy Repeated Defendants' Omission and Misleading Disclosures Regarding the Merger's Economic Constraint on Spin-Offs for Tax Reasons ... 43

(b) The Proxy Provided New Details About Defendants' Due Diligence, Further Strengthening the Inference that They Knew About the Tax Constraint on Spin-Offs Before the Class Period 45

(c) After the Proxy, the Market Continued to React Favorably to Eaton's Purported Spin-off Ability, Further Demonstrating the Materiality of Defendants' Misstatements and Omissions... 46

4. Defendants Continued to Mislead the Market with Reassurances Regarding the Viability of a Business Spin-Off as Market Interest Intensified ... 46

(a) Misleading Statement or Omission No. 5: Cutler's Misstatement at the October 31, 2012 Earnings Call ... 47

(b) Misleading Statement or Omission No. 6: Cutler's Misstatement at the November 13, 2012 Goldman Sachs Industrials Conference ... 48

(c) Analysts Were Reassured by Defendants' Continued Misstatements and Omissions, Further Underscoring Their Materiality ... 49

(i) Analyst Report: Vertical Research Partners ... 49

(ii) Analyst Report: MKM Partners ... 49

(iii) Analyst Report: Morgan Stanley ... 49

(d) Misleading Statement or Omission No. 7: Cutler's Misstatement at the February 5, 2013 Earnings Call ... 50

(e) Eaton's February 2013 Restructuring of Its Automotive and Truck Businesses Into a Single "Vehicle Segment" and Cutler's

Misleading Statement or Omission No. 7 Further Increased Market Focus on a Potential Spin-Off ........ 51

(i) Analyst Report: Jefferies ........ 51

(ii) Analyst Report: MKM Partners ........ 52

(iii) Analyst Report: Wells Fargo ........ 52

(iv) Analyst Report: KeyBanc ........ 52

(v) Analyst Report: MKM Partners ........ 53

(vi) Analyst Report: Barclays ........ 53

(f) Misleading Statement or Omission No. 8: Cutler's Misstatement at the May 21, 2013 EPG Conference ........ 54

(g) Analysts Reacted Favorably to Defendants' May 21, 2013 Misstatements, Further Supporting Their Materiality ........ 55

(h) Misleading Statement or Omission No. 9: Eaton's June 12, 2013 Press Release ........ 56

(i) Misleading Statement or Omission No. 10: Fearon's Misstatement at the November 13, 2013 Goldman Sachs Industrial Conference ........ 57

(j) Additional Developments and Defendants' Repeated Misstatements and Omissions Continued to Fuel Investor Anticipation of a Spin-off ........ 59

(i) Analyst Report: J.P. Morgan ........ 59

(ii) Analyst Report: Vertical Research Partners ........ 60

(iii) Analyst Report: Morgan Stanley ........ 60

(iv) Analyst Report: Deutsche Bank ........ 61

(v) Analyst Report: Wells Fargo ........ 62

F. Defendants Admitted the Truth Regarding the Five-Year "Prohibition" on Tax-Free Spin-Offs, Which They Were "Well Aware" of "All Along" ........ 63

1. Defendants' Corrective Disclosures on July 29, 2014 ........ 63

2. The Market Was Shocked by Defendants' Disclosures ........ 65

(a) Eaton's Stock Price Dropped by More Than 8% ........ 65

(b) Three Prominent Analyst Firms (Goldman Sachs, J.P. Morgan, and Deutsche Bank) Downgraded Eaton ........ 66

(c) Other Negative Market Reactions ........ 67

(i) Analyst Report: KeyBanc ........ 67
(ii) Analyst Report: Jefferies ........ 68
(iii) Analyst Report: Wells Fargo ........ 68
(iv) Analyst Report: Oppenheimer ........ 68
(v) Analyst Report: Morgan Stanley ........ 69
(vi) Analyst Report: Buckingham Research Group ........ 69
(vii) News Report: *Wall Street Journal* ........ 69

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO ........ 70

A. May 21, 2012 – Conference Call ........ 70

1. Misleading Statement or Omission No. 1 ........ 70

2. Misleading Statement or Omission No. 2 ........ 72

B. Misstatement/Omission No. 3: June 22, 2012 – Preliminary Proxy Statement ........ 73

C. Misstatement/Omission No. 4: September 14, 2012 Proxy Statement ........ 75

D. Misleading Statement or Omission No. 5: October 31, 2012 – Q3 2012 Earnings Call ........ 77

E. Misleading Statement or Omission No. 6: November 13, 2012 – Goldman Sachs Industrials Conference ........ 78

F. Misleading Statement or Omission No. 7: February 5, 2013 – Q4 2012 Earnings Call ........ 80

G. Misleading Statement or Omission No. 8: May 21, 2013 – EPG Conference ........ 81

H. Misleading Statement or Omission No. 9: Eaton's June 12, 2013 Press Release ........ 82

I. Misleading Statement or Omission No. 10: November 13, 2013 – Goldman Sachs Industrial Conference ........ 83

VII. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER ........ 85

A. Defendants Engaged in Massive and Highly Suspicious Insider Sales of Their Eaton Stock During the Class Period ........ 86

1. Cutler's and Fearon's Class Period Sales Were Highly Suspicious in Timing and Amount ..... 86

2. Cutler's Pre-Class Period Sales Do Not Render His Class Period Sales Non-Suspicious, and in Fact Confirm a Pattern of Insider Trading ..... 88

B. The "Transformational" Cooper Merger Was Core to Eaton's Operations, and the Individual Defendants Were Directly Involved in It, Including Any Potential Tax Implications ..... 90

VIII. CLASS ACTION ALLEGATIONS ..... 93

IX. LOSS CAUSATION ..... 96

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ..... 98

XI. NO SAFE HARBOR ..... 100

A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking ..... 100

B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking" ..... 101

C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language ..... 101

D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made ..... 102

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ..... 103

COUNT II Violation of § 20(a) of the Exchange Act Against Defendants Cutler and Fearon ..... 104

COUNT III Violation of § 20A of the Exchange Act (Against Defendant Cutler) ..... 106

XII. PRAYER FOR RELIEF ..... 107

XIII. JURY DEMAND ..... 108

Lead Plaintiff South Carolina Retirement Systems Group Trust ("South Carolina" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following against Defendants Eaton Corporation plc. ("Eaton" or the "Company"), and Alexander M. Cutler and Richard H. Fearon (collectively, the "Individual Defendants" and together with Eaton, the "Defendants"), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon, among other things, a review and analysis of (i) press releases, news articles, transcripts, and other public statements issued by or concerning Eaton and the Individual Defendants; (ii) research reports issued by financial analysts concerning Eaton's business; (iii) reports filed publicly by Eaton with the Securities and Exchange Commission (the "SEC"); (iv) news articles, media reports, and other publications concerning the networking technology industry and markets; (v) information provided by two consulting experts, one with expertise in corporate tax and the other in investment banking; and (vi) other publicly available information and data concerning Eaton, its securities, and the markets therefor. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Lead Plaintiff brings this federal securities class action on behalf of itself and all persons and entities that, during the period from May 21, 2012 through July 28, 2014, inclusive (the "Class Period"), purchased the publicly traded common stock of Eaton and/or exchange-traded options on such common stock, so long as they purchased at least one share or option from November 13, 2013 through July 28, 2014, inclusive (the "Original Class Period," *see* ECF No. 1), and were damaged thereby, except as excluded below (the "Class"). Excluded

from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Eaton during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Eaton's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (vi) persons and entities that purchased the publicly traded common stock of Eaton and/or exchange-traded options on such common stock ***solely*** during the period from May 21, 2012 through the time immediately preceding when Defendant Fearon made his alleged misstatement on November 13, 2013 (*see* ¶¶153, 215, *infra*);[1] and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person. Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act"), specifically, Section 10(b), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, Section 20(a), 15 U.S.C. § 78t(a), and Section 20A, 15 U.S.C. § 78t–1.

### A. Background on Eaton and the Cooper Merger

2. Eaton is an Ireland-based manufacturer of engineered products marketed to customers in the industrial, agricultural, construction, aerospace, and vehicle markets. The Company's products include hydraulic equipment, fluid connectors, electrical distribution equipment, and engine components.

[1] Therefore, this Class definition excludes from the Class anyone who was not the Lead Plaintiff, a named plaintiff (*e.g.* Steamfitters Local 449 Pension Plan and Helene Karafin Gabriele), or an absent putative Class member within the Original Class Period. Stated differently, it only includes those persons who the Court previously deemed to be "'parties'" **within the Original Class Period** for purposes of the statute of limitations or relation back (ECF No. 69 at 15).

3. For most of its over-100 year history, Eaton was primarily a U.S.-based vehicle component manufacturer. In the past few decades, however, the Company has been making strategic shifts away from its vehicle business (comprised of the truck and automotive divisions), while growing its electrical component businesses through a series of acquisitions, **spin-offs**,[2] and other divestitures.

4. In 2012, the Company engaged in a merger (the "Merger" or the "Cooper Acquisition") with Irish-headquartered Cooper Industries plc. ("Cooper"), an electrical products manufacturer, and reincorporated in Ireland. This $13 billion acquisition was, by far, the largest in Eaton's history. Defendants repeatedly hailed it as "transformational," particularly because it represented a key step in Eaton's metamorphosis into a company focused on manufacturing electrical products. Indeed, post-Merger, the electrical business generated approximately 60% of Eaton's revenues and profits. Numerous analysts also recognized the "transformational" nature of this Merger and its key role in Eaton's continued transition to an electrical-focused product portfolio.

### B. Investors and Analysts Repeatedly Focused on the Possibility of a Spin-off of the Vehicle Business During the Class Period as a "Powerful Catalyst" for the Stock

5. This action alleges that two types of Defendants' public statements during the Class Period were materially false or misleading because they omitted adverse tax consequences of the Merger – namely, Eaton's inability to do a tax-free spin-off of the vehicle business for five years: (1) misstatements about Eaton's continued, unconstrained **ability** to spin-off or

---

[2] "A spinoff is a type of divestiture" that involves a "distribution of new shares of an existing business or division of a parent company…. A corporation creates a spinoff by distributing 100% of its ownership interest in that business unit … to existing shareholders." Definition of Spin-off, INVESTOPEDIA, http://www.investopedia.com/terms/s/spinoff.asp (last visited Jan. 11, 2017).

otherwise divest its vehicle business after the Merger, and (2) misleading half-truths denying any **current** plans or intentions to divest that business while not disclosing the inability to do a tax-free spin-off as an additional fact affecting any such plans.

6. Eaton's continued ability to spin-off or otherwise divest its non-core businesses, most notably the now non-core vehicle segment, was critical to the Company's investors and analysts after the Merger. Indeed, during the Class Period, analysts repeatedly lauded Eaton's "options to potentially **spin-off**" or otherwise divest the vehicle business as a "final step in [its] transition to a more electrical/multi-industry business model," which would be a "powerful catalyst" for the stock post-Merger.

7. For instance, an April 2, 2013 Morgan Stanley report stated that "**the question regarding a possible spin of Eaton's Auto and Truck businesses has come up** at many conferences and investor events," and "[i]n response, **management has stated that while the Cooper transaction does not have any covenants that prevent it from taking any further strategic actions**, it **currently** has no plans." The same analyst later (on July 14, 2014) again highlighted that "**the possibility of a Vehicle spin** ... could be a **powerful catalyst** for multiple expansion [of Eaton stock price] towards and potentially beyond our $90 price target," and thus "reiterate[d] ETN as one of our top-picks."

8. Further, investors and analysts were also focused on the spin-off or other divestiture of Eaton's vehicle or other non-core businesses as a "viable option" after the Merger because it was a means to help pay off the $6.7 billion of debt that the Company took on to finance the acquisition. Defendants specifically raised this possibility by referencing "the possible sale of assets" to refinance this debt in the May 21, 2012 Merger announcement. Investors and analysts understood that a spin-off could also be used to generate capital, and thus

help pay off Eaton's debt post-Merger. For example, a June 4, 2012 article by *Crain's Cleveland Business* titled "Eaton Shift Away From Trucks Long In Coming; Acquisition Continues Manufacturer's Focus On Electrical Business," reported on Cutler's alleged misstatements at the beginning of the Class Period, stating: "the big price tag on the Cooper purchase, and the ton of debt Eaton must take on to swing the deal, leave open the possibility that Eaton will need to sell pieces of its past as it pursues its future."

### C. A Tax-Free Spin-off Was the Only Economically Feasible Way of Divesting the Vehicle Business

9. Investors and analysts viewed a potential **spin-off** as the most advantageous option because, unlike most other corporate divestitures such as subsidiary stock sales and asset sales, spin-offs often qualify as tax-free events.[3] Indeed, during the Class Period, analysts (*e.g.*, Jefferies, on February 5, 2013) estimated that a taxable sale of Eaton's vehicle business would result in a tax of up to **35%**.

10. Research conducted by Lead Plaintiff's consulting tax expert, Mark Baran, confirms the 35% corporate tax rate estimated by Jefferies. Given that Eaton's vehicle business had been a part of the Company since its inception, the expert concluded that it was reasonable to believe – as many analysts did – that the tax basis of the assets in that business, including intangibles, would be very low. According to Mr. Baran's analysis, because a very low tax basis was likely attributable to Eaton's vehicle division's assets, Eaton's sale of the vehicle business would likely have been subject to the highest statutory U.S. federal corporate tax rate of **35%** on the portion of the sale proceeds exceeding the tax basis or adjusted cost basis of the

[3] Spin-offs can be executed on a tax-free basis if they meet certain statutory and non-statutory criteria as set forth in 26 U.S.C. §355, related Internal Revenue Service ("IRS") regulations and judicial decisions.

assets. Mr. Baran concluded that this would be a conservative estimate of tax liability because it does not account for additional U.S. state and local taxes that likely also would have applied to a sale of the vehicle business. Thus, if a sale of the vehicle business could have generated approximately $6 billion, as one analyst estimated (*see* ¶157, *infra*), taxes on such a sale could have been more than **$2 billion**.

11. Accordingly, analysts concluded that a taxable sale of the vehicle business was not economically feasible because of the large tax liability that would result. For example, Jefferies, on February 5, 2013, estimated that a taxable sale at 35% would reduce the value of the Company by approximately **7% ($1.85 billion** in market capitalization). In contrast, it estimated that a tax-free spin-off of the vehicle business would increase the Company's value by **6%** (**$1.64 billion** in market capitalization). Thus, the analyst estimated that pursuing a taxable sale as opposed to a tax-free spin-off represented a total difference in value of **13%** (approximately **$3.5 billion** in market capitalization). Notably, this Jefferies analysis was an apparent follow-up to a Jefferies analyst's questioning of Defendant Cutler on an October 31, 2012 call whether "**[i]n 2013** is there anything from a **regulatory** basis vis-a-vis, I guess, the acquisition of Cooper that would **prevent you from doing additional divestitures if you wanted to?**" In response, Cutler had told him: "***No. There wouldn't be any—no regulatory restrictions.***" This further underscores the materiality and misleading nature of Defendants' public statements.

12. An analysis performed by an investment banking consulting expert retained by Lead Plaintiff, James Miller, confirmed that the tax liability on a potential sale of the vehicle business rendered the transaction economically unworkable. Specifically, Mr. Miller opined that the methodology in the February 5, 2013 Jefferies report was appropriate and in keeping

with industry custom and practice. He then conducted his own analysis as of that date using similar methodology and assumptions, which produced a result that was substantially similar to Jefferies'. Specifically, he found the total difference in value between the two transactions to be **16.7% ($4.6 billion** in market capitalization), with a tax-free spin-off creating an 8.8% increase ($2.4 billion in market capitalization), and a taxable sale causing a **7.9%** decrease ($2.2 billion in market capitalization).

13. Moreover, because of the length of the Class Period, the expert performed another analysis as of March 3, 2014, with updated Eaton information. That analysis showed that a tax-free spin-off of the vehicle business would result in an increase in shareholder value of 4% ($1.4 billion in market capitalization), while a taxable sale of the segment would result in a decrease of **6.6% ($2.2 billion** in market capitalization). This resulted in a total difference in shareholder value of **10.6%,** or $**3.6 billion** in market capitalization, as of March 2014.

14. Based on his analysis, Mr. Miller concluded that a reasonable investment banker would not have recommended a taxable sale of Eaton's vehicle business during the Class Period because it would result in a substantial decrease in shareholder value, particularly if Eaton could do a tax-free spin-off beginning on December 1, 2017. Accordingly, in Mr. Miller's opinion, a taxable sale of Eaton's vehicle business would not have been economically feasible. Thus, the expert's opinion corroborated similar conclusions by Eaton analysts that a tax-free spin-off was the only economically feasible way for Eaton to divest that business during the Class Period.

15. Moreover, if a tax-free spin-off were possible during the Class Period, Mr. Miller believed that a reasonable investment banker would have recommended such a spin-off because it would have provided a substantial increase in shareholder value and thus would have represented a positive strategic move by the Company. He found that this was consistent with

his review of Eaton analyst reports during the Class Period and that it explained why analysts repeatedly focused on the possibility of a tax-free spin-off as an important, positive catalyst for Eaton's stock growth.

### D. Defendants Repeatedly Made Misstatements and Misleading Half-Truths Regarding Eaton's Ability and Plans to Divest the Vehicle Business

16. Under these circumstances, throughout the Class Period, investors and analysts repeatedly asked Defendants whether Eaton would spin-off or otherwise divest its vehicle (or other) businesses, including whether anything about the Merger limited Defendants' **ability** to do so. For instance, at the November 13, 2012 Goldman Sachs Industrials Conference, an analyst directly questioned Cutler about Eaton's "**ability to divest business** that you may not necessarily think are core any more [sic]," including "what is the thought in terms of **the ability** if you decided to sell some of those businesses? Is it a **spin out**?" The ability to engage in a tax-free spin-off of Eaton's vehicle or other businesses during the Class Period was thus important to investors' and analysts' valuation of the Company, even if Defendants repeatedly expressed the view that they had no current plans to divest the business.

17. However, throughout the Class Period, in response to such investor and analyst questions, Defendants repeatedly assured them that nothing, including **tax implications**, "constrain[ed]" the Company's ability to do a post-Merger spin-off. For example, at a May 21, 2013 industry conference with analysts, an audience member asked Cutler if "[a]nything about the way **the tax structure** [of Eaton post-Merger] has formed over time would **constrain things you might do strategically**, whether that were **a larger-scale divestiture** or anything

else?" Cutler replied that "***[o]n the tax issue, no***," falsely denying that there were not any "constraints" on Eaton's ability to do a "larger-scale divestiture," *i.e.* a spin-off."[4]

18. Similarly, on May 21, 2012, the start of the Class Period, when Eaton announced the Merger, an analyst specifically asked if the Company was "precluded by any element of the **tax structure of the deal to spin off** the truck and automotive part at any time?" In response, Eaton's CEO, Alexander Cutler, falsely affirmed that "***[t]here is nothing in the deal per se that would prevent us from taking portfolio moves***," and then implied that the only limitation was the fact that they "***have no such plans***."

19. Although Defendants told investors on May 21, 2012 (and other occasions) that they had no **current** plans to divest the vehicle business, such statements were themselves misleading half-truths because they failed to inform investors that it **was not economically feasible** for Eaton to spin-off the vehicle business until late 2017. As Defendants knew from the beginning of the Class Period but failed to disclose, the tax consequences of the Merger made a tax-free spin-off impossible and thus a divestiture of the vehicle business during the Class Period was economically unworkable, as Defendants ultimately admitted. Defendants' statements created the misleading impression that Eaton **could** do the spin-off in the next year or two, when in fact Defendants knew they **were constrained from doing so for at least five years** from the Merger. As noted above, that omission thus rendered two types of Defendants' statements during the Class Period materially misleading: (1) statements about Eaton's continued, unconstrained **ability** to spin-off or otherwise divest its vehicle business after the

[4] The statements made by Defendants that are ***bolded and italicized*** are the statements alleged to be false and misleading. All other emphasis is in **bold**.

Merger and (2) misleading half-truths denying any **current** plans or intentions to divest that business while omitting the prohibition on tax-free spin-offs.

20. Indeed, analyst and news reports from the Class Period confirm that Defendants' half-truths created such a materially misleading impression. For example, the June 4, 2012 article by *Crain's Cleveland Business* discussed Cutler's purported denial in response to the analyst's question whether investors "[s]hould [] expect more portfolio evolution," concluding that his answer "**isn't a full-fledged no**," though "it isn't a yes."

21. Defendants, therefore, engaged in an intentional or reckless course of conduct throughout the Class Period to mislead investors as to Eaton's ability to divest the vehicle business, including by repeatedly telling such misleading half-truths in response to direct analyst questions on the subject and omitting these known, adverse tax consequences of the Merger.

22. Defendants also repeatedly invited investors and analysts to review the Proxy Statements for the Merger for more information regarding tax consequences of the transaction, including broader tax consequences beyond the taxation of the Cooper Acquisition itself. The Proxy Statements did not, however, disclose a critical, adverse tax consequence of the Merger – that a tax-free spin-off of Eaton's businesses was not possible for five years after the Merger, which rendered such a divestiture economically unworkable given the large tax liability that would result. Although the Proxy Statements contained risk warnings regarding **other** tax consequences of the Merger, such disclosures were inadequate and misleading because of Defendants' omission of the adverse facts regarding the economic unfeasibility of certain divestitures, particularly of Eaton's vehicle business.

23. As the Proxy Statements also revealed, Defendants performed due diligence and an in-depth analysis of the tax consequences of the Merger **before** its announcement on May 21, 2012. Accordingly, they knew that Eaton could not do a tax-free spin-off of its businesses for five years due to the tax consequences of the Merger – and thus knew of a material constraint on Eaton's ability to divest its vehicle business given the resulting high tax liability would render the transaction economically unworkable – from the outset of the Class Period, as Defendants, in fact, later admitted.

24. As a result, Defendants' material misstatements and omissions as alleged herein artificially inflated the price of Eaton stock, which reached a Class Period high of $79.44 **less than two weeks** before the end of the Class Period.

### E. Eaton Finally Disclosed the "Prohibition" on Its Ability to Do Tax-Free Spin-Offs Post-Merger, Which Made a Divestiture Economically Unworkable

25. On July 29, 2014, Defendants, after years of misleading the market regarding Eaton's supposedly unfettered ability to undertake a tax-free spin-off, finally disclosed to investors that Eaton could not, in fact, spin-off its vehicle business until late 2017 due to the tax consequences of the Merger. Specifically, Cutler admitted that it was "**not possible** to do a tax-free spin for five years" from the Merger and "that **limitation** means that any spin[-off] would result in **a very significant tax liability**," which rendered a divesture of the business economically unworkable. Indeed, Defendant Fearon acknowledged that a spin-off was "**difficult to make work economically**" because it would be taxed even "**higher** than just an asset sale for some complex reasons." Likewise, contrary to Defendants' prior half-truths denying any intent to divest the vehicle business—which created the misleading impression that they were simply **choosing** not to do it but retained the option if they changed their mind—

Cutler now revealed that Eaton's failure to divest its vehicle business during the Class Period was "not simply an issue of **will**"—*i.e.*, it was an issue of ability.

26. Crucially, Defendant Cutler further revealed that Defendants had been "**well aware"** of this "prohibition" "**all along**" and that this was "**not new knowledge**."

27. On this news, the price of Eaton shares dropped **8.2 percent**, from $76.75 per share to $70.51 per share, erasing nearly $**3 billion** from the Company's market capitalization. This substantial stock price drop, Eaton's largest in six years, upon Defendants' disclosures supports the materiality of the omitted information regarding Eaton's inability to do a tax-free spin-off, and thus the economic unfeasibility of a vehicle business divestiture for five years from the Merger.

28. Moreover, analysts' shocked reactions to these admissions further evidence the materiality of such information and the market's understanding that Eaton's inability to do a tax-free spin-off ruled out any divestiture of the vehicle business until December 2017. Three prominent analyst firms (Goldman Sachs, J.P. Morgan, and Deutsche Bank) downgraded Eaton stock as a result of these disclosures.

29. For example, a Deutsche Bank report issued on July 30, 2014 downgraded Eaton to "Hold" from "Buy" and greatly decreased its price target (from $90 to $77) based on the spin-off disclosure: "Perhaps more importantly, **the company threw cold water on the opportunity for further meaningful portfolio change** citing tax code items that require Eaton to wait 5 years after the close of the Cooper acquisition (Nov 30/12)." The report explained that "**[a] key element** to our previous ETN recommendation had been the prospect for the company to possibly pursue additional portfolio change … **[which] [n]ow [] appears off the table** … (presuming Eaton **cannot spin off its businesses tax-free nor sell them without incurring**

**substantial tax leakage** [*i.e.* tax liability])." Crucially, the report noted that "**Eaton had not previously publicly discussed these items –** although the company has maintained that investors should not expect significant additional portfolio actions (ie, [sic] sale or spin)." Thus, notwithstanding Defendants' denials of plans to divest the business, prominent analysts such as Deutsche Bank believed the option remained "on the table" and thus formed a "key element" of its recommendation to buy Eaton stock during the Class Period, and were surprised when the truth was revealed.

30. Likewise, a July 30, 2014 KeyBanc analyst report stated that Eaton's stock price was "hit" on Defendants' disclosures regarding the "clarity on **inability to spin off vehicle business**," – namely, the disclosures "concerning the **unlikelihood of any business divestiture or spin-off (*e.g.*, Vehicle Systems segment) given the immense tax inefficiency** that would ensue until late 2017." The report made clear that Defendants' disclosures meant that a spin-off of the vehicle business "**clearly remains off the table through 2017**."

31. Similarly, a July 30, 2014 Wells Fargo analyst report specifically criticized Defendants for not previously disclosing "that it could not spin off any businesses for at least five years without triggering tax consequences," noting the 8% "sell-off that occurred" on the news and substantially reducing its valuation of Eaton stock based on the "**removal of optionality** related to a potential business segment spin-off." The report emphasized that this "announced **inability to spin-off businesses** for the next five years" was not previously known to the market: "we believe a more proactive stance by the company may have helped mitigate the sell-off that occurred **ETN dropped 8.13%** vs. S&P 500 0.45% contraction on 7/29)." Moreover, a July 30, 2014 Oppenheimer report wrote that "tax-free spin-offs are essentially

barred for five years post the Cooper close," which "**pressured shares 8%**, erasing $3B in market value.").

32. Because of Defendants' material misstatements and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

33. The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and Section 20A of the Exchange Act, 15 U.S.C. § 78t–1.

34. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

35. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this district. Eaton has operations in this district and division, including the listing of the Company's stock on an exchange located in this District, the New York Stock Exchange ("NYSE").

36. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of NYSE, the world's largest stock exchange by market capitalization.

## III. PARTIES

### A. Lead Plaintiff

37. On December 13, 2016, this Court appointed South Carolina to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 45).

38. South Carolina, established in 1945, is a group trust that encompasses five defined-benefit retirement plans that provide retirement benefits to employees of state and local agencies, public school districts, police officers and firemen of the state and its political subdivisions, members of the General Assembly, judges, solicitors, circuit public defenders of the state and administrative law court judges, and certain members who served in the South Carolina National Guard. Specifically, South Carolina consists of (1) the South Carolina Retirement System, (2) the South Carolina Police Officers Retirement System, (3) the Retirement System for Members of the General Assembly of the State of South Carolina, (4) the Retirement System for Judges and Solicitors of the State of South Carolina, and (5) the South Carolina National Guard Supplemental Retirement Plan. As of June 30, 2016, South Carolina had more than $29.8 billion in total assets held in trust for pension benefits. As of the same date, South Carolina had 1,020 participating employers and more than 563,000 individual members. As set forth in its amended PSLRA certification (*see* ECF No. 51-1), South Carolina purchased Eaton common stock during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### B. Defendants

39. Defendant Eaton is an Irish corporation with principal executive offices at Eaton House, 30 Pembroke Road, Dublin 4, Ireland. Eaton was reincorporated under the laws of Ireland on May 10, 2012 in connection with the Company's acquisition of Ireland-based

Cooper, as of November 30, 2012. Prior to its 2012 reincorporation in Ireland, the Company had been incorporated in Ohio. As of December 31, 2015, Eaton had approximately 97,000 employees in over 60 countries and sold products to customers in more than 175 countries. Throughout the Class Period, Eaton common stock traded actively on the NYSE under the ticker symbol "ETN." During the Class Period, there were approximately 337 million to 476 million shares of Eaton common stock outstanding.

40. Defendant Alexander M. "Sandy" Cutler ("Cutler") was at all relevant times Eaton's Chairman and Chief Executive Officer ("CEO"). Cutler served as Eaton's Chairman and CEO from August 2000 until May 2016, when he retired. Prior to being elected Chairman and CEO in August 2000, he was Eaton's President and Chief Operating Officer from September 1995. Cutler was also a member of Eaton's Board of Directors from September 1993 until May 2016. Prior to September 1995, he had served in a variety of positions at Eaton since 1979, when Eaton acquired Cutler-Hammer, a company he had joined in 1975 as a financial analyst. Cutler was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Eaton's SEC filings (including proxy statements), quarterly conference calls, industry events, and events for analysts, investors, and the media.

41. Defendant Richard H. Fearon ("Fearon") was at all relevant times Eaton's Vice Chairman and Chief Financial and Planning Officer ("CFO"). Fearon has been Eaton's Vice Chairman and CFO from April 24, 2002 through the present. He became a member of the Board of Directors in September 2015. Prior to joining Eaton in 2002, he was a partner and founder of Willow Place Partners LLC since 2001. From 1997 to 2000, he served as the Senior Vice President of Corporate Development for Transamerica Corporation, a financial services

company that provides insurance and investment for organizations. Fearon was a direct and substantial participant in the fraud. During the Class Period, as more fully alleged below, he made materially false and misleading statements/omissions in Eaton's SEC filings (including proxy statements), quarterly conference calls, industry events, and events for analysts, investors, and the media.

## IV. CONTROL PERSON ALLEGATIONS

42. The Individual Defendants, by virtue of their high-level positions at Eaton, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of their collective actions.

43. Defendants Cutler and Fearon were closely involved in all aspects of the Company's operation. For example, Cutler was described in the Company's March 15, 2013 Proxy Statement as having "**detailed knowledge** of Eaton's businesses, customers, end markets, sales and marketing, technology innovation and new product development, supply chains, manufacturing operations, talent development, policies and internal functions."

44. Further, as described on Eaton's website, in Fearon's role as Chief Financial and Planning Officer, "he has responsibility for the **accounting**, control, corporate development, information systems, internal audit, investor relations, **strategic planning, tax** and treasury functions" at Eaton. Accordingly, Fearon was closely involved in all aspects of the Company's financials, including accounting, tax matters and "strategic planning." Fearon's responsibilities thus included the financial and tax due diligence for the Merger, and determining any adverse

tax implications, including tax implications preventing any potential strategic portfolio divestiture of the Company's vehicle or other businesses.

45. The Individual Defendants, as senior executive officers, and Cutler as a director, of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the NYSE, and governed by the federal securities laws, each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, so that the market prices of Eaton's publicly-traded common stock would be based on accurate information. Cutler and Fearon violated these requirements and obligations during the Class Period.

46. The Individual Defendants, because of their positions of control and authority as senior executive officers of Eaton, and Cutler as a director of the Company, were able to, and did, control the content of the SEC filings (including proxy statements), press releases, and other public statements issued by Eaton during the Class Period. Both were provided with copies of the statements at issue in this action before they were made to the public and had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Cutler and Fearon are responsible for the accuracy of the public statements detailed herein.

47. The Individual Defendants, because of their positions of control and authority as senior executive officers, and Cutler as a director, of Eaton, knew about the adverse tax implications of the Merger. They had access to the adverse undisclosed information about Eaton's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other corporate officers and employees, attendance at Eaton management and Board of Directors meetings and committees thereof, and

via reports and other information provided to them in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Eaton materially false and misleading.

48. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Eaton common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme and course of conduct: (i) deceived the investing public about the tax consequences of the Merger, including the undisclosed "prohibition" on Eaton's ability to conduct tax-free spin-offs for five years after the Merger, which constrained it from engaging in a beneficial divestiture of the vehicle business during the Class Period; (ii) deceived the investing public regarding Eaton's products, business, operations, and management, and the intrinsic value of Eaton's common stock and options; and (iii) caused Lead Plaintiff and members of the Class to purchase Eaton common stock and options at artificially inflated prices.

## V. SUBSTANTIVE ALLEGATIONS

### A. Eaton's Business Overview

49. Eaton began in 1911 as the Torbensen Gear & Axle Company, a New Jersey corporation. It produced patented truck axles, including the first ever gear-driven rear truck axle. To be closer to the automotive industry it served, the Company moved to Ohio in 1915 under the name Torbensen Axle Co., where it reincorporated in 1916. For most of its history, Eaton was primarily a vehicle component manufacturer.

50. More recently, however, Eaton adopted a business model of growing and pruning its product portfolio through mergers, acquisitions, asset sales, spin-offs, and other divestitures in order to focus more on its electrical components businesses and less on its

vehicle business. For example, in 1994, Eaton acquired the Westinghouse Electric Corporation Distribution and Control Business Unit for approximately $1.1 billion, gaining product lines in industrial controls and power distribution markets. In 1997, it divested part of its legacy truck axle and brake business to Dana Corporation for $287 million. In 1999, Eaton acquired Aeroquip-Vickers, a manufacturer of industrial and aerospace hydraulics, for approximately $1.7 billion. In 2000, it **spun off** its semiconductor equipment subsidiary Axcelis Technologies Inc. for proceeds of approximately $300 million on a **tax-free** basis. In 2008, it added further to its presence in electrical products and services markets when it acquired the power supply company Phoenixtec Power for approximately $568 million, followed by the Moeller Group (an electrical components company) for nearly $2.0 billion. Through these acquisitions and divestitures, the Company's products broadened significantly to include electrical hardware (such as powerline equipment), electrical systems and services for power distribution and control (such as grid maintenance and metering), and other non-vehicle products.

51. The market reacted favorably to this strategy, and Eaton's share price grew steadily over time. From Eaton's announcements of the Westinghouse acquisition on August 12, 1993, to the announcement of the Moeller Group acquisition on December 20, 2007, the Company's adjusted share price quintupled (from adjusted close stock price of $9.84 per share to $47.44 per share).

52. By the start of the Class Period, Eaton sold its products through five business segments: Electrical, Hydraulics, Aerospace, Automotive, and Truck.

### B. Start of Class Period: Eaton Acquired Cooper—a Key Step in Its "Transformation" into an Electrical-Focused Company

53. The Company's strategic shift toward electrical products culminated in the Company's May 21, 2012 announcement of its acquisition of, and related Merger with, Irish-

headquartered Cooper, for $11.8 billion. Cooper was primarily an electrical products manufacturer. According to Defendants, the acquisition was intended to "significantly increase the capabilities and geographic breadth of the combined company's power management portfolio and electrical business." As a result of the Merger, **approximately 60%** of the combined Company's revenues and profits would be generated by its electrical businesses.

54. Indeed, Defendant Cutler repeatedly stated that the Cooper transaction was "a **game changer**," a "**transformational** acquisition," and "an **enormously transformative** deal for Eaton," particularly for its transition to an electrical products-focused portfolio. For example, on the May 21, 2012 conference call, he stated: "We believe that the bringing together of these two companies results in an enterprise that is increasingly well-positioned for growth, **as we focus on this continuing theme of power management**" and "about 45% of Eaton in 2011 is our **electrical** business. Post the acquisition of Cooper, you can see that moves to 59%. So **a real growth of our electrical capability** and quite an impact on our mix."

55. Similarly, at the May 31, 2012 Sanford C. Bernstein & Co. Strategic Decisions Conference, Cutler emphasized:

> [The Cooper acquisition] **is an enormously transformative deal for Eaton** and one that we are really quite excited about. And perhaps the easiest way to think about this is if you think about Eaton's electrical business today, which is a little less than 50% of the Company, it will become based on 2011 sales approximately 59% of the Company. **This forms a very powerful electrical Company** within Eaton….

56. The following year, at the May 21, 2013 Electrical Products Group ("EPG") Conference, Cutler delivered a presentation hailing the Cooper transaction as "**transformational**," specifically in the context of how its product "**portfolio has changed very substantially**."

57. Eaton's announcement of the Merger was consistent with investor expectations that the Company would continue realigning its product portfolio away from legacy truck and automotive products, and toward electrical products and services. For example, on November 27, 2012, after the merger was approved by the Irish High Court, a Wells Fargo analyst report summarized the Company's transformation as follows:

> **ETN has undergone a metamorphosis to generating a majority of its revenue and operating profit from its Electrical businesses**…. **With the addition of Cooper, ETN's business mix becomes further weighted to Electrical and shifts away from exposure to vehicle markets.** Ultimately, we expect this to have a positive impact on earnings growth trajectory over the next few years and potentially lead to higher stock price valuation levels.

58. As a Morgan Stanley analyst report from July 14, 2014 stated, "[g]iven that management has clearly pointed to the non-Vehicle businesses as its core strategic focus, **the question regarding a possible spin[-off] of Auto & Truck has come up in many investor events"** since the Merger.

59. In short, the market expected Eaton to further its strategic realignment towards its electrical business, and thus increase return on their investment, by divesting at least part of its vehicle segment.

### C. Defendants Disclosed the Beneficial Tax Consequences of the Merger, But Not the Harmful Ones

60. The Merger had significant tax consequences. Under the agreement, Eaton would acquire Cooper through the formation of a new Irish holding company. The transaction resulted in Eaton's re-domiciling its headquarters and reincorporating from Cleveland, Ohio to Dublin, Ireland. The Company stated that this change would allow Eaton to lower its corporate tax rate, resulting in tax benefits of $160 million a year to shareholders. Indeed, Defendants repeatedly touted these tax benefits in announcing the Merger. For example, on the May 21,

2012 call, Cutler stated: "The **financial benefits [of the Merger]**, as I mentioned, **are attractive and substantial**; $375 million of operating synergies with over 80% of them realized by the third year, and **$160 million of** global cash management and **resultant tax benefits** in the mature year. And as you'll see, those come on board very quickly."

61. On November 30, 2012, Eaton completed the acquisition of Cooper for **$13 billion**, $1.2 billion more than the amount stated in its initial announcement of the transaction. In Eaton's related press release on November 30, Cutler described the Merger as follows: "The $13 billion acquisition of Cooper, the largest in Eaton's 101-year history, is a **transformational milestone** that expands our market segment reach, broadens our portfolio of products, services, and solutions, and strengthens our global geographic footprint."

62. By the end of 2012, the Company reported a corporate tax rate of roughly 8% – even lower than most analysts expected. By the end of 2013, the tax rate was down to 5%. Defendants continued to tout these tax benefits of the Merger throughout the Class Period. For example, on the February 5, 2013 earnings call, Cutler highlighted Eaton's tax rate by the end of 2012: "Tax rate of 7% to 9%, in line with our expectations when we announced the Cooper deal last spring and reflects the -- as you remember, the **$160 million of synergies that we said we would get on the tax line**."

63. Accordingly, Defendants disclosed the beneficial tax consequences and other beneficial aspects of the Merger, but not the negative consequences related to Eaton's ability to spin-off its businesses.

### D. Analysts and Investors Understood That a Tax-Free Spin-off of Eaton's Vehicle Business Was More Advantageous Than Other Types of Divestitures and Repeatedly Raised This PossibilityDuring the Class Period

64. Throughout the Class Period, analysts and investors understood that a spin-off of Eaton's vehicle businesses would be far more beneficial than a sale, for the simple reason that a spin-off would be tax-free while a sale would incur high taxes.

#### 1. Analyst Reports: Vertical Research Partners

65. For instance, on June 7, 2012, shortly after Eaton announced the Merger, a Vertical Research Partners analyst report considered the outcome if the legacy businesses were sold rather than spun-off tax-free:

> **Spin-offs could even be more compelling [than a sale] and create the potential for additional creative strategic combinations**…. We estimate Auto and Tools could provide **gross pre-tax proceeds of ~$1.6B[illion]**.... We would note however that Auto is legacy ETN Segment so **there is a chance an outright sale would have significant tax leakage.** In the face of higher post deal leverage and difficult 2013 outlook, the cash hit from tax leakage may make management more hesitant to pursue a sale in the near term.

Thus, the report specifically concluded that a tax-free spin-off of Eaton's vehicles businesses was superior to a taxed sale of the same.

66. An October 31, 2012 Vertical Research analyst report reiterated this point: "We continue to believe that ETN **should spin-off** Auto and Truck (and maybe Hydraulics) after the CBE deal closes. **A spin eliminates tax leakage associated with a sale** and the new spincos would be Irish."

#### 2. Analyst Report: Jefferies

67. Similarly, in a February 5, 2013 analyst report, Jefferies saw "the potential sale or **spin** of the auto and truck businesses (the new Vehicle segment) as a final step in Eaton's transition to a more electrical/multi-industry business model." The report conducted a detailed

analysis of the tax implications if Eaton were to sell its "less core" businesses and concluded that a sale of the Vehicle Segment "would appear to make less sense at present" because of the large tax liability, up to 35%, it would incur:

> Increasingly investors are focusing on the potential value that could be unlocked from the divesting of the Truck and Auto Components businesses as they appear to be less "core" now that nearly 60% of earnings will be attributed to the Electrical business. **We have run a scenario (Exhibit 7) in which both businesses are sold at 1.0x LTM Sales incorporating a 35% tax rate, and using half the proceeds to pay down debt and half in share repurchases. Given the recent strong performance of ETN stock, this divestiture would appear to make less sense at present**, but could still remain a longer term option, in our view, if the stock should hit a patch of underperformance.

68. Specifically, Jefferies estimated that a 35% taxable sale would reduce the value of the Company by approximately **7%** (**$1.85 billion** in market capitalization), as depicted in Exhibit 7 of the report:

**Exhibit 7: "New Eaton" post Asset Sales on 2013E**

**2013E EPS** **$3.60**

| Segment | Contribution to EPS | Assumed Multiple | Comparable Companies | Value per share |
|---|---|---|---|---|
| Electrical | 78% | 15 | Schenider, ABB Ltd., Emerson | $43 |
| Hydraulic / Aerospace | 22% | 16 | Parker Hannifin, Honeywell, Sun Hydraulics | $13 |
| Vehicle | 0% | 12 | Allison, BorgWarner, EnPro, WABCO,Autoliv, BrogWarner, Standard | $0 |
| | | | Total Value | $55 |
| | | | ETN Market Value | $59 |
| | | | **Premium Over Current Market Price** | **-7%** |

Source: Jefferies estimates, company data

Notably, this Jefferies analysis was an apparent follow-up to a Jefferies analyst's questioning of Defendant Cutler on an October 31, 2012 call whether "**[i]n 2013** is there anything from a **regulatory** basis vis-a-vis, I guess, the acquisition of Cooper that would **prevent you from doing additional divestitures if you wanted to?**" In response, Cutler had told him: "***No. There wouldn't be any—no regulatory restrictions.***"

69. A consulting investment banking expert retained by Lead Plaintiff, James Miller, reviewed this analysis in the Jefferies report and opined that Jefferies' methodology is appropriate and in keeping with industry custom and practice.

70. Mr. Miller's conclusions are based on his 18 years of experience as an investment banker, his review of public documents Eaton has filed with the SEC, and his review of analyst reports from the Class Period. Mr. Miller's professional experience includes overseeing over 100 public offerings of securities as the lead investment banker or lead capital markets banker at investment banks including Merrill Lynch, Deutsche Bank, and Lehman Brothers. He holds a B.A. in Economics and an M.B.A. in Finance.

71. Mr. Miller further confirmed that Exhibit 7 in the report shows the effect on shareholder value of a taxable sale of the vehicle segment, assuming a 35% tax rate included, as stated in the report.

72. The Jefferies report also included another analysis, Exhibit 6, which is a "sum of the parts evaluation" of the Company, as follows:

**Exhibit 6: "New Eaton" on 2013E**

**2013E EPS $4.25**

| Segment | Contribution to EPS | Assumed Multiple | Comparable Companies | Value per share |
|---|---|---|---|---|
| Electrical | 61% | 15 | Schenider, ABB Ltd., Emerson | $39 |
| Hydraulic / Aerospace | 19% | 16 | Parker Hannifin, Honeywell, Sun Hydraulics | $13 |
| Vehicle | 20% | 12 | Allison, BorgWarner, EnPro, WABCO,Autoliv, BrogWarner, Standard | $11 |
| | | | Total Value | $63 |
| | | | ETN Market Value | $59 |
| | | | **Premium Over Current Market Price** | **6%** |

Source: Jefferies estimates, company data

Mr. Miller explained that the Exhibit 6 "sum of the parts" analysis is equivalent to an analysis of the impact on shareholder value of a tax-free spin-off of the vehicle segment. Thus, in its Exhibit 6, Jefferies estimated that a tax-free spin-off of the vehicle business would result in a **6%** increase in value (**$1.64 billion** in market capitalization). Further, the analysis showed that the total difference in value between these two options (a tax-free spin-off as opposed to a taxable sale) was **13%** (**$3.5 billion** in market capitalization).

### 3. Analyst Report: Deutsche Bank

73. Similarly, a July 15, 2014 report from Deutsche Bank explained: "Because the Vehicle business dates back so many years (remaining segment acquisitions such as Ag Transmissions have been relatively few), the associated book value would appear to be extremely low. As such, a **sale** of Truck would face **significant U.S. and (other jurisdiction)**

**tax** applied to the gains. In turn, we believe it ultimately would make **more sense to spin the business off to shareholders (on a tax-free basis).**"

### 4. Expert Analyses Confirm that a Taxable Sale Was Economically Unworkable

74. Research conducted by Lead Plaintiff's consulting tax expert, Mark Baran, confirms the analysts' conclusions that the only economically feasible way for Eaton to divest its vehicle business would be through a tax-free spin-off rather than a taxable sale.

75. Mr. Baran is a Tax Principal at Marks Paneth LLP, a large regional accounting and consulting firm headquartered in New York City. He provides transactional tax advisory services to a broad spectrum of clients including publicly-traded corporations, privately-held companies and partnerships, and regulated financial institutions. His areas of expertise include tax structuring in connection with mergers, corporate reorganizations, and divestitures.

76. In view of the fact that Eaton's vehicle business had been a part of the Company since its inception, Mr. Baran concluded that it was reasonable to believe – as many analysts did (*see supra* at ¶¶65-67) – that the tax basis of the assets in that business, including intangibles, would be very low. Therefore, a sale of the vehicle business would likely have been subject to the highest statutory U.S. federal corporate tax rate of **35%** on the portion of the sale proceeds exceeding the tax basis or adjusted cost basis of the assets. *Accord* ¶76, *supra* (Jefferies analyst report "incorporating a 35% tax rate" into discussion of "the potential sale" of Eaton's vehicle business). Mr. Baran concluded that this would be a conservative estimate of tax liability because it does not account for additional U.S. state and local taxes that likely also would have applied to a sale of the vehicle business. Thus, if a sale of the automotive division could have generated approximately $6 billion, as one analyst estimated (*see* ¶157, *infra*), taxes on such a sale could have been more than **$2 billion**.

77. An analysis performed by Plaintiff's investment banking expert, Mr. Miller, confirmed that the tax liability on a potential sale of the vehicle business rendered the transaction economically unworkable. Thus, like the securities analysts who followed Eaton, Mr. Miller concluded that a tax-free spin-off was the only economically feasible way for Eaton to divest that business.

78. Specifically, Mr. Miller reviewed Eaton's public filings and analyst reports during the Class Period, and conducted his own analysis to determine the different impacts on Eaton's valuation of pursuing either a tax-free spin-off or a taxable sale of its vehicle business at two points during the Class Period – specifically, as of February 5, 2013 and as of March 3, 2014.

79. In particular, as noted above, Mr. Miller reviewed the Jefferies analyst report dated February 5, 2013, which conducted a similar analysis at the time. He opined that Jefferies' methodology is appropriate and in keeping with industry custom and practice.

80. Mr. Miller also conducted his own analysis as of that date, using similar methodology and assumptions with respect to deal structure and use of sale proceeds, as relates to Exhibits 6 and 7 of the Jefferies report.

81. The conclusion of Mr. Miller's analysis, as of February 5, 2013, was substantially similar to Jefferies'. He found the total difference in value between the two transactions to be **16.7%**, representing a difference of approximately **$4.6 billion** in market capitalization, with a tax-free spin-off creating an **8.8%** increase (**$2.4 billion** in market capitalization), and a taxable sale causing a **7.9%** decrease (**$2.2 billion** in market capitalization).

82. Further, Mr. Miller performed another analysis, using the same methodology, as of March 3, 2014, reflecting Eaton's filing of its 2013 form 10-K, an analyst update meeting, on February 28th, and updated research reports from seven analysts[5] on February 28th and March 3rd, which provided consensus data for analyst expectations for Eaton's performance in 2014.

83. Mr. Miller's analysis, as of March 3, 2014, showed that a tax-free spin-off of the Vehicle segment would result in an increase in shareholder value of 4% ($1.4 billion in market capitalization), while a taxable sale of the segment would result in a decrease of **6.6%** (**$2.2 billion** in market capitalization). This resulted in a total difference in shareholder value of **10.6%** as of March 2014, representing approximately **$3.6 billion** in market capitalization.

84. Mr. Miller was asked whether a reasonable investment banker would have recommended a taxable sale of Eaton's vehicle segment during the 5-year period following the Cooper Merger (with an understanding that a tax-free spin-off could be conducted after November 30, 2017). Mr. Miller opined that a reasonable investment banker would not have recommended a taxable sale of Eaton's vehicle segment during the Class Period because it would result in a substantial decrease in shareholder value, particularly if Eaton could do a tax-free spin-off beginning on December 1, 2017. Accordingly, in his opinion, a taxable sale of Eaton's vehicle business would not have been economically feasible.

85. Conversely, if a tax-free spin-off was possible during the Class Period, Mr. Miller opined that a reasonable investment banker would have recommended such a spin-off because it would provide a substantial increase in shareholder value and thus would represent a positive strategic move by the Company. This was consistent with his review of Eaton analyst

[5] William Blair, J.P. Morgan, Barclays, Credit Suisse, Morgan Stanley, Oppenheimer, and Jefferies.

reports during the Class Period and explained why analysts repeatedly focused on the possibility of a tax-free spin-off as an important, positive catalyst for Eaton's stock.

**5. Analyst Report: Vertical Research Partners**

86. Analysts also recognized that a spin-off could generate capital to help pay off Eaton's substantial debt and offer other strategic and economic benefits. For instance, as an June 7, 2012 Vertical Research analyst report explained:

> While spins would not bring sale proceeds per se, ETN could push debt down onto these entities and/or pull dividends out. We [believe] spin-offs are the most interesting scenario because the auto/truck spinco(s) could be Irish companies and therefore open up a strategic pathway for a suitor to redomicile just as ETN is doing with CBE and Pentair is doing with Tyco Flow.

87. Accordingly, analysts and investors understood that for Eaton, a tax-free spin-off of its Vehicle business was the only economically feasible way that Eaton could divest its vehicle business.

**E. Throughout the Class Period, Defendants Repeatedly Assured the Market that the Merger Did Not Constrain Eaton from "Spinning Off" Its Vehicle or Any Other Business**

**1. May 21, 2012 – Defendants Announced the Merger and Omitted the Tax Consequences on Eaton's Ability to Spin-Off Its Businesses**

88. On May 21, 2012, Eaton announced the Merger and held a conference call with investors to discuss it. On the call, Cutler implied that the Company had conducted a full assessment of the Merger's tax consequences, touting "resultant tax benefits of $160 million a year."

89. In the May 21 press release announcing the Merger, the Company raised the possibility of future asset sales as a means of refinancing the large amount of debt that Eaton took on to finance the acquisition: "Eaton has secured a $6.75 billion fully underwritten bridge financing commitment from Morgan Stanley Bank, N.A., Morgan Stanley Senior Funding, Inc.

and Citibank, N.A. to finance the cash portion of the Acquisition. Eaton plans to later refinance these bridge borrowings through a new term debt issuance, use of cash on hand, **and the possible sale of assets**."

90. Further, Defendant Cutler's remarks on the call were accompanied by a slideshow presentation, which described Eaton's long-term strategy, yet conspicuously omitted any reference to the Company's vehicle businesses. Based on this information, together with the May 21 press release noting "the possible sale of assets" for a future refinancing, numerous analysts made a reasonable connection between the Merger and a potential, future spin-off or other divestiture of Eaton's vehicle businesses.

91. Several analysts questioned Defendants about this very possibility on the call. Indeed, a news article on June 4, 2012 in *Crain's Cleveland Business* titled "Eaton Shift Away From Trucks Long In Coming; Acquisition Continues Manufacturer's Focus On Electrical Business," stated that "in viewing a slideshow presentation on Eaton's website that served as a companion to its May 21 teleconference, a few analysts made note during the call that references to the company's Truck and Automotive segments were conspicuous by their absence in a slide discussing Eaton's long-term strategy." Investors and analysts thus recognized the value-creating potential of such a spin-off.

### (a) Defendants Misrepresented Eaton's Ability to Spin-Off Its Vehicle Business in Response to Analysts' Direct Questions About It

#### (i) Misleading Statement or Omission No. 1: Cutler Misled Investors by Saying that Such a Spin-off Was Not in Eaton's "Active Planning"

92. Given Defendants' statements in the May 21, 2012 press release and earnings call presentation raising the possibility of a future divestiture of its vehicle business, a Vertical Research analyst asked Defendant Cutler the following on the May 21 call: "And then finally,

just thinking about we'll all fast forward to what's next in the portfolio after the dust settles here today. You mentioned electrical hydraulic era. **You obviously didn't mention truck or auto**. You're looking a lot more like an electrical company. **Should we expect more portfolio evolution over time?**" Cutler responded that "[w]e have continued and will continue to grow our two vehicle businesses, primarily through internal investment" and that "***we are not anticipating -- it's not in our active planning any substantial, additional change in the portfolio as a result of this transaction***." This statement was a misleading half-truth because Cutler failed to disclose that such a divestiture was economically unworkable due to tax consequences of the Merger that made tax-free spin-offs not possible for five years—a fact that Defendants knew "all along" but concealed from investors—given the large tax liability that would result. Thus, by omitting this adverse information, Cutler created the materially misleading impression that Eaton **could** spin off the vehicle business, but simply was **choosing** not to do so at this time, when in reality Eaton **could not** do so because tax consequences of the Merger made it economically unworkable. Indeed, as Cutler later revealed on July 29, 2014, Eaton's failure to divest its vehicle business during the Class Period was "not simply an issue of **will**" (*see* ¶169), but an issue of **ability**.

93. This was the first in a series of such misleading half-truths and omissions by Defendants that created the false impression that nothing constrained Eaton's ability to divest the vehicle business during the Class Period—a course of conduct that Defendants continued throughout the Class Period.

**(ii) Misleading Statement or Omission No. 2: Cutler Misrepresented that "There [Was] Nothing" in the "Tax Structure" of the Merger that "Would Prevent" a "Spin-off"**

94. The fact that Defendants were fully aware of the tax consequences of the Merger was made explicit by an interaction with an analyst from Gabelli & Co. later on the same call. Following up on Cutler's prior misstatement, he asked Cutler directly: "**Are you precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time**?" Defendant Cutler falsely answered: "***There is nothing in the deal per se that would prevent us from taking portfolio moves***," repeating that the only limitation was the fact that they "***have no such plans***." Cutler's statement was false and misleading because it omitted that Eaton was constrained from spinning off or otherwise divesting the vehicle business for five years after the Merger due to its tax consequences, which prohibited tax-free spin-offs and thus rendered any divestiture economically unworkable given the resulting high tax liability. Contrary to Cutler's assurance, Eaton was in fact economically "prevent[ed] from taking portfolio moves," *i.e.* spinning off or selling the business, by the "tax structure of the [Cooper] deal."

95. Further, Cutler's denial that Defendants "have no such plans" at that time continued Defendants' course of conduct of telling misleading half-truths, which created the materially misleading impression that Eaton **could** spin-off the vehicle business, but simply chose not to do so at this time, when in reality Eaton **could not** do so for five years because of the tax consequences of the Merger that made the business's divestiture economically unworkable.

96. Moreover, as discussed *infra* at ¶106, a third analyst (from Bank of America Merrill Lynch) later asked Defendants on that May 21 call for specifics about the tax

consequences of the Merger. In response, Fearon directed him to the forthcoming proxy statement, creating the reasonable expectation that the proxy statement would outline all material tax consequences of the Merger, as discussed *infra* at Section V.E.2.(a).

#### (b) Analysts' Favorable Reactions to Defendants' Misstatements on the May 21 Call Support the Statements' Materiality

97. The market reacted positively to Defendants' representation on the May 21 call that "nothing in the deal per se would prevent" Eaton from divesting any of its businesses and similar assurances.

##### (i) Analyst Report: Wells Fargo

98. A Wells Fargo analyst report issued on the same day reiterated its "Outperform" rating and price target and favorably noted: "To fund the approximate $6.3 billion cash portion of the transaction, ETN has secured a $6.75 billion bridge loan, which it plans to refinance later through new term debt issuance, use of cash on hand **and possible asset divestitures**."

##### (ii) Analyst Report: Vertical Research Partners

99. A Vertical Research Partners analyst report issued on June 7, 2012 maintained its "Buy" rating, stressing the Company's "**potential**" for a **tax-free spin-off** of its Automotive and Truck businesses as a "compelling" catalyst for the stock, which would "likely" occur in 2013:

> **Ultimately Asset Sales or Spin-offs Should be Expected** – We think ETN will continue to move its portfolio away from cyclical exposures toward more electrical.... **[W]e see ETN's Auto and Truck business as potential candidates for sale or spin-off. Any disposition of Auto and/or Truck is likely a 2013 event**. The potential to spin Auto and or Truck as new Irish companies, providing a path for a suitor to re-domicile just as ETN is doing with CBE and Pentair is doing with Tyco Flow, could be a very compelling proposition.... **Spin-offs could even be more compelling and create the potential for additional creative strategic combinations**.

Further, in highlighting a spin-off as a catalyst for the stock, the report noted the Company's statement in its May 21, 2012 press release that it planned to refinance the acquisition in part through "the possible sale of assets":

> **Asset Sales or Spin-Offs Could Follow Acquisition[.]**... **[U]ltimately we believe the Auto and or Truck segment could be divested or spun-off** although the timing of when that might happen is less certain. Post close we do expect management to confront questions about **future divestitures given language in the acquisition press release about asset sales** along with a continued portfolio migration towards electrical. Selling Auto post deal would put ETN's late cycle exposure (Aero + Electrical) at >70% of total revenues and would reduce the overall cyclicality of the business even more so. Selling Truck and Auto would put late cycle revenues above 80%.

**(iii) News Report: *Crain's Cleveland Business***

100. Similarly, news reports after the May 21 conference call also described investors' and analysts' interest in the potential for a spin-off of the vehicle business after the Merger, further supporting the materiality of Defendants' misstatements and omissions. For instance, a June 4, 2012 article by *Crain's Cleveland Business* titled "Eaton Shift Away From Trucks Long In Coming; Acquisition Continues Manufacturer's Focus On Electrical Business," reported on Cutler's statements at the May 21, 2012 conference call and the public's continued questions regarding "whether Eaton might sell or spin off either its Automotive or Truck segments," despite Defendants' statements that they had "no plans" currently to do so.

101. The *Crain's* article explained that such questions arose in part because "in announcing the deal that day, Eaton also stated that it **might turn to the sale of assets** to help repay debt" and "in viewing a slideshow presentation on Eaton's website that served as a companion to its May 21 teleconference, a few analysts made note during the call that references to the company's Truck and Automotive segments were conspicuous by their absence in a slide discussing Eaton's long-term strategy." Thus, the article stated that "the big price tag

on the Cooper purchase, and the ton of debt Eaton must take on to swing the deal, **leave open the possibility that Eaton will need to sell pieces of its past as it pursues its future**."

102. Moreover, the article quoted Cutler's exchange with the Vertical analyst on the May 21 conference call as to whether investors "should expect more portfolio evolution" (Misleading Statement or Omission No. 1 above), and concluded that Cutler's answer "**isn't a full-fledged no,**" though "it isn't a yes."

103. Accordingly, such reports demonstrate that Defendants' denials of any "plans' to divest the vehicle business were misleading half-truths: they omitted adverse tax consequences of the Merger that precluded tax-free spin-offs and thus rendered a divestiture of the business economically unworkable. Accordingly, such half-truths created the materially misleading impression, *i.e.* left "open the possibility," that Eaton could divest the business during the Class Period, when in reality it was constrained from doing so by the undisclosed tax consequences of the Merger.

**2. Eaton's June 22, 2012 Preliminary Proxy Statement Did Not Disclose the Merger's Five-Year Economic Constraint on Spin-Offs Due to Adverse Tax Consequences of the Merger**

104. On June 22, 2012, Eaton filed with the SEC a Preliminary Proxy Statement in connection with its Form S-4 registration statement under the Securities Act of 1933 for the Merger (the "Preliminary Proxy"). The filing included a communication to shareholders inviting them to attend a special meeting (on an undetermined date) for a vote on whether to approve the Merger, and recommending that they vote to approve it.

### (a) Defendants Had Directed Analysts' Questions about Tax Consequences of the Merger to Eaton's Proxy Statements

105. Eaton's May 21, 2012 press release announcing the Merger specifically directed the market "TO READ … CAREFULLY" the forthcoming joint proxy statement for further details about the Merger.

106. Likewise, when an analyst from Bank of America Merrill Lynch asked for specifics regarding the tax consequences of the Merger on the May 21, 2012 call, Fearon directed him to the upcoming Proxy statement because, even though the legal structure of the deal was already determined and vetted, it was complex:

> [Analyst:] And then the second question on tax structure. I thought one of the issues with making a large acquisition or an acquisition of foreign domiciled entity, because Eaton's tax mechanism[s] are structured in a very specific way. So how do you buy Cooper and reincorporate without undoing all the tax systems that you have inside the Company?
>
> [Fearon:] Andrew, **we will detail out the precisely [sic] legal structure [in] the proxy** that will be filed within the next few weeks. **I think you really do need to go through the detail to understand how the legal structure works for the transaction.** We are very comfortable with the transaction, and it's been thoroughly vetted by many more lawyers than I care to count.

In directing the analyst to the upcoming Proxy for "detail" of the deal's "precise[] legal structure" to be filed "within the next few weeks," Fearon further confirmed that Defendants had completed due diligence and knew about, and would disclose, the Merger's full tax implications. Stated differently, in directing investors and analysts to the upcoming Proxy statement, Fearon created a reasonable expectation that the Proxy would outline all material risks of the Merger, including any tax regulations that could limit Eaton's ability to engage in a spin-off of its businesses.

**(b) Misstatement/Omission No. 3: The Preliminary Proxy**

107. In the Preliminary Proxy, Eaton's directors (including Cutler as Chairman of the Board) "accept[ed] responsibility for the information contained" in the Preliminary Proxy, "[t]o the best of the knowledge and belief of the directors of Eaton (who have taken all reasonable care to ensure such is the case)," including specifically that its information "**is in accordance with the facts and *does not omit*** anything likely to affect the import of such information." This statement was false and misleading because the Preliminary Proxy **did omit** adverse, material facts regarding Eaton's inability to do tax-free spin-offs for five years after the Merger due to its tax consequences, which made a divesture of its vehicle business economically unworkable. The omission of such facts rendered Defendants' other disclosures in the Preliminary Proxy materially misleading, as discussed below.

108. The Preliminary Proxy outlined numerous risk warnings, including an extensive discussion of the Merger's tax consequences, with sections titled, for example, "U.S. Federal Income Tax Considerations," "Tax Consequences of the Transaction to Eaton and New Eaton," and "Irish Tax Considerations." These warnings regarding tax consequences were not limited to the taxation of the acquisition itself, but included broader tax implications from the Merger, such as those implicated by Internal Revenue Code Section 7874:

> Section 7874 provides an exception under which a foreign incorporated entity may, in certain circumstances, be treated as a U.S. corporation for U.S. federal income tax purposes.
> …
> Following the acquisition of a U.S. corporation by a foreign corporation, section 7874 can limit the ability of the acquired U.S. corporation and its U.S. affiliates to utilize U.S. tax attributes (including net operating losses and certain tax credits) to offset U.S. taxable income resulting from certain transactions.

In discussing these broader tax consequences, the Preliminary Proxy also reassured investors: "A corporation generally is considered a tax resident in the jurisdiction of its organization or

incorporation for U.S. federal income tax purposes. **Because New Eaton is an Irish incorporated entity, it would be classified as a foreign corporation (and, therefore, a non-U.S. tax resident) under these rules.**"

109. However, the Preliminary Proxy made no mention of Eaton's inability to do tax-free spin-offs for five years after the Merger due to its tax consequences, which made a divesture of its vehicle business economically unworkable – continuing the course of conduct outlined above. The Preliminary Proxy omitted this information even though it outlined numerous risk warnings regarding tax consequences that were not limited to the taxation of the acquisition itself, but included broader tax implications from the Merger, and was an issue analysts had raised with Defendants at the May 21, 2012 conference call discussing the Merger, to which Defendants responded by directing them to the Preliminary Proxy, *see* Section V.E.2.(a), *supra*. Thus, the Preliminary Proxy failed to disclose to investors what Defendants knew "all along"—that Eaton was constrained from spinning off or otherwise divesting the vehicle business for five years due to the tax consequences of the Merger that made such divestitures economically unworkable, under applicable Internal Revenue Code tax laws.

110. Further, Defendants' various risk warnings in the Preliminary Proxy regarding the potential tax consequences of the transaction were inadequate and themselves misleading in that they omitted to disclose this adverse information that was known to Defendants by that time. In particular, Defendants' risk warnings did not enable Eaton investors and analysts to learn about the negative tax implications of the Merger that would prohibit tax-free spin-offs and thus render economically unworkable a divestiture of the vehicle business for five years, as demonstrated by continued investor and market interest in such a spin-off as a "viable option" throughout the Class Period.

**(c) The Preliminary Proxy Also Revealed that Defendants Had Conducted Tax-Related Due Diligence Before Announcing the Merger, Raising a Strong Inference of Their Knowledge of the Spin-Off Tax "Prohibition" Before Their First Misstatements**

111. The Preliminary Proxy contained new details about the Company's due diligence, including Defendants' (and specifically Cutler's) scrutiny into the tax consequences of the Merger as early as March 2012. Specifically, Defendants represented that:

> **On March 26, 2012, Mr. Cutler** contacted Mr. Hachigian [Cooper's CEO] to express Eaton's need to understand more about Cooper's **corporate and tax structure** in order to further evaluate the terms of a potential transaction. As a result of this conversation, **on March 29 and 30, 2012**, representatives of Eaton[6] and of its outside tax advisor met with representatives[7] of Cooper in Houston, Texas **for purposes of conducting due diligence with respect to tax matters**.

This "due diligence **with respect to tax matters**" included a full analysis of normally anticipated tax issues, including an analysis of issues about which the Company was on notice, such as restrictions on its ability to conduct acquisitions or divestitures – an important part of its business model (*see* ¶50), and an issue that analysts raised with Defendants since the Merger was announced. *See* Section V.E.1, *supra*.

112. Thus, the Company's due diligence for the Merger resulted in Defendants being informed of a tax consequence as important as the five-year economic constraint on spin-offs by **March 29-30, 2012**, and certainly no later than the deal's announcement on May 21, 2012. This is consistent with Defendants' subsequent revelation almost two years later, on July 29,

---

[6] A subsequent disclosure in Eaton's Definitive Proxy Statement identified the Eaton "representatives" as follows: John S. Mitchell, Eaton's Senior Vice President – Taxes, and Patricia L. Hennis, Eaton's Vice President – Federal Tax Strategy. *See* Section V.E.3, *infra*.

[7] A subsequent disclosure in Eaton's Definitive Proxy Statement identified the Cooper "representatives" as follows: John B. Reed, Cooper's Vice President, Taxes; David A. Barta, Cooper's Senior Vice President and Chief Financial Officer; and Bruce M. Taten, Cooper's Senior Vice President, General Counsel and Chief Compliance Officer. *See* Section V.E.3, *infra*.

2014, that Defendants knew "**all along**"—*i.e.* before they announced the Merger and made their false and misleading statements on the May 21, 2012 call—that as a result of the Merger, the Company faced a tax-related "prohibition" making it "not able to do a tax-free spin[-off] of any business for five years."

**(d) After the Preliminary Proxy, Analysts Further Highlighted the Spin-Off as a Positive "Viable Option," Demonstrating the Materiality of Defendants' Omission**

113. In the months after Eaton's May 21, 2012 announcement of the Merger and release of its Preliminary Proxy, stock analysts continued to highlight Eaton's ability to spin-off the vehicle business after the Merger as a positive for the Company's stock.

114. For example, a July 24, 2012 MKM Partners report reiterated its "Buy" rating on Eaton, commenting that the "greater electrical exposure and the potential for sufficient critical mass to warrant a sale or **spin of the vehicle businesses could be a positive for ETN's valuation**."

115. Likewise, an August 21, 2012 KeyBanc Capital Markets analyst report reiterated its "Buy" rating on Eaton and raised its price target (from $56 to $58), "highlighting ETN as a top idea ahead of the CBE [Cooper] acquisition" and noting a future **spin-off** of the "non-core" vehicle businesses as a "**viable option**," notwithstanding Defendants' statements that they had no plans to do so at the time: "**We see options to potentially spin-off assets deemed as potentially non-core over time (namely Truck and Auto),** while aligning resources/focus on its core Electrical, Aerospace and Hydraulic platforms." With respect to time frame, the report further explained that Defendants may "**spin-off**" the vehicle businesses after "the next year or two" from the Merger—*i.e.* **in late 2013 or 2014**—given that such "portfolio changes would further underscore ETN's shift to a multi-industry company," and noting specifically that "**a**

**spin-off** of the Truck/Auto segments would result in Electrical becoming an increasingly larger piece of the business at nearly 75% of the mix, with Hydraulics at 15% and Aerospace at 10%."

### 3. Eaton's September 14, 2012 Proxy Statement Again Did Not Disclose the Merger's Five-Year Economic Constraint on Spin-Offs Due to Adverse Tax Consequences

116. On September 14, 2012, Eaton filed with the SEC a Definitive Proxy Statement pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Proxy") inviting shareholders to attend a special meeting on October 26, 2012, and recommending that they vote to approve the Merger.

117. As noted above, Defendants pointed investors and analysts to the Proxy for answers to their questions concerning the Merger's tax implications. *See* Section V.E.2.(a), *supra*.

#### (a) Misstatement/Omission No. 4: The Proxy Repeated Defendants' Omission and Misleading Disclosures Regarding the Merger's Economic Constraint on Spin-Offs for Tax Reasons

118. The Proxy contained substantially similar statements to those in the Preliminary Proxy. Specifically, it provided substantially similar descriptions of the structure of the proposed transaction to merge with Cooper in detail and outlined numerous risk warnings, including an extensive discussion of the Merger's tax consequences, which were insufficient and themselves misleading for the reasons stated above. *See supra* ¶¶107-110. Eaton's directors (including Cutler as Chairman of the Board) continued to "accept responsibility for the information contained" in the Proxy, "[t]o the best of the knowledge and belief of the directors of Eaton (who have taken all reasonable care to ensure such is the case)," including specifically that this information "**is in accordance with the facts and *does not omit*** anything likely to affect the import of such information."

119. Further, the Proxy contained new details about Defendants' due diligence, including its scrutiny into the tax consequences, of the Merger after the tax-related due diligence on March 29-30, 2012 that had been discussed in the Preliminary Proxy (*see* ¶111, *supra*). For example, the Proxy stated that "after the Eaton board meeting **on April 5, 2012**, Mr. Cutler sent a letter to [Cooper CEO] Mr. Hachigian setting forth a proposal for the acquisition of Cooper," including that post-Merger "the surviving parent entity would be incorporated outside the United States" because of the "advantages currently enjoyed by Cooper as a result of its non-United States incorporation," such as "greater flexibility and lower cost of cash management . . . as well as a lower worldwide effective tax rate." The Proxy further explained the tax-related "flexibility and associated financial benefits" that Eaton would enjoy post-Merger by incorporating in Ireland, "**without negative tax effects**:"

> **It was ultimately concluded** that incorporating in Ireland would provide the combined entities with enhanced global cash management and **flexibility and associated financial benefits,** including increased global liquidity and free global cash flow among the various entities of the combined enterprise **without negative tax effects. Eaton also considered all the requirements of section 7874 of the Code**, including the requirement that former stockholders of Eaton own less than 80%, by vote and value, of the stock of New Eaton, as well as other applicable laws.

120. However, although the Proxy stated that there were "**no negative tax effects**" of the Merger, like the Preliminary Proxy, it omitted that Eaton was not able to do tax-free spin-offs for five years after the Merger due to its tax consequences, which made a divestiture of the vehicle business economically unworkable. Thus, continuing in the same course of conduct, it repeated Defendants' omissions of what Defendants knew "all along"— that Eaton was constrained from spinning off any business for five years due to tax consequences of the Merger under applicable Internal Revenue Code tax laws.

### (b) The Proxy Provided New Details About Defendants' Due Diligence, Further Strengthening the Inference that They Knew About the Tax Constraint on Spin-Offs Before the Class Period

121. The Proxy also provided new information detailing Cutler's and Fearon's involvement in the Merger due diligence efforts after Cutler's April 5 letter. Specifically, it stated that "on **April 12, 2012**, Mr. **Cutler**, Richard H. **Fearon**," and other Eaton senior executives[8] met with Cooper's CEO and other senior executives "for purposes of conducting due diligence as to various matters."

122. Further, Defendants specifically represented that Eaton subsequently engaged in additional "due diligence with respect to **tax matters**":

> On April 23, 2012, Mr. Mitchell and Ms. Hennis of Eaton, Mary E. Huber, **Eaton's mergers and acquisitions counsel, and Eaton's outside tax advisor** met with Messrs. Reed and Monesmith of Cooper in Houston, Texas for purposes of conducting **due diligence with respect to tax matters.** Over the course of the following weeks, **additional diligence discussions occurred between members of Eaton and Cooper management and their outside advisors**.

123. Eaton's conclusion "that incorporating in Ireland would provide the combined entities with enhanced global cash management and flexibility and associated financial benefits" (*see* ¶119, *supra*), and its related due diligence, including specifically the "due diligence **with respect to tax matters,**" would have included a full analysis of normally anticipated tax issues, including an analysis of issues about which the Company was on notice, such as economic constraints on its ability to conduct acquisitions or divestitures -- an important part of its

[8] Specifically: "Eaton's Vice Chairman and Chief Financial and Planning Officer, Mark M. McGuire, Eaton's Executive Vice President and General Counsel, Thomas S. Gross, Eaton's Vice Chairman and Chief Operating Officer—Electrical Sector, and Cynthia K. Brabander, Executive Vice President and Chief Human Resources Officer."

business model, *see* ¶50, and an issue analysts raised with Defendants since the Merger was announced. *See* Section V.E.1, *supra.*

124. Thus, the Company's due diligence for the Merger resulted in Defendants being informed of a tax consequence as important as a five-year economic constraint on spin-offs by **late March or April of 2012**, and certainly no later than "the following weeks" pending the deal's announcement on May 21, 2012. Again, this is consistent with Defendants' subsequent revelation almost two years later, on July 29, 2014, that Defendants knew "**all along**"— that as a result of the Merger, the Company faced a tax "prohibition" making it "not able to do a tax-free spin[-off] of any business for five years."

#### (c) After the Proxy, the Market Continued to React Favorably to Eaton's Purported Spin-off Ability, Further Demonstrating the Materiality of Defendants' Misstatements and Omissions

125. After the filing of the Proxy and before the shareholder meeting on October 26, 2012 to approve the Merger, analysts continued to highlight Eaton's ability to divest its vehicle businesses as a positive for the Company's valuation. For example, on October 10, 2012, an MKM Partners analyst report stated that it had "downgraded the sector" that included Eaton, as a whole, but then highlighted "**[w]hat we need to get positive**" (emphasis in original) on Eaton specifically: "the [valuation] multiple expansion **potential**" driven by the "**potential Auto/Truck sale**."

### 4. Defendants Continued to Mislead the Market with Reassurances Regarding the Viability of a Business Spin-Off as Market Interest Intensified

126. Throughout the Class Period, Defendants misrepresented and created the misleading impression that Eaton was not constrained from divesting its assets, including by tax consequences of the Merger that made spin-offs economically unworkable. Such reassurances became increasingly important after the closing of the Merger as new facts emerged, which

indicated to investors and analysts that the time was right for strategic spin-offs, particularly of Eaton's vehicle business.

**(a) Misleading Statement or Omission No. 5: Cutler's Misstatement at the October 31, 2012 Earnings Call**

127. On October 31, 2012, Eaton held an earnings call to discuss its financial results for the third quarter of 2012. The Company's sales from its Truck segment were down 23% on a year-to-year basis, and fell in the quarter by 12% compared to the previous quarter. Similarly, sales volumes from its Automotive segment decreased 12% year-to-year and 8% from the previous quarter. In contrast, the Company's electrical businesses experienced what Cutler termed "an outstanding quarter, a record quarter in terms of revenues and operating profits," and "a real headline quarter."

128. During the call, an analyst from Jefferies & Company asked Defendant Cutler what he called a "bigger question" than those he previously asked: "In 2013 is there **anything from a regulatory basis vis-a-vis, I guess, the acquisition of Cooper that would prevent you from doing additional divestitures** if you wanted to?" In response, Defendant Cutler stated, in full: "***No. There wouldn't be any—no regulatory restrictions***." Cutler's statement was false and misleading because it omitted that Eaton was constrained from spinning off or selling any business for five years from the Merger due to its tax consequences, which prohibited tax-free spin-offs and thus made a divestiture of the vehicle business economically unworkable under applicable tax regulations, thereby effectively imposing "regulatory restrictions" on Eaton's divestiture ability. Cutler thus continued the same course of conduct omitting this information, as outlined above.

**(b) Misleading Statement or Omission No. 6: Cutler's Misstatement at the November 13, 2012 Goldman Sachs Industrials Conference**

129. Shortly thereafter on November 13, 2012, Cutler attended the Goldman Sachs Industrials Conference. A member of the audience, presumably an analyst, observed that "[t]here is a lot of talk of **the ability** to divest businesses that you may not necessarily think are core any more or to change the profile of the Company." The speaker went on to ask Cutler, "what is the thought in terms of **the ability** if you decided to sell some of those businesses? **Is it a spin out**? There is a market to be able to sell and what's your thought on things like that?" In response, Cutler falsely assured: "Yes, ***there is nothing structural in our deal structure or any of our covenants that, it prevents us from making changes in our portfolio[.] [T]hat is not our plan at this point***." Cutler's statement was false and misleading because it omitted that Eaton was constrained from spinning off any business for five years from the Merger due to its tax consequences, which prohibited tax-free spin-offs for five years and thus made a divestiture of the vehicle business economically unworkable. Thus, contrary to Cutler's assurance, there were undisclosed "structural" aspects of the "deal" that "prevent[ed]" Eaton "from making changes in [its] portfolio" – *i.e.*, spinning off the non-core businesses – for five years after the Merger.

130. Further, Cutler's denial of any "plan at this point" was a misleading half-truth because it created the materially misleading impression that Eaton **could** spin-off the vehicle business, but simply chose not to do so at this time, when in reality Eaton **could not** do so for five years because of the tax consequences of the Merger that made its divestiture economically unworkable. Accordingly, Cutler's statements and omissions continued Defendants' course of conduct in misleading the public regarding Eaton's ability to divest the vehicle business during the Class Period.

### (c) Analysts Were Reassured by Defendants' Continued Misstatements and Omissions, Further Underscoring Their Materiality

131. The market reacted positively to these reassurances.

#### (i) Analyst Report: Vertical Research Partners

132. For instance, an October 31, 2012 Vertical Research analyst report, issued immediately after Eaton's October 31, 2012 earnings call, reiterated its "Buy" rating on Eaton and its continued belief that Eaton "**should spin-off Auto and Truck** (and maybe Hydraulics) after the CBE [Cooper] deal closes." The report explained that "[e]xiting Auto/Truck [w]ould [h]elp" Eaton's valuation, noting that a spin-off in particular was compelling because it was tax-free (as opposed to a taxable sale) and "the new spincos would be Irish," which "would likely attract[] a suitor looking for a vehicle (no pun intended) to re-incorporate"—thus, making it "**a move [that] would accelerate and cement the [positive] re-rating of ETN shares.**"

#### (ii) Analyst Report: MKM Partners

133. Similarly, a December 26, 2012 MKM Partners analyst report reiterated its "Buy" rating and increased its price target to $61 (from $57), citing the Cooper Acquisition as "transformational" and the analysts' belief that Eaton "has multiple paths to value creation as it unlocks synergies [from the Cooper Acquisition] and receives credit in valuation for the electrical-focused portfolio." The belief was based in part on the analysts' conviction that Eaton "may hasten this appreciation [in value] through **further shifting of the portfolio by spinning off noncore assets**," which it estimated would occur over the next "**several quarters**."

#### (iii) Analyst Report: Morgan Stanley

134. Further, a later analyst report specifically referenced Defendant Cutler's November 13, 2012 misstatement above that "***there [was] nothing structural in our deal structure or any of our covenants that [] prevents us from making changes in our portfolio***"

as fueling the market's continued interest in the possibility of a Vehicle business spin-off for Eaton. Specifically, an April 2, 2013 Morgan Stanley report stated:

> Since management has clearly pointed to Electrical, Aerospace and Hydraulics as its key growth units, **the question regarding a possible spin of Eaton's Auto and Truck businesses has come up** at many conferences and investor events. **In response, management has stated that while the Cooper transaction does not have any covenants that prevent it from taking any further strategic actions**, it **currently** has no plans to make material changes to Eaton's portfolio.

**(d) Misleading Statement or Omission No. 7: Cutler's Misstatement at the February 5, 2013 Earnings Call**

135. After the Merger, Eaton's realignment of its product portfolio – towards the electrical business and away from the automotive and truck businesses – continued. On February 5, 2013, the Company issued a press release announcing a major reorganization: going forward, Eaton would consolidate the truck and automotive business segments into only one "Vehicle segment," while expanding the electrical business into "two segments, the first named Electrical Products and the second named Electrical Systems and Services." Thereafter, the Company's five business segments were Electrical Products, Electrical Systems and Services, Hydraulics, Aerospace, and Vehicle.

136. On February 5, 2013, Eaton also held an earnings call to discuss its financial results for the fourth quarter of 2012. An analyst observed that "the combination of the vehicle assets has some of us kind of speculating on what the future might hold," and asked Defendants "what's next for the Eaton portfolio?" In response, Cutler stated that there was "***nothing different*** . . . ***than I've said in numerous forums*** . . . since we announced the Cooper transaction," and assured that "***we like the portfolio we're with***."

137. Cutler's response continued his course of conduct in telling misleading half-truths rather than reveal the prohibition on Eaton's ability to do tax-free spin-offs. While he

repeated his prior denials of any intent to spin-off the vehicle business, he misleadingly omitted that Eaton could not do tax-free spin-offs for five years after the Merger and thus created the misleading impression that Eaton **could** spin-off the vehicle business, but simply chose not to do so at this time. However, in reality, Eaton **could not** do so for five years because of the tax consequences of the Merger that made its divestiture economically unworkable.

### (e) Eaton's February 2013 Restructuring of Its Automotive and Truck Businesses Into a Single "Vehicle Segment" and Cutler's Misleading Statement or Omission No. 7 Further Increased Market Focus on a Potential Spin-Off

138. As a result of Eaton's restructuring and Cutler's Misleading Statement or Omission No. 7, which again omitted the prohibition on tax-free spin-offs and thus repeated Defendants' misleading half-truths denying any current plans to divest the vehicle business, analysts grew even more focused on their belief that Eaton was preparing to spin-off its Vehicle business.

#### (i) Analyst Report: Jefferies

139. For example, a Jefferies analyst report issued on February 5, 2013 after Cutler's Misleading Statement or Omission No. 7 maintained its "Hold" rating on the stock, commenting: "**we still see the potential sale or spin of the auto and truck businesses (the new Vehicle segment) as a final step in Eaton's transition** to a more electrical/multi-industry business model." The report further noted that "**[i]ncreasingly investors are focusing on the potential value that could be unlocked from the divesting of the Truck and Auto Components businesses** as they appear to be less 'core' now that nearly 60% of earnings will be attributed to the Electrical business." Thus, such reports show that Cutler's purported denial on February 5, 2013 fueled, rather than dispelled, the market's incorrect belief that a spin-off of

the vehicle business was possible in the near-term. Accordingly, they further support the materiality of Defendants' misstatements and omissions.

**(ii) Analyst Report: MKM Partners**

140. Likewise, a February 6, 2013 MKM Partners analyst report discussed Defendants' statements about the vehicle business restructuring, including Cutler's Misleading Statement or Omission No. 7 on the February 5, 2013 call, under the heading "**Packing up the Cars and Trucks?**," as follows: "While management did not offer much in the way of an explanation around the Truck and Auto combination into the new Vehicle segment," the market saw it as signaling **"a spinoff as an additional opportunity to expand the [valuation] multiple."** The analyst viewed such a spin-off as "a move [that] would be **positively received**" by the market, maintaining its "Buy" rating.

**(iii) Analyst Report: Wells Fargo**

141. Further, a February 27, 2013 Wells Fargo analyst report issued in advance of Eaton's "Investor Day" meeting on March 1, 2013 stated that "**[s]ome in the investment community have been focused on the potential separation of the new Vehicle segment** from the rest of the portfolio," characterizing this potential divestiture as a "**potential upside catalyst**" that "**may be a future consideration**," confirming the market's continued belief, reinforced by Defendants' misleading denials of any plans to divest the vehicle business, that such a spin-off remained a feasible option after the Merger.

**(iv) Analyst Report: KeyBanc**

142. A March 3, 2013 KeyBanc analyst report reiterated its "Buy" rating and confirmed the market's continued belief that the Vehicle business spin-off was still a viable and positive option for Eaton, despite Defendants' statements misleadingly "down playing the possibility" of a spin-off: "**While some market participants have speculated that Eaton**

**might consider spinning out its newly formed Vehicles Group**, management reiterated its commitment to the businesses and long-term growth potential, while to some degree down playing the possibility. **Despite this commentary, we continue to view this as a potential value creating option over the next few years**." Thus, such analyst reports further show that Defendants' misleading half-truths denying any current plans to divest the business, fueled, rather than dispelled, the market's incorrect belief that a spin-off of the vehicle business remained a "value creating option" during the Class Period.

**(v) Analyst Report: MKM Partners**

143. Similarly, a March 4, 2013 MKM Partners analyst report reiterated its "Buy" rating on Eaton's stock and increased its price target to $75 (from $70), stating that "**we believe a Vehicle spin remains a possibility down the road and part of the bull case**."

**(vi) Analyst Report: Barclays**

144. Moreover, analyst reports from the same time period connected investor positivity about potential divestitures to the Company's own statements. For example, a March 14, 2013 Barclays analyst report stated, under the heading "**We also like what we hear from management**," that "it also seems inevitable that ETN **will further prune** its relatively complex portfolio" because Eaton was "**not likely**" to "**still be in the truck or auto businesses in ~3 years ... particularly if its strategy in electrical proves out**." The report further echoed Defendants' statements that the Merger was "a transformational deal:"

> In the end, it's very clear to us that ETN is on the path to becoming higher growth, less cyclical, driving to higher margins and ROIC, and will be increasingly relevant to industrial investors. Whether it's classified as "multi-industry" or otherwise is irrelevant to us. What is relevant, however, is that ETN had the courage and smarts to do **a transformational deal (CBE)** at what we view as a very fair price at potentially advantageous cycle timing. If ETN integrates CBE successfully, **further prunes the portfolio**, de-

> levers, and executes on its asset improvement plan, **it will likely continue to be re-rated towards higher end peers.**

### (f) Misleading Statement or Omission No. 8: Cutler's Misstatement at the May 21, 2013 EPG Conference

145. As the subject of a Vehicle business spin-off continued to come up, Defendants fueled investor enthusiasm for the possibility of a tax-free spin-off rather than disclose the truth that such a divestiture would be economically unworkable until December 2017. For example, at the May 21, 2013 EPG Conference, where Eaton was a participant, Cutler again misrepresented Eaton's ability to engage in potential spin-offs from a **tax** perspective in the following exchange with an audience member (presumably an analyst):

> [Audience Member:] **"Anything about the way the tax structure has formed over time would constrain things you might do strategically**, whether that were **a larger-scale divestiture** or anything else?..."
>
> [Cutler:] "***On the tax issue, no***, we are domiciled outside the US. We've got great flexibility in terms of how we are able to move cash around the world, and that really is the issue that gives us our great strategic flexibility. ***So I would say no on that one.***"

Cutler's statement was false and misleading because it omitted that Eaton was not able to do a tax-free spin-off of any business for five years from the Merger due to its tax consequences, rendering a divestiture of the vehicle business economically unworkable. Thus, contrary to Cutler's assurance, there were undisclosed, adverse consequences of the Merger's "tax structure" that did "***constrain***" Eaton's ability to do "a larger-scale divestiture," such as a spin-off, for five years from the Merger. This continued the same course of conduct, described above.

### (g) Analysts Reacted Favorably to Defendants' May 21, 2013 Misstatements, Further Supporting Their Materiality

146. Analysts reacted favorably to Defendants' statements reaffirming Eaton's continued, unfettered ability to engage in future strategic divestitures, including a tax-free spin-off of the Vehicle business. For instance, a May 22, 2013 Jefferies analyst report stated that the potential divesture of the Vehicle business was one of three key items for its "Bull Case" on Eaton stock: "1/ A self-help story with the integration of Cooper, including greater synergies than currently targeted; 2/ **Higher valuation multiples as the company's business mix shifts – including a potential [divesting] of the Vehicles business**; and 3/ a cyclical story given exposure to depressed end markets."

147. Further, approximately three weeks after Defendant Cutler's May 21, 2013 misstatement, a Bloomberg news article on June 10, 2013, titled "Eaton Said to Consider Sale of Auto-Parts Business," reported that "**Eaton Corp. is weighing a sale of its auto parts unit** to focus on its growing power and lighting operations, said people with knowledge of the matter." The article explained that "Eaton, which started in 1911 building truck axles, is shifting its focus away from its transportation roots," and included the following commentary from a stock analyst at Longbow Securities who recommended buying Eaton's stock:

> **Without the auto unit, Eaton's valuation could improve because 'electrical companies are valued incredibly higher than more diversified, more cyclical kinds of companies,'** he said in a telephone interview.

The article also quoted a market participant, John Sini, a fund manager and principal at Douglas C. Lane & Associates, which oversees more than $3 billion in assets, including Eaton shares, as stating that such a divestiture would make sense because "[f]rom a strategic standpoint, especially as they're integrating Cooper, **the auto-parts segment doesn't really fit anymore**, given the size of the electrical end market." The article quoted a response from an Eaton

spokesman as follows: "'There is no basis for the speculation on the sale of our automotive business.'"

148. A Wells Fargo analyst report later that day also commented on the June 10, 2013 Bloomberg press report, noting Defendants' prior misstatements: "When previously asked about the topic, **ETN management did not rule out a potential separation of Automotive from the rest of the company**." Such reports thus show that Defendants' statements, including their denials of any plans to divest the vehicle business, were misleading half-truths that "did not rule out" the possibility of a beneficial spin-off during the Class Period. Specifically, such half-truths omitted that Eaton could not do a tax-free spin-off for five years and thus created the materially misleading impression that Eaton could divest the vehicle business during the Class Period, while Defendants knew that it was not economically workable.

149. Further, a June 11, 2013 analyst report issued by Langenberg & Company discussed the June 10 Bloomberg article, and concluded as its "take-away" that a divestiture of this business "**makes sense to consider now**." The report elaborated as follows, highlighting the advantages of a divestiture of the automotive business, and noting that Eaton's response quoted in the article "does NOT mean 'no'":

> - We would not be surprised if an internal discussion is underway. And, speaking as a former Navy Intelligence Officer, the words **"no basis for speculation" does NOT mean "no." Divestiture would be consistent with where company is going (power, lighting).**
> **- Everybody has been asking about divesting the machinery pieces**. . . .

**(h) Misleading Statement or Omission No. 9: Eaton's June 12, 2013 Press Release**

150. Two days after the June 10, 2013 Bloomberg article, Eaton issued a press release titled "Eaton Not in Discussions to Sell its Automotive Business." It stated that "Eaton said

earlier this week there was no basis for published reports involving speculation on the sale of Eaton's automotive business." It further quoted Cutler's remarks earlier the same day at the Deutsche Bank Global Industrials and Basic Materials Conference in Chicago, where Cutler stated: "***We are not, and have not been, in the process of discussions to sell our automotive business***. . . . I've answered this question repeatedly since we did the acquisition of Cooper. . . . Our vehicle business is a very important part of Eaton. It is a very strong franchise. . . . It is an important part of our company, and a very strong profit-producing portion of our company."

151. Eaton's and Cutler's statements contained in this press release were misleading half-truths because, while the Company may not have been " in the process of discussions" to divest its vehicle business, they failed to disclose that it was actually constrained from doing such a divestiture, by tax consequences of the Merger that made tax-free spin-offs not possible for five years—a fact that Defendants knew "all along" but concealed from investors—given the large tax liability that would result. By omitting this adverse information, Cutler created the materially misleading impression that Eaton **could** spin-off the vehicle business, but simply was **choosing** not to do so at this time, when in reality Eaton **could not** do so because tax consequences of the Merger made it economically unworkable. This denial, therefore, continued Defendants' course of conduct to mislead the market regarding the material constraint on Eaton's ability to divest the vehicle during the Class Period.

#### (i) Misleading Statement or Omission No. 10: Fearon's Misstatement at the November 13, 2013 Goldman Sachs Industrial Conference

152. As time passed and Defendants continued to conceal the truth, analysts increasingly anticipated that Eaton was nearing a spin-off of its Vehicle business. For example, an October 28, 2013 UBS analyst report raised its price target (from $66 to $72), affirming that

"[w]e [ ] believe **a spin-off** or sale of the [Eaton] Vehicle segment **is possible over the next 12-18 months** and could be a **positive catalyst for the stock**."

153. Several weeks later, at the November 13, 2013 Goldman Sachs Industrial Conference, Defendant Fearon again reaffirmed to the market that Eaton retained the ability to make strategic spin-offs and other divestitures when a worthy opportunity presented itself. Specifically, in response to an analyst question about whether the Company was considering divesting its vehicle business or viewed the vehicle business as a "sacred cow," Fearon stated: "In terms of your second question ***about vehicle***, is it a sacred cow? Well, first of all, I'd say ***nothing is a sacred cow***." He added, "when the opportunity naturally arises for a transaction, ***we can act***.... ***If we believe that a business is better owned by somebody else, we will not be afraid to act on that, but at this juncture we really think that the structure of the portfolio works***. The automotive business, for example, is a very high return business and throws off a lot of cash and a lot of management, talent and management, as well and ***we really don't see a strong case to be made for changing right now***...." Fearon's statement was misleading because it omitted that a tax-free spin-off of the Vehicle business was not possible for five years after the Merger due to its tax consequences, rendering its divestiture economically unworkable. It thus created the materially misleading impression that Eaton "***can act***" to spin-off its Vehicle business "when the opportunity" presented itself, while in reality Eaton **could not so "act"** for five years after the Merger without incurring significant tax liability, which rendered such a transaction economically unworkable.

154. Further, Fearon's denials (*e.g.,* that "***the structure of the portfolio works***" and "***we really don't see a strong case to be made for changing right now***") were misleading half-truths because they created the materially misleading impression that Eaton **could** spin-off the

vehicle business, but simply had no plans to do so at this time, when in reality Eaton could not because tax consequences of the Merger prevented tax-free spin-offs and thus made the business's divestiture economically unworkable. Thus, Fearon's denials were part of the Defendants' course of conduct outlined above.

**(j) Additional Developments and Defendants' Repeated Misstatements and Omissions Continued to Fuel Investor Anticipation of a Spin-off**

155. Investor interest in the possibility of a favorable spin-off of the Vehicle business continued after two additional developments given Defendants' continued misstatements and omissions, which left the false impression that such a spin-off remained feasible after the Merger. On January 20, 2014, Eaton announced a taxable, cash sale of two of its aerospace businesses to Safran S.A. for $270 million. Then, on June 23, 2014, the Company announced a $500 million legal settlement with Meritor, a competitor in its Vehicle business, which resolved antitrust claims against the Company.

156. Analysts reasonably interpreted these developments as signaling that the Defendants now would "act" on Eaton's purported ability to spin-off the Vehicle business given their repeated misstatements and omissions that Eaton ***could*** so "**act** . . . when the opportunity naturally arises." Analysts thus reacted positively to what these developments meant for the potential spin-off of Eaton's Vehicle business.

**(i) Analyst Report: J.P. Morgan**

157. For example, on January 21, 2014, a J.P. Morgan analyst report explained that the announced aerospace asset sale "highlights management's willingness to sell assets that are no longer considered strategic" and "**raise[s] anticipation of a larger divestiture/spin-off of [Eaton's] Vehicle business**" which was **"an attractive asset that could garner a premium valuation**" for an estimated price of about $6 billion.

**(ii) Analyst Report: Vertical Research Partners**

158. A few days after Eaton announced the Meritor settlement, a June 29, 2014 Vertical Research Partners report stated: "With the CBE integration progressing ahead of schedule **and lingering litigation now cleaned up (e.g. Meritor, Triumph Group cases), we think ETN should move to the next logical phase of repositioning - a spin-off of Vehicle.**" The report further detailed why investors refocused on Eaton's potential spin-off of its Vehicle business, highlighting the 2013 business segment restructuring and other more recent comments by Defendants regarding its "core" non-Vehicle businesses:

> Following the acquisition of Cooper Industries, ETN decided to re-segment its reporting structure. It was determined Electrical would be split by product groups (vs. geographies) and ETN's Truck and Automotive divisions would be combined as one segment, Vehicle. Other segments were left unchanged. **This obviously le[d] to immediate speculation of a potential spin-off of the Vehicle segment and something we have postulated for some time**. Management adamantly denied such a transaction was in the cards **(in the near-term)** in an attempt to appropriately set expectations. However, in February of this year CEO Cutler remarked that over 80% of sales are in the "core" Electrical, Aero and Hydraulics segments. **That sounds to us like Vehicle will ultimately go.** When a business stops getting acquisition capital or isn't considered "core" that is often a precursor to eventual exit.

**(iii) Analyst Report: Morgan Stanley**

159. Likewise, a July 14, 2014 Morgan Stanley analyst report maintained its positive "overweight" rating, stating that "**we have fielded more questions from investors regarding a potential spin of its Vehicle business**, given that this long-running anti-trust case ... was widely viewed as a major barrier to any potential strategic actions around ETN's Vehicle business." In fact, "Eaton has transformed its portfolio, including lowering exposure to the Auto & Truck markets, and many have viewed a spin-off of its Vehicle segment as a potential **final step**." The report further observed: "given that management has clearly pointed to the non-Vehicle

businesses as its core strategic focus, **the question regarding a possible spin of Auto & Truck has come up in many investor events**, and that "[i]n response, **management has stated that** while **the Cooper transaction does not have any covenants that prevent it from taking any further strategic actions**, it **currently has no plans** to make material changes to Eaton's portfolio." The report concluded that "we believe that **the stars are aligning if management is considering strategic options for Vehicle** and that this would be a **powerful catalyst**" for the stock, and thus "reiterate[d] ETN as one of our top-picks." Specifically, it stated that "**the possibility of a Vehicle spin** ... could be a **powerful catalyst** for multiple expansion towards and **potentially beyond our $90 price target**."

**(iv) Analyst Report: Deutsche Bank**

160. Similarly, a July 15, 2014 Deutsche Bank analyst report maintained its "buy" rating and raised its price target, discussing the market's "intensifie[d]" "focus on Vehicle" after the announced settlement, specifically noting the a tax-free spin-off was much more advantageous than a traditional asset sale: "With the Meritor litigation settled, we believe **the path has been cleared for Eaton to monetize its Vehicle business** – either through a sale **or tax-free spin. We believe a tax-free spin could make the most sense**." The report further elaborated:

> **Focus on Vehicle intensifies**
> Since Eaton's recent (and favorable) Meritor and Frisby litigation settlements (see our report "Litigation resolution ahead"), we believe the spotlight has again turned toward Eaton's ~$4bn (revenues) **Vehicle segment as a possible candidate for divestiture/spin-off.** Recall that while the Meritor litigation was ongoing, it seemed highly unlikely that Eaton would have done anything with Vehicle (Truck was the target of the litigation).
>
> The Vehicle (truck) business represents a heritage segment for Eaton, with origins dating back to the early 1900s. **It has long been opined, in our view, that Eaton might ultimately separate the rest of its Vehicle business from the portfolio** – continuing a

> process of transportation segment divestitures that have occurred for more than a decade to mitigate Eaton's volatility and improve the company's financial returns.
> …
> Still, we believe management ultimately recognizes that the valuation of ETN seems unlikely to be helped by Vehicle (over time) and possibly dragged given the high cyclicality of the business.
> …
> **Tax leakage wrinkle**
> Because the Vehicle business dates back so many years (remaining segment acquisitions such as Ag Transmissions have been relatively few), the associated book value would appear to be extremely low. As such, a sale of Truck would face significant U.S. and (other jurisdiction) tax applied to the gains. **In turn, we believe it ultimately would make more sense to spin the business off to shareholders (on a tax-free basis).**

**(v) Analyst Report: Wells Fargo**

161. Finally, a July 16, 2014 Wells Fargo analyst report commented on investors' "widely discussed" interest in a divestiture of the Vehicle business, which it viewed as a positive move that would help Eaton "realize favorable future performance:" "ETN could continue to prune its portfolio of businesses and potentially create value independent of end market demand trends (***i.e.*, potential complete or partial separation of its Vehicle business that has been widely discussed by investors** with no comment from management)."

162. As these analyst reports show, the market continued to believe that a divestiture of the vehicle business remained feasible throughout the Class Period. This again confirms that all of Defendants' denials of any current plans to divest its vehicle business were misleading half-truths, ineffective to cure the materially misleading impression they created throughout the Class Period.

### F. Defendants Admitted the Truth Regarding the Five-Year "Prohibition" on Tax-Free Spin-Offs, Which They Were "Well Aware" of "All Along"

#### 1. Defendants' Corrective Disclosures on July 29, 2014

163. Two weeks later, on July 29, 2014, in response to the mounting investor and analyst anticipation about a strategic Vehicle business spin-off, Defendants finally disclosed that Eaton was prohibited from making such a beneficial divestiture until November 30, 2017 at the earliest because the tax consequences of the Merger made tax-free spin-offs impossible and thus rendered any divestiture of the vehicle business economically unworkable under applicable regulations.

164. Specifically, on July 29, 2014, during the second quarter 2014 earnings call with investors, Defendant Cutler admitted that "**we are not able to do a tax-free spin[-off] of any business for five years post the acquisition date of the Cooper transaction**." He went on to explain "that **limitation** means that any spin[-off] would result in **a very significant tax liability**" and "this five year kind of **prohibition** ... means that there is not really a compelling economic rationale for further business portfolio transformation."

165. Cutler also acknowledged that "there's been a lot of speculation about whether it would make sense for Eaton to spin off any of our business in light of the transformation that we've been undergoing over the past 14 years." He further recognized that they had been receiving an increasing number of investor inquiries on this subject, referencing "**a number of questions that a number of investors have either asked or written about over the last month.**" This statement further evidences the materiality of this information.

166. After Cutler's revelation, the conference call was opened to questions. A Vertical Research analyst asked Cutler for more "color" regarding his announcement, noting in particular that although "there's obviously been some fresh speculation from myself and others,

[] **these questions have been out there before**" and demanding "**why we're kind of learning of a five year limitation now**."

167. Fearon responded first, revealing that the news was the result of a complex analysis undertaken by an internal team at Eaton, and confirmed by Eaton's external experts. Specifically, he stated: "Because of the legal steps we had to do to complete the transaction for Cooper, there are a couple of code sections that make it **not possible** to do a tax free spin for five years." He then clarified "it's a conclusion our team came to" based on "**not a simple analysis**, but they came to it and then several outside advisors corroborated that, so we're very certain that that analysis is accurate."

168. Crucially, Cutler also responded and confirmed that Defendants knew about these tax consequences of the Merger, which rendered a spin-off or any divestiture of the business economically unworkable from the outset of the Class Period: "It's **not new knowledge**. We've been **well aware of this all along**."

169. Cutler's answer further clarified "that **it's not simply an issue of will**" – *i.e.*, Eaton had no choice regarding its inability to engage in tax-free spin-offs and thus divest the vehicle business after the Merger. This acknowledgement was in stark contrast to Defendants' prior misstatements, including their denials of any intent or plan to divest the business, which created the materially misleading impression that the lack of a divestiture was a matter of choice, rather than any constraint.

170. In answering a follow-up question, Fearon further revealed that any spin-off would actually be taxed at an **even higher tax rate** than a traditional asset sale. In other words, Fearon disclosed that any expectedly tax-free spin-off would instead be prohibitively expensive, rendering it economically unworkable. Fearon further implied that the unexpectedly higher tax

rate was due to reasons too "complex" to explain to investors, revealing that a spin-off was "difficult to make work economically" – *i.e.* economically unworkable:

| | |
|---|---|
| [Vertical Analyst]: | "And if you were to proceed with a spin or a similar transaction, the spin would just be treated as an asset sale? You could still spin something but it would be treated as a sale for tax purposes?" |
| Rick Fearon: | "**It actually would be taxed higher than just an asset sale for some complex reasons**." |
| [Vertical Analyst]: | "Okay." |
| Rick Fearon: | "So that **has been difficult to make work economically.**" |

171. Had the market known what Defendants revealed they knew "all along" – namely, that Eaton was "not able to do a tax-free spin[-off] of any business for five years post the acquisition date of the Cooper transaction" – analysts would not have been able to support their investment theses, as described in ¶¶66-68, 73, 86, 98-99, 125, 132-134, 139-144, 146-149, 152, and 157-161, *supra*.

**2. The Market Was Shocked by Defendants' Disclosures**

**(a) Eaton's Stock Price Dropped by More Than 8%**

172. Eaton's stock dropped more than 8% as a result of Defendants' July 29, 2014 disclosures, falling from a close of $76.75 per share on July 28, 2014 to $70.51 per share on July 29, 2014, on 10.5 million shares traded, and wiping out nearly $**3 billion** in shareholder value.

173. It was the largest drop that the Company's stock has experienced in percentage terms for the last six years.

**(b) Three Prominent Analyst Firms (Goldman Sachs, J.P. Morgan, and Deutsche Bank) Downgraded Eaton**

174. Analysts were shocked by Defendants' disclosures. For instance, at least three analyst firms (Goldman Sachs, J.P. Morgan, and Deutsche Bank) immediately downgraded their ratings for Eaton as a result of Defendants' disclosures regarding the Company's inability to do a tax-free spin-off due to tax consequences of the Merger, rendering any divestiture economically unworkable, and substantially reduced their price targets on its stock. These analyst reports further demonstrate that the market understood Defendants' disclosures regarding Eaton's inability to do a tax-free spin-off as effectively precluding any divestiture of the vehicle business given the immense tax liability that would result. Accordingly, such analyst reactions further show the market's understanding that Eaton's inability to do a spin-off tax-free effectively made such a transaction unworkable, rather than merely expensive.

175. Specifically, a Goldman Sachs report issued the same day downgraded Eaton stock to Neutral from Buy and lowered its price target substantially (to $74 from $81) due to the news of Eaton's inability to spin-off the Vehicle business: "**a potential catalyst has been removed** as ETN cited today that it cannot do a tax-free spin-off of any part of its portfolio for five years post Cooper (4Q12)."

176. Similarly, a July 30, 2014 J.P. Morgan analyst report downgraded Eaton stock to Neutral from Overweight, substantially lowering its price target (from $85 to $75) and estimates. The report supported its decision to downgrade Eaton's stock "**especially in light of management comments on the spin-off of the Vehicle business**." The report elaborated on its reasoning:

> In response to a question on the call, management noted that it would not be able to achieve a tax-free spin-off of its Vehicle business for at least five years following the CBE acquisition. **We viewed this potential transaction as a potential catalyst for the**

> **stock as it could have driven multiple expansion by removing one of the company's most cyclical businesses from the portfolio.**

177. Likewise, a Deutsche Bank report issued on the same day downgraded Eaton to "Hold" from "Buy" and greatly decreased its price target (from $90 to $77) based on the spin-off disclosure. The report explained: "**Perhaps more importantly, the company threw cold water on the opportunity for further meaningful portfolio change** citing tax code items that require Eaton to wait 5 years after the close of the Cooper acquisition (Nov 30/12). **Previously, the prospects for significant portfolio action had provided a basis of our ETN investment thesis**." Crucially, the report noted that "**Eaton had not previously publicly discussed these items**" and elaborated on its negative reaction to the news as follows:

> **A key element to our previous ETN recommendation had been the prospect for the company to possibly pursue additional portfolio change** – prospectively in advance of CEO Sandy Cutler's expected retirement in less than 2 years. Now this appears off the table, as does the opportunity for activist investors to elicit portfolio change (**presuming Eaton cannot spin off its businesses tax-free nor sell them without incurring substantial tax leakage**).

### (c) Other Negative Market Reactions

178. Other analyst reports following the Company's July 29 disclosure similarly showed the market's negative reactions to the news.

#### (i) Analyst Report: KeyBanc

179. For instance, a KeyBanc analyst report from July 29, 2014 stated that Eaton stock price was "hit" on Defendants' statements on the conference call regarding the "**clarity on inability to spin off vehicle business**," – namely, the disclosures "concerning the **unlikelihood of any business divestiture or spin-off (*e.g.*, Vehicle Systems segment) given the immense tax inefficiency** that would ensue until late 2017." The report further stated: "We believe the

Company clarified this issue in response to **heightened attention paid recently by investors and the Street** on the prospect of a business spin-out, **which clearly remains off the table through 2017**."

**(ii) Analyst Report: Jefferies**

180. Likewise, a Jefferies analyst report on July 29, 2014 described the "**8% fall**" in the stock price as a "**large negative reaction in the stock**" resulting from Defendants' disclosures that "**any spin-offs would need to wait five years from the Cooper acquisition to qualify as tax-free**," which dashed investors' "lingering expectations" for such a spin-off.

**(iii) Analyst Report: Wells Fargo**

181. A July 30, 2014 Wells Fargo analyst report specifically criticized Defendants for not previously disclosing "that it could not spin off any businesses for at least five years without triggering tax consequences," which it also characterized as the "announced **inability to spin-off businesses** for the next five years." The report highlighted that this "bad news" caused the substantial stock price drop on July 29: "**we believe a more proactive stance by the company may have helped mitigate the sell-off that occurred (ETN dropped 8.13%** vs. S&P 500 0.45% contraction on 7/29)." Accordingly, Wells Fargo reduced its valuation range on Eaton stock to $80-83 from $87-90, based on "**the removal of optionality related to a potential business segment spin-off.**"

**(iv) Analyst Report: Oppenheimer**

182. A July 30, 2014 Oppenheimer analyst report similarly discussed the "diminished prospects for a Vehicle spin-off" due to Defendants' disclosures that "**tax-free spin-offs are essentially barred for five years** post the Cooper close," which "**pressured shares 8%**, erasing $3B in market value."

**(v) Analyst Report: Morgan Stanley**

183. Similarly, a Morgan Stanley report on the same day, aptly titled "Taking the Spin Out of the Story," described Defendants' disclosure of an "**unexpected** lack of portfolio optionality" as "**breaking news** that a tax-free Vehicle spin-out cannot be contemplated until at least Nov 2017 (5Y post-Cooper close due to IRS regulations re the inversion transaction) **[which] drove the sharp sell-off post-2Q [earnings call]**."

**(vi) Analyst Report: Buckingham Research Group**

184. A later "initiating coverage" analyst report by Buckingham Research Group on September 4, 2014 summarized investors' **surprise** on Defendants' July 29 disclosures as follows: "investors had been clinging to the value creating potential of a Vehicle spinout, which is now off the table…. **[T]he revelation** that ETN cannot effect a tax-free spin of Vehicle for at least 5 years after the Cooper deal **came as a surprise to investors** looking for ETN to shed the cyclical assets and create an additional Irish domiciled company." Moreover, a follow-up report by the same analyst on the next day elaborated that "the recent revelation by management" regarding the inability to do the spin-off "**has broken the thesis for many investors**" on Eaton.

**(vii) News Report: *Wall Street Journal***

185. News coverage of Defendants' disclosures also confirmed the market's negative reactions. For example, a *Wall Street Journal* article on the same day, titled "Eaton CEO Says No Plans to Spin Off Businesses," reported that Cutler said that "the company's move to Ireland will block it from divesting businesses through tax-free spinoffs." The article elaborated: "Cutler said Eaton would face **severe tax consequences** for the next five years if it were to spin-off any of its businesses. Eaton's tax liability stems from the decision to relocate its corporate registration to Ireland from Cleveland when it acquired Cooper Industries PLC, which was based in Ireland."

186. Starting on May 21, 2012, Defendants engaged in a course of conduct throughout the Class Period, assuring the market that, *inter alia,* the Merger had "nothing in the deal per se that would prevent us from taking portfolio moves," and telling misleading half-truths that denied any **current** plans to divest the vehicle business. The market's surprise and negative reaction to Defendants' July 29, 2014 disclosures – including that "we are not able to do a tax-free spin[-off] of any business for five years post the acquisition date of the Cooper transaction" – shows that Defendants' assurances and denials were materially false and misleading. Specifically, the market reasonably understood that Eaton's unconstrained ability to engage in tax-free spin-offs was valuable to the Company, and accordingly lowered its valuation of the Company after learning the truth on July 29 that there was a five-year "**prohibition**" on tax-free spin-offs due to adverse tax consequences from the Merger. Because it was a substantial "limitation" or "constrain[t]" on Eaton's ability to do any divestiture, which Defendants had been "**well aware of** [] **all along,**" their statements to the contrary were material and knowingly or recklessly false and misleading.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD, AND ANALYST AND MARKET REACTIONS THERETO

187. During the Class Period, Defendants made the following materially false and misleading statements and omissions.

### A. May 21, 2012 – Conference Call

#### 1. Misleading Statement or Omission No. 1

188. On May 21, 2012, Eaton held an investor call to discuss the Merger. During the call, numerous analysts asked about a potential spin-off or other divestiture of the Vehicle business, based on Defendants' statements in the May 21, 2012 press release referencing "the possible sale of assets" (*see* ¶¶89-90, *supra*) and a slide used by Cutler on the call, which

omitted any reference to that business in describing Eaton's long-term strategy (*see* ¶¶90-91, *supra*). For example, a Vertical Research analyst asked Defendant Cutler about their vehicle business and Cutler replied as follows:

> [Vertical Analyst]: "And then finally, just thinking about we'll all fast forward to what's next in the portfolio after the dust settles here today. You mentioned electrical hydraulic era. **You obviously didn't mention truck or auto.** You're looking a lot more like an electrical company. **Should we expect more portfolio evolution over time?**"
>
> Sandy Cutler: "Let me give you two answers, Jeff. Thanks for the question. Our point in making that point was that I think we have been consistent since 2000, indicating that the vast majority of our acquisition dollars would be spent on building out our electrical, our hydraulic and our aerospace business. We have continued and will continue to grow our two vehicle businesses, primarily through internal investment.
>
> So that really was the point of that amplification. It was really consistency with our historical business. At this point, answering the second part of your question, ***we are not anticipating – it's not in our active planning any substantial, additional change in the portfolio as a result of this transaction***."

189. Cutler's statement was knowingly or recklessly misleading when made because it was a half-truth. He failed to disclose that such a divestiture was economically unworkable due to tax consequences of the Merger that made tax-free spin-offs not possible for five years—a fact that he subsequently admitted on July 29, 2014 that Defendants knew "all along" but concealed from investors—given the large tax liability that would result. In addition, Cutler's denial indicated that the lack of changes to Eaton's portfolio was the result of a fully informed,

"***active planning***" choice, implying that Eaton was not constrained in doing so from a tax perspective. Thus, by omitting this adverse information, Cutler created the materially misleading impression that Eaton **could** spin-off the vehicle business, but simply was **choosing** not to do so at this time, when in reality Eaton **could not** do so because tax consequences of the Merger made it economically unworkable. Indeed, as Cutler later revealed on July 29, 2014, Eaton's failure to divest its vehicle business during the Class Period was "not simply an issue of **will**," ¶169, but an issue of **ability**. *See also* ¶170, *supra* (Fearon revealed on July 29, 2014 that a spin-off would be "difficult to make work economically"). This was the first in a series of such misleading half-truths and omissions by Defendants, which created the false impression that nothing constrained Eaton's ability to divest the vehicle business during the Class Period—a course of conduct that Defendants continued throughout the Class Period.

### 2. Misleading Statement or Omission No. 2

190. On the same conference call, analysts later sought to confirm that the Merger would **not** prevent Eaton from engaging in a lucrative spin-off of its vehicle business. Specifically, during the call, a Gabelli & Co. analyst asked Defendant Cutler whether any tax implications of the Merger would limit Eaton's ability to spin-off its Vehicle business in the future: "**Are you precluded by any element of the tax structure of the deal to spin off the truck and automotive part at any time**?" In response, Cutler stated: "***There is nothing in the deal per se that would prevent us from taking portfolio moves, but we have no such plans***."

191. Cutler's statement was knowingly or recklessly false and misleading when made because it omitted that Eaton was constrained from spinning off or otherwise divesting the vehicle business for five years after the Merger due to its tax consequences, which prohibited tax-free spin-offs and thus rendered any divestiture economically unworkable given the resulting high tax liability. As Cutler subsequently admitted on July 29, 2014, contrary to his

assurance, he knew "all along" that Eaton was in fact economically "prevent[ed] from taking portfolio moves," *i.e.* spinning off or selling the business, by the "tax structure of the [Cooper] deal." Further, Cutler's denial ("***we have no such plans***") at that time continued Defendants' course of conduct of telling misleading half-truths, which created the materially misleading impression that Eaton could spin-off the vehicle business, but simply chose not to do so at this time, when in reality Eaton could not do so for five years because of the tax consequences of the Merger that made the business's divestiture economically unworkable. *See also* ¶170, *supra* (Fearon revealed on July 29, 2014 that a spin-off would be "difficult to make work economically").

192. As noted above, the market reacted favorably to Defendants' statements on the May 21, 2012 conference call regarding the continued viability of Eaton's potential spin-off or other divestiture of its businesses after the Merger, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.1.(b), *supra*.

**B. Misstatement/Omission No. 3: June 22, 2012 – Preliminary Proxy Statement**

193. On the May 21, 2012 conference call and in the related press release, Defendants repeatedly directed the analysts to the upcoming proxy statements for details, including any potential tax implications, as alleged more fully in Section V.E.2.(a), *supra*. On June 22, 2012, Eaton filed with the SEC the Preliminary Proxy, which included the following statement by which Eaton directors, including Defendant Cutler, "accept[ed] responsibility" for the Eaton-related information in the Preliminary Proxy, including that it "is in accordance with the facts and does not omit anything likely to affect the import of such information":

> **The directors of Eaton accept responsibility for the information contained in this document**, other than that relating to Cooper, its Associates (as defined in paragraph 4 below) and the directors of Cooper and members of their immediate families, related trusts and persons connected with them. To the best of the

> knowledge and belief of the directors of Eaton **(who have taken all reasonable care to ensure such is the case**), the information contained in this document for which they accept responsibility is **in accordance with the facts *and does not omit anything likely to affect the import of such information***.

This statement was knowingly or recklessly false and misleading because the Preliminary Proxy **did omit** adverse, material facts regarding Eaton's inability to do tax-free spin-offs for five years after the Merger due to its tax consequences, which made a divesture of its vehicle business economically unworkable. The omission of such facts rendered Defendants' other disclosures in the Preliminary Proxy materially misleading, as discussed below.

194. The Preliminary Proxy described in detail the proposed Merger and outlined numerous risk warnings, including an extensive discussion of its tax consequences, with sections titled, for example, "U.S. Federal Income Tax Considerations," "Tax Consequences of the Transaction to Eaton and New Eaton," and "Irish Tax Considerations." *See* ¶108, *supra*. As noted above, these warnings regarding tax consequences were not limited to the taxation of the acquisition itself, but instead included broader tax implications from the Merger – for example, those implicated by Internal Revenue Code Section 7874 (*see* ¶¶108-109, *supra*) – issues analysts had raised with Defendants at the May 21, 2012 conference call discussing the Merger, to which Defendants responded by directing them to the Preliminary Proxy, *see* Section V.E.2.(a), *supra*. In discussing these broader tax consequences, the Preliminary Proxy also reassured investors: "A corporation generally is considered a tax resident in the jurisdiction of its organization or incorporation for U.S. federal income tax purposes. **Because New Eaton is an Irish incorporated entity, it would be classified as a foreign corporation (and, therefore, a non-U.S. tax resident) under these rules.**" However, the Preliminary Proxy made no mention of Eaton's inability to do tax-free spin-offs for five years after the Merger due to its tax

consequences, which made a divesture of its vehicle business economically unworkable – continuing the course of conduct outlined above.

195. The inclusion of these detailed tax-related sections in the Preliminary Proxy created a duty to disclose **all** of the material tax consequences of the Merger known to Defendants at that time. However, the Preliminary Proxy failed to disclose to investors what Defendants knew "all along"—that Eaton was constrained from spinning off or otherwise divesting the vehicle business for five years due to the tax consequences of the Merger that made such divestitures economically unworkable, under applicable Internal Revenue Code tax laws. Defendants' various risk warnings in the Preliminary Proxy, including those noted above regarding the potential tax consequences of the Merger were inadequate and themselves misleading in that they omitted to disclose this adverse information that was known to Defendants by that time. Defendants' risk warnings did not enable Eaton investors and analysts to learn about the Merger's effect of making spin-offs economically unworkable for five years after the Merger.

196. As noted above, after the filing of the Preliminary Proxy, the market continued to view favorably Eaton's supposed ability to conduct tax-free spin-offs after the Merger, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.2.(d), *supra*.

### C. Misstatement/Omission No. 4: September 14, 2012 Proxy Statement

197. On September 14, 2012, Eaton filed its Proxy, inviting shareholders to attend a special meeting on October 26, 2012, and recommending that they vote to approve the Merger. As noted above, Defendants had previously pointed investors to the proxy statements for answers about their questions concerning the Merger's tax implications. *See* Section V.E.2.(a), *supra*.

198. The Proxy contained false and misleading statements substantially similar to those in the Preliminary Proxy described in ¶193, *supra*, including that Eaton directors, including Defendant Cutler, "accept[ed] responsibility" for the Eaton-related information in the Proxy, which was "**in accordance with the facts *and does not omit anything likely to affect the import of such information***." This statement was knowingly or recklessly false and misleading because the Proxy **did omit** adverse, material facts regarding Eaton's limitation from spinning off its businesses for five years due to the Merger making spin-offs economically unfeasible, which rendered Defendants' other disclosures in the Proxy misleading, as discussed below.

199. Further, the Proxy contained other, new statements regarding Defendants' due diligence, including its scrutiny into the tax consequences, of the Merger. For example, the Proxy stated that "after the Eaton board meeting on April 5, 2012, Mr. Cutler sent a letter to Mr. Hachigian [Cooper CEO] setting forth a proposal for the acquisition of Cooper," including that post-Merger "the surviving parent entity would be incorporated outside the United States" because of the "advantages currently enjoyed by Cooper as a result of its non-United States incorporation," such as "**greater flexibility** and lower cost of cash management . . . as well as a lower worldwide effective tax rate." The Proxy further explained the tax-related "flexibility and associated financial benefits" that Eaton would enjoy post-Merger by incorporating in Ireland, "**without negative tax effects**:"

> **It was ultimately concluded** that incorporating in Ireland would provide the combined entities with enhanced global cash management and **flexibility and associated financial benefits,** including increased global liquidity and free global cash flow among the various entities of the combined enterprise **without negative tax effects. Eaton also considered all the requirements of section 7874 of the Code**, including the requirement that former stockholders of Eaton own less than 80%,

> by vote and value, of the stock of New Eaton, as well as other applicable laws.

Such substantially similar statements to those in the Preliminary Proxy, specifically, the various risk warnings regarding the potential tax consequences of the Merger, and the new statements in the Proxy described above were inadequate and themselves misleading for the same reasons as those in the Preliminary Proxy—namely, they knowingly or recklessly omitted that Eaton was not able to do tax-free spin-offs for five years after the Merger due to its tax consequences, which made a divestiture of the vehicle business economically unworkable. *See* ¶194, *supra.* Defendants had a duty to disclose all of the material tax consequences of the Merger known to Defendants at that time, including that Eaton was constrained from spinning off any business for five years due to tax consequences of the Merger under applicable Internal Revenue Code tax laws. *See* ¶195, *supra*. The Proxy thus continued the same course of conduct in failing to disclose that adverse information even though, as Defendant Cutler admitted on July 29, 2012, it was known to Defendants "all along." *Id.*

200. After the filing of the Proxy and before the shareholder meeting on October 26, 2012, analysts continued to highlight Eaton's supposed ability to spin-off its vehicle business as a positive for the Company's valuation, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.3.(c), *supra*.

### D. Misleading Statement or Omission No. 5: October 31, 2012 – Q3 2012 Earnings Call

201. On October 31, 2012, Eaton held an earnings call with analysts and investors to discuss its third-quarter 2012 financial results. During the call, a Jefferies analyst asked Defendant Cutler the following "bigger question" regarding Eaton's continued ability to spin-off or otherwise divest one of its businesses: "**In 2013** is there anything from **a regulatory basis** vis-a-vis, I guess, the acquisition of Cooper that would **prevent you from doing additional**

**divestitures** if you wanted to?" Cutler responded, in full: "***No. There wouldn't be any—no regulatory restrictions***."

202. Cutler's statement above was knowingly or recklessly false and misleading when made because it omitted what he knew "all along"—that Eaton was constrained from spinning off or selling any business for five years from the Merger due to its tax consequences, which prohibited tax-free spin-offs and thus made a divestiture of the vehicle business economically unworkable under applicable tax regulations, thereby effectively imposing "**regulatory restrictions**" on Eaton's divestiture ability. Cutler thus continued the same course of conduct omitting this information, as outlined above.

203. Analysts reacted positively to Defendants' reassurance that there were no "restrictions" that would prohibit Eaton from conducting a tax-free spin-off of its vehicle business after the Merger, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* ¶132, *supra*.

### E. Misleading Statement or Omission No. 6: November 13, 2012 – Goldman Sachs Industrials Conference

204. On November 13, 2012, at the Goldman Sachs Industrials Conference, which Cutler attended, a member of the audience, presumably an analyst, asked him the following question:

> There's obviously a lot of consideration from the sell-side in terms of change in business model, which you guys have stressed that the three core businesses are now our majority. **There is a lot of talk of the ability to divest businesses that you may not necessarily think are core any more or to change the profile of the Company**. The stock, it seems to be reflecting a lot of that, I mean what is the thought in terms of **the ability** if you decided to sell some of those businesses**? Is it a spin out?** There is a market to be able to sell and what's your thought on things like that?

In response, Cutler stated:

> ***Yes, there is nothing structural in our deal structure or any of our covenants that, it prevents us from making changes in our portfolio that is not our plan at this point.*** I've spoken about that in a number of forums. We really like the balance of the businesses as we have and we've never been more bullish on the prospects in our automotive and our truck businesses.
>
> We've got a very, very good view of what's already booked in those businesses and the huge premium that -- around the world today on fuel economy and emissions, is really what's driving those businesses and that's why we've really taken the investment in those businesses, put them all around the engine and the transmission.
>
> And we've shared on our last several meetings in New York, our February annual meetings, there exactly what those projections are and we think pretty exciting growth in cash flow coming out of those over the next couple of years, but frankly they're smaller part of the Company now.

205. Cutler's statement was knowingly or recklessly false and misleading when made because it omitted what he knew "all along"—that Eaton was constrained from spinning off any business for five years from the Merger due to its tax consequences, which prohibited tax-free spin-offs for five years and thus made a divestiture of the vehicle business economically unworkable. Thus, contrary to Cutler's assurance, there were undisclosed "***structural***" aspects of the "***deal***" that "***prevent[ed]***" Eaton from "***making changes in [its] portfolio***"—*i.e.* spinning off the non-core businesses—for five years after the Merger. Further, Cutler's denial of any "***plan at this point***" was a misleading half-truth because it created the materially misleading impression that Eaton **could** spin-off the vehicle business, but simply chose not to do so at this time, when in reality Eaton **could not** do so for five years because of the tax consequences of the Merger that made its divestiture economically unworkable. *See* ¶169, *supra* (as Cutler revealed on July 29, 2014, "it's not simply an issue of will"); *see also* ¶170, *supra* (Fearon revealed on July 29, 2014 that a spin-off would be "difficult to make work economically").

Accordingly, Cutler's statements and omissions continued Defendants' course of conduct in misleading the public regarding Eaton's ability to divest the vehicle business during the Class Period.

206. After Cutler's November 13, 2012 statement and the closing of the Cooper Acquisition on November 30, 2012, the market continued to view Eaton's ability to spin-off its vehicle businesses as a positive catalyst for the stock, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.4.(c), *supra*.

### F. Misleading Statement or Omission No. 7: February 5, 2013 – Q4 2012 Earnings Call

207. On February 5, 2013, Eaton also held an earnings call to discuss its financial results for the fourth quarter of 2012. Earlier that day, Eaton announced a major reorganization wherein it would consolidate the truck and automotive business segments into only one "Vehicle segment," while expanding the electrical business into "two segments." *See* Section V.E.4.(d.), *supra*. An analyst asked Defendants "what is next for the Eaton portfolio?" In response, Cutler misleadingly assured investors that "***[w]e like the portfolio we're with***."

> [Vertical Analyst:] "Sandy [Cutler], could you just address big picture how to think about the portfolio going forward? Obviously, the combination of the vehicle assets has some of us kind of speculating on what the future might hold. Anything you could share there about what's next for the Eaton portfolio?"
>
> [Cutler:] "***Nothing different***, Jeff, ***than I've said in numerous forums*** really since we announced the Cooper transaction, is that we have changed our segment reporting to respond to kind of the changes in the Company at this point. But it doesn't presage any other moves at this point. ***We like the portfolio we're with***. We like the products that we've got and the capabilities, and we're really quite enthused about some of the new products and earning capability in a number of the features, a number of the products, where we don't simply have as great market support right now in terms of end markets. That will come back again."

208. Cutler's response continued his course of conduct in telling misleading half-truths rather than revealing the material constraint on Eaton's ability to do tax-free spin-offs. While he repeated his prior denials of any current intent to spin-off the vehicle business and stated that Eaton "***like[d] the portfolio***," knowingly or recklessly, he misleadingly omitted what Defendants knew "all along"—that Eaton could not do tax-free spin-offs for five years after the Merger and thus created the misleading impression that Eaton **could** spin-off the vehicle business, but simply chose not to do so at this time. However, in reality, Eaton **could not** do so for five years because of the tax consequences of the Merger that made its divestiture economically unworkable, adverse facts that he concealed from the public. *See also* ¶170, *supra* (Fearon revealed on July 29, 2014 that a spin-off would be "difficult to make work economically").

### G. Misleading Statement or Omission No. 8: May 21, 2013 – EPG Conference

209. On May 21, 2013, Eaton participated in the EPG Conference, with Cutler attending on its behalf. During this conference, analysts and investors again voiced their continued interest in Eaton's potential spin-off of its Vehicle business. That interest had grown in the preceding months following the February announcement of Eaton's consolidation of its Auto and Truck segments into one Vehicle segment, as described above. *See supra* Section V.E.4.(c). In particular, at the conference, an audience member (presumably an analyst), asked Cutler about the tax consequences of the Cooper Acquisition, including specifically whether there was "anything" about its resultant impact on Eaton's "tax structure" that "would constrain" Eaton's ability to do "**a larger-scale divestiture**" such as a spin-off, as follows:

> [Audience Member:] **Anything about the way the tax structure has formed over time would constrain things you might do strategically, whether that were a larger-scale divestiture** or anything else?..."

> [Cutler:] "***On the tax issue, no,*** we are domiciled outside the US. We've got great flexibility in terms of how we are able to move cash around the world, and that really is the issue that gives us our great strategic flexibility. ***So I would say no on that one***."

210. Defendant Cutler's statement that there was ***not*** "***anything about the way the tax structure has formed***" after the Cooper acquisition that "***would constrain***" Eaton's ability to do "***a larger-scale divestiture***," such as a spin-off, was knowingly or recklessly false and misleading when made because it omitted what he knew "all along"—that Eaton was not able to do a tax-free spin-off of any business for five years from the Merger due to its tax consequences, rendering a divestiture of the vehicle business economically unworkable. Thus, contrary to Cutler's assurance, there were undisclosed, adverse consequences of the Merger's "tax structure" that did "***constrain***" Eaton's ability to do "a larger-scale divestiture," such as a spin-off, for five years from the Merger. This continued the same course of conduct, described above.

211. Analysts reacted favorably to Defendants' statements reaffirming Eaton's continued ability to spin-off the Vehicle business, thus demonstrating the materiality of Defendants' misstatements and omissions. *See* Section V.E.4.(g) and ¶152, *supra*.

### H. Misleading Statement or Omission No. 9: Eaton's June 12, 2013 Press Release

212. On June 10, 2013, Bloomberg published an article titled "Eaton Said to Consider Sale of Auto-Parts Business." It reported, among other facts, that "Eaton Corp. is weighing a sale of its auto parts unit to focus on its growing power and lighting operations, said people with knowledge of the matter."

213. Two days later, on June 12, 2013, Eaton issued a press release titled "Eaton Not in Discussions to Sell its Automotive Business." It stated that "Eaton said earlier this week ***there was no basis for published reports involving speculation on the sale of Eaton's***

***automotive business***." It further quoted Cutler's remarks earlier the same day at the Deutsche Bank Global Industrials and Basic Materials Conference in Chicago, where Cutler stated: "***[W]e are not, and have not been, in the process of discussions to sell our automotive business***. I've answered this question repeatedly since we did the acquisition of Cooper. Our vehicle business is a very important part of Eaton, it is a very strong franchise. It's an important part of our Company, and a very strong profit-producing portion of our Company as well."

214. Eaton's and Cutler's statements contained in this press release were knowingly or recklessly misleading half-truths because, while the Company may not have been "in the process of discussions" to divest its vehicle business, Defendants failed to disclose that Eaton was actually constrained from doing such a divestiture, by tax consequences of the Merger that made tax-free spin-offs not possible for five years—a fact that Defendants knew "all along" but concealed from investors—given the large tax liability that would result. By omitting this adverse information, Cutler created the materially misleading impression that Eaton **could** spin-off the vehicle business, but simply was **choosing** not to do so at this time, when in reality Eaton **could not** do so because tax consequences of the Merger made it economically unworkable. *See* ¶169, *supra* (as Cutler revealed on July 29, 2014, "it's not simply an issue of will"); *see also* ¶170, *supra* (Fearon revealed on July 29, 2014 that a spin-off would be "difficult to make work economically"). This denial, therefore, continued Defendants' course of conduct to mislead the market regarding the material constraint on Eaton's ability to divest the vehicle during the Class Period.

### I. Misleading Statement or Omission No. 10: November 13, 2013 – Goldman Sachs Industrial Conference

215. On November 13, 2013, Defendants once again reaffirmed Eaton's continued ability to engage in a Vehicle business spin-off. At the Goldman Sachs Industrial Conference

on that day, in response to an analyst question about whether the Company was considering divesting its Vehicle business and whether it viewed the business as a "sacred cow," Defendant Fearon stated:

> In terms of your second question about **vehicle**, is it a sacred cow? Well, first of all, I'd say ***nothing is a sacred cow***. You have seen us over the last 15 years make pretty major portfolio shifts. We have sold or spun businesses that had roughly $1.5 billion of revenues. We've bought businesses that had $12 billion of revenues. And so we have had [sic] made major changes. We have a systematic process of looking at where those kinds of actions would benefit us and a process, particularly on the acquisition side, of keeping our hand in various situations ***so that when the opportunity naturally arises for a transaction, we can act***. ***And we are continuing those processes. If we believe that a business is better owned by somebody else, we will not be afraid to act on that, but at this juncture we really think that the structure of the portfolio works.*** The automotive business, for example, is a very high return business and throws off a lot of cash and a lot of management, talent and management, as well and ***we really don't see a strong case to be made for changing right now***, but we will continue to follow that.

216. Defendant Fearon's statement was knowingly or recklessly misleading at the time made because, contrary to Fearon's assurances that "when the opportunity" for such a divestiture of "vehicle" "naturally arises… ***we can act***," it omitted what he and Cutler knew "all along"—that a tax-free spin-off of the Vehicle business was not possible for five years after the Merger due to its tax consequences, rendering its divestiture economically unworkable. It thus created the materially misleading impression that Eaton "***can act***" to spin-off its Vehicle business "when the opportunity" presented itself, while in reality Eaton **could not so "act"** for five years after the Merger without incurring significant tax liability, which rendered such a transaction economically unworkable. *See* ¶169, *supra* (Cutler revealed on July 29, 2014, "it's not simply an issue of will"); *see also* ¶170, *supra* (Fearon revealed on July 29, 2014 that a spin-off would be "difficult to make work economically").

217. Further, Fearon's denials (*e.g.,* that "***the structure of the portfolio works***" and "***we really don't see a strong case to be made for changing right now***") were misleading half-truths because they created the materially misleading impression that Eaton **could** spin-off the vehicle business, but simply had no plans to do so at this time, when in reality Eaton could not because tax consequences of the Merger prevented tax-free spin-offs and thus made the business's divestiture economically unworkable. Thus, Fearon's denials were part of the Defendants' course of conduct outlined above.

## VII. ADDITIONAL ALLEGATIONS SUPPORTING THE INDIVIDUAL DEFENDANTS' SCIENTER

218. At all relevant times, the Individual Defendants acted with scienter in making materially false and misleading statements and omissions during the Class Period discussed above. The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter as discussed above. The following additional allegations further support a strong inference of scienter.

219. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Eaton, their control over, receipt, and/or modification of Eaton's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Eaton, participated in the fraudulent scheme alleged herein. The scheme deceived the investing public regarding Eaton's business, operations, and management and the intrinsic value of Eaton

securities and caused Plaintiff and members of the Class to purchase Eaton securities at artificially inflated prices.

### A. Defendants Engaged in Massive and Highly Suspicious Insider Sales of Their Eaton Stock During the Class Period

220. During the Class Period, Defendants Cutler and Fearon made massive insider sales of their personally-held Eaton common stock, which were highly suspicious in timing and amount. Collectively, Cutler and Fearon sold Eaton shares that were worth approximately **$40.4 million**. As a result, Cutler and Fearon personally benefited from the artificial inflation of Eaton's stock price caused by their materially false and misleading statements to investors. These facts further support a strong inference of scienter.

#### 1. Cutler's and Fearon's Class Period Sales Were Highly Suspicious in Timing and Amount

221. Specifically, Cutler and Fearon made the following sales of Eaton stock on the following dates during the Class Period, and reaped the following proceeds from those sales:

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| CUTLER | 2/20/2013 | 199,535 | $61.02 | $12,176,344.03 |
| CUTLER | 2/25/2013 | 32,107 | $60.65 | $1,947,295.97 |
| CUTLER | 3/4/2014 | 199,535 | $74.32 | $14,829,441.20 |
| CUTLER | 3/7/2014 | 29,280 | $75.55 | $2,212,104.00 |
| **CUTLER Totals** | | **460,457** | | **$31,165,185.20** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| FEARON | 12/10/2012 | 20,000 | $52.27 | $1,045,400.00 |
| FEARON | 5/3/2013 | 65,470 | $61.99 | $4,058,485.30 |
| FEARON | 11/21/2013 | 57,086 | $72.28 | $4,126,450.09 |
| **FEARON Total** | | **142,556** | | **$9,230,335.39** |

222. These stock sales represented a profit of approximately **$17.45 million** for Cutler and **$5.038 million** for Fearon.

223. Cutler's and Fearon's Class Period stock sales were suspicious in timing because they made these sales while in possession of the material, non-public adverse information that Eaton could not perform a "tax-free spin[-off] of any business for five years" after the Cooper merger. As Cutler admitted in July 2014, this was "not new knowledge" and "[w]e've been aware of this all along." Because of this awareness, under the securities laws, Cutler and Fearon were required to either disclose the adverse non-public information or abstain from trading in Eaton stock. They did neither.

224. Cutler's and Fearon's Class Period stock sales were also suspicious in amount. By any reasonable measure, Eaton stock sales in the total amounts of $31.165 million and $9.230 million by the Company's two most senior executives are large and significant to Eaton investors and to Cutler's and Fearon's personal wealth.

225. Cutler's and Fearon's stock sales are also highly suspicious in amount in comparison to their base salaries. Cutler's total base salary for the years 2012, 2013 and 2014 (which is over-inclusive because the Class Period starts in May 2012 and ends in July 2014) was $3.6 million. Cutler's $31.165 million in insider sales was a staggering 8.79 times that amount. Similarly, Fearon's total salary for the years 2012, 2013 and 2014 (which, again, is over-inclusive) was $2.2 million, and Fearon's $9.230 million in insider sales was a dramatic 4.2 times that amount.

226. Cutler's and Fearon's stock sales are also suspicious in amount in comparison to the amounts of Eaton stock that they sold during a control period of the same length as the Class Period, from March 15, 2010 through May 20, 2012 ("the Control Period"). Specifically,

during the Control Period, Fearon sold only approximately half of the Eaton shares that he sold during the Class Period (*i.e.*, 84,616 shares for total proceeds of $4,748,185). This renders the 142,556 shares valued at $9.23 million that Fearon sold during the Class Period highly suspicious.

#### 2. Cutler's Pre-Class Period Sales Do Not Render His Class Period Sales Non-Suspicious, and in Fact Confirm a Pattern of Insider Trading

227. During the Control Period, Cutler sold more Eaton shares than he did during the Class Period, **but those sales are themselves suspicious in timing and amount**. As a result, Cutler's pre-Class Period sales do not render his Class Period sales non-suspicious. Rather, they evidence his pattern of selling Eaton stock at opportune times before negative information about the Company is likely to be released.

228. Indeed, Cutler made his pre-Class Period sales during a time when Eaton faced significant public scrutiny over its alleged role in influencing a Mississippi state judge in a trade secret litigation that Eaton had filed against Frisby Aerospace. For example, on April 29, 2010, Cutler sold $18.3 million of Eaton stock. As the financial magazine *Barron's* reported, the sale on May 4, 2010 was "the first out-of-pocket sale by the top executive since May 2008, and the largest sale of any kind by Eaton insiders in at least the past seven years." On December 22, 2010, after Cutler's April 2010 stock sale, Hinds County Circuit Judge Swan Yerger sanctioned Eaton by dismissing its case against Frisby due to the conduct of the Company, its counsel, and its use of former Hinds County District Attorney Ed Peters. The court found:

> It is clear, when considering the totality of the circumstances, that Peters was hired due to Eaton's being assured that he was the "closest possible associate" of then-Judge DeLaughter, to work on Eaton's behalf. Exhibit 5047. Further, in the subject case, the Court finds that Peters' intentional misconduct and attempts to influence then-Judge DeLaughter were made solely to influence judicial decisions in Eaton's favor....

> Eaton and its counsel knew of the serious improprieties occurring, on its behalf, between Peters and DeLaughter, and stood by "with blind eyes." In the opinion of this Court, there is only one sanction that will sufficiently deter this type of unacceptable and unethical behavior that strikes at the very core of our judicial system: a dismissal of the Plaintiffs' [Eaton's] claims with prejudice.

*Eaton v. Frisby*, No. 251-04-642, slip op. at 16-17, 25 (Miss. Hinds Cty. Cir. Ct. 1st. Jud. Dist., Dec. 22, 2010).

229. Very shortly after the December 2010 ruling in *Eaton v. Frisby*, on January 28, 2011, Cutler appeared on Jim Cramer's CNBC *Mad Money* program and discussed Eaton's financial quarter and his bullish expectations for further growth in the Company's business. In response, the price of Eaton stock shot up, from a closing price of $52.13 on January 28, 2011 to a closing price of $55.39 on February 9, 2011, an increase of more than 6.25%. On February 9, 2011, Cutler sold another $26 million of his Eaton stock, less than two weeks after he touted the Company's prospects on *Mad Money*.

230. In early 2012, Cutler made another massive, pre-Class Period sale of Eaton shares. This occurred around the time that Eaton learned internally that it committed what Cutler would later refer to as "discovery failures," and the *Eaton v. Frisby* court described as "documents, which are years overdue for production" that "included [email] communications from Ed Peters about conversations and/or communications with Judge DeLaughter." *Eaton v. Frisby*, No. 251-04-642, slip op. at 2 & 5 (Miss. Hinds Cty. Cir. Ct. 1st. Jud. Dist., May 10, 2012). Eaton's Vice President and Chief Counsel – Litigation, Victor Leo, swore in an affidavit that he learned about these unproduced but responsive documents on February 13, 2012. Then, on February 27, 2012, Cutler sold 505,090 shares of Eaton stock for total proceeds of $26.29 million. Shortly thereafter, on April 17, 2012, Eaton provided the email chains in question to the *Eaton v. Frisby* court. After these details came to light, in May 2012, that court required

Cutler to personally "provide full and detailed explanations" why, *inter alia*, "the withholding of the newly discovered documents" occurred "and exactly why the documents were not previously discovered," which he did in a sworn affidavit. Affidavit of Alexander M. Cutler at 2-3, *Eaton Corp. v. Frisby*, No. 251-04-642 (Miss. Hinds Cty. Cir. Ct. 1st. Jud. Dist., May 21, 2012). Cutler's sworn affidavit disclosed that they first learned of the withheld emails "during a February 2012 briefing made by counsel for the Special Committee of Eaton's Board"—the **same month** that he had sold $26.29 million worth of Eaton stock—wherein Eaton's outside counsel discovered an Eaton email "that [outside counsel] had not seen referenced before and that [he] had become concerned as to whether the email had been turned over to the Court." *Id.*

231. Cutler's history of trading Eaton stock on insider information, both during the Class Period and during the Control Period, demonstrates a pattern of selling opportunistically after stock price highs and before negative information would be released to the public. Accordingly, this series of events renders the timing of Cutler's pre-Class Period, late February 2012 stock sale **highly suspicious**, and insufficient to render Cutler's Class Period sales non-suspicious. Far from excusing his Class Period sales, this history further evidences a pattern of insider trading on material, non-public information. Thus, Cutler's pre-Class Period trading history shows that his Class Period stock sales were also **highly suspicious.**

### B. The "Transformational" Cooper Merger Was Core to Eaton's Operations, and the Individual Defendants Were Directly Involved in It, Including Any Potential Tax Implications

232. Cutler and Fearon were at all times fully informed about the details of the Merger, including any potential adverse tax implications on Eaton's subsequent ability to do a tax-free spin-off of any of its businesses, given the importance and size of the transaction for Eaton. Eaton acquired Cooper for **$13 billion**, the largest acquisition in the Company's 106-year history, to "significantly increase the capabilities and geographic breadth of the combined

company's power management portfolio and electrical business." During the Class Period, Cutler repeatedly stated that the Cooper transaction was "a **game changer**," a "**transformational** acquisition," "an **enormously transformative** deal for Eaton," and "a **major acquisition**."

233. Indeed, the Cooper acquisition grew Eaton's size and revenues by nearly **34%**, bringing its overall portfolio to $21.8 billion in revenue, compared to $16 billion pre-Merger, and 103,000 employees, compared to 73,000 employees pre-Merger. Additionally, as a result of the Merger, nearly 60% of the combined Company's revenues and profits were generated by its electrical business, compared to only 45% pre-Merger. The Cooper Acquisition made "Eaton the fourth largest electrical giant in the world."

234. The Merger was thus a defining event in Eaton's history. Accordingly, its implementation – including the effects of the Merger on Eaton's core business model of managing its product portfolio through mergers, acquisitions, asset sales, spin-offs and other divestitures – was a core operation of the Company.

235. The Merger also had significant tax consequences. Under the agreement, Eaton would acquire Cooper through the formation of a new Irish holding company. Following Eaton's re-domiciling of its headquarters from Cleveland to Dublin, the transaction resulted in Eaton's reincorporation in Ireland. Fearon stated, in a September 13, 2013 interview with CFO.com, that the reincorporation was "[t]he **only way** to make the transaction happen from a legal and financial standpoint…." The reincorporation allowed Eaton to significantly lower its corporate tax rate and gain resultant tax benefits of $160 million a year.

236. Cutler was described in the Company's March 15, 2013 Proxy Statement as having "**detailed knowledge** of Eaton's businesses, customers, end markets, sales and

marketing, technology innovation and new product development, supply chains, manufacturing operations, talent development, policies and internal functions." In his capacity as Chairman and CEO of Eaton, and as a member of the Board of Directors, he was closely involved in all aspects of the transformative Cooper Acquisition. Certainly, he would have been informed of the adverse tax consequences that would limit Eaton's future ability to do an advantageous, tax-free spin-off the Vehicle business or any other business.

237. Further, as described on Eaton's website, in Fearon's role as the Vice Chairman and Chief Financial and Planning Officer, "he has responsibility for the **accounting**, control, corporate development, information systems, internal audit, investor relations, **strategic planning, tax** and treasury functions" at Eaton. Accordingly, by virtue of his position at Eaton, Fearon was closely involved in all aspects of the Company's financials, including accounting, tax matters and "strategic planning," such as financial and tax due diligence, including the adverse tax implications for the Cooper Acquisition, the largest acquisition in the Company's history, and the adverse implications for any potential strategic portfolio divestiture of the Vehicle business.

238. During Cutler's and Fearon's ten years of leadership, Eaton made significant strategic shifts away from its Vehicle business, while growing its electrical component and other businesses through mergers, acquisitions, asset sales, and spin-offs, which culminated in the Merger.

239. Accordingly, by virtue of Cutler's and Fearon's positions at Eaton and their abundant experience with mergers, acquisitions, and divestures (including spin-offs) during their long tenure at the Company, the Individual Defendants were closely involved and knowledgeable in all aspects of the Merger, including the financial and tax due diligence

required to be conducted by the Board of Directors and the adverse tax implications that would arise from any spin-off of the Vehicle or other businesses.

## VIII. CLASS ACTION ALLEGATIONS

240. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that, during the period from May 21, 2012 through July 28, 2014, inclusive, purchased the publicly traded common stock of Eaton and/or exchange-traded options on such common stock, so long as they purchased at least one share or option in the Original Class Period and were damaged thereby, except as excluded below. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Eaton during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Eaton's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (vi) persons and entities that purchased the publicly traded common stock of Eaton and/or exchange-traded options on such common stock ***solely*** during the period from May 21, 2012 through the time immediately preceding when Defendant Fearon made his alleged misstatement on November 13, 2013 (*see* ¶¶153, 215);[9] and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

[9] Therefore, this Class definition excludes from the Class anyone who was not the Lead Plaintiff, a named plaintiff (*e.g.*, Steamfitters Local 449 Pension Plan and Helen Karafin Gabriele), or an absent putative Class member within the Original Class Period. Stated differently, it only includes those persons who the Court previously deemed to be "'parties'" **within the Original Class Period** for purposes of the statute of limitations or relation back (ECF No. 69 at 15).

241. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Eaton had approximately 337 to 476 million shares of common stock outstanding and actively trading on the NYSE with the ticker symbol "ETN." As of September 30, 2016, Eaton had 451.7 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the tens of thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Eaton or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

242. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

243. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

244. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e) whether and to what extent the market price of Eaton's common stock and exchange-traded options on such common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(f) whether the Individual Defendants were controlling persons of Eaton;

(g) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(h) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

245. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. LOSS CAUSATION

246. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Eaton common stock and operated as a fraud or deceit on Class Period purchasers of Eaton common stock and exchange-traded options on such common stock by failing to disclose and misrepresenting the adverse facts detailed herein. Later, when Defendants' prior misrepresentations and fraudulent course of conduct were disclosed to the market, the price of Eaton common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

247. As a result of their purchases of Eaton's common stock and exchange-traded options on such common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Eaton common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $79.44 per share at the close of the market on July 16, 2014 – less than two weeks before Defendants' corrective disclosure on July 29, 2014.

248. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Eaton's business and prospects. As the truth about the Company was revealed to the market, the price of Eaton's common stock fell dramatically. These declines removed the artificial inflation from the price of Eaton's common stock, causing economic loss to investors who had purchased Eaton common stock and exchange-traded options on such common stock during the Class Period.

249. The decline in the price of Eaton common stock after the corrective disclosures on July 29, 2014 came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and

magnitude of the price declines in Eaton's common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

250. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Eaton common stock and the subsequent material decline in the value of Eaton common stock when Defendants' prior misrepresentations, misleading half-truths and other fraudulent conduct were revealed.

251. Specifically, on July 29, 2014, Defendants disclosed that, as a result of the Merger, the Company faced a five-year limitation on spin-offs due to adverse tax consequences of the Merger that made spin-offs economically unfeasible. In other words, for the five years following the date of the Merger, *i.e.* until November 30, 2017, "any spin[-offs] would result in a very significant tax liability" – even "higher than just an asset sale." Defendants also revealed that this five-year "prohibition" on spin-offs was a result of a complex analysis of "very technical issues" conducted by Eaton's internal team and corroborated by "several outside advisors." Moreover, Defendants admitted that this was "**not new knowledge**," as that they were "**well aware of this all along**."

252. On these disclosures, the Company's stock price fell nearly 8.13%, from $76.75 per share to $70.51 per share, on highly unusual trading volume of 10.5 million shares traded (as compared to only 2.6 million shares traded the day before). It was the largest drop that the Company's stock has experienced in percentage terms for the last six years.

253. Analyst commentary attributed the "large negative reaction in the stock" specifically to Defendants' disclosures that "any spin-offs would need to wait five years from the Cooper acquisition to qualify as tax-free." ¶180, *supra* (Jefferies, July 29, 2014); *see also, e.g.*, ¶181, *supra* (Wells Fargo, July 30, 2014 report: "we believe a more proactive stance by the company may have helped mitigate the sell-off that occurred"); ¶182, *supra* (Oppenheimer, July 30, 2014 report: disclosures that "tax-free spin-offs are essentially barred for five years post the Cooper close," which "pressured shares 8%, erasing $3B in market value.").

254. Likewise, numerous other analyst reports and news coverage further revealed the market's surprise to Defendants' corrective disclosures on July 29, 2012, as detailed above. *See* Section V.F.2, *supra*.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

255. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

256. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a) Eaton's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period;

(b) Eaton's common stock traded at high weekly volumes during the Class Period;

(c) as a regulated issuer, Eaton filed periodic public reports with the SEC;

(d) Eaton regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Eaton;

(f) Eaton's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote analyst reports on Eaton during the Class Period included, but are not necessarily limited to, the following: Argus Research, Bank of America, Bank of America Merrill Lynch, Barclays, Bernstein, Buckingham Research, Citigroup, Credit Suisse, Deutsche Bank, Evercore ISI, FBR Capital Markets, Gabelli & Co, Goldman Sachs, J.P. Morgan, Jefferies & Co., KeyBanc, Langenberg & Co., Longbow Research, MKM Partners, Morgan Stanley, Morningstar, Nomura Securities International, Northcoast Research, Oppenheimer, Robert Baird, S&P Capital IQ, Stifel Nicolaus, SunTrust Robinson Humphrey, UBS, Vertical Research, Wells Fargo, and William Blair & Co.;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Eaton's common stock; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Eaton's common stock and exchange-traded options on such common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XI. NO SAFE HARBOR

257. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint. *First*, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions. *Second*, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. *Third*, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. *Fourth*, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

### A. Defendants' False and Misleading Statements and Omissions Were Not Forward-Looking

258. Defendants' false and misleading statements and omissions alleged herein, (1) relate to historical or current facts; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives. Specifically, they relate to Eaton's current ability to do a tax-free spin-off of any of its businesses and the historical tax consequences of the Merger on Eaton's ability to do so.

259. To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

### B. The False and Misleading Statements Were Not Properly Identified as "Forward-Looking"

260. The PSLRA imposes an additional burden on "oral" forward-looking statements, requiring defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and failed to include the language required by the PSLRA. For example, the following oral statements made by Cutler and Fearon were neither identified as forward-looking pursuant to the PSLRA nor accompanied by *any* cautionary language, and thus to the extent that any such statement may be considered forward-looking, they are not afforded immunity by the PSLRA:

- Cutler's statements at the November 13, 2012 Goldman Sachs Industrial Conference (¶204); and
- Fearon's statements at the November 13, 2013 Goldman Sachs Industrial Conference (¶215).

### C. Any Forward Looking Statements Were Not Accompanied by Meaningful Cautionary Language

261. None of Defendants' alleged false statements or omissions were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

262. Additionally, to the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already manifested. As detailed herein, at the time Defendants assured investors that nothing in the Merger, including tax implications, limited the Company in engaging in spin-offs of its businesses, Defendants knew "all along" that such spin-offs were limited for five years post-Merger due to its tax consequences making spin-offs economically unfeasible. Thus, vague

warnings regarding, for example, changes in government regulations that ***could*** adversely affect operating results, were insufficient because they failed to warn that the risks at issue here had already occurred when Defendants made their false and misleading statements.

263. To the extent Defendants included any cautionary language, that language was not precise and did not relate directly to any forward-looking statements at issue.

### D. Defendants Knew That Any Forward-Looking Statements Were False or Misleading When Made

264. Even if the alleged statements were forward-looking, sufficiently identified as such, and accompanied by adequate cautionary language at the time they were made, each speaker knew that the statement was false or misleading, as discussed above. In addition, all such statements were authorized or approved by Eaton executive officers who actually knew that the statements were false or misleading when made. Accordingly, Defendants remain liable even for forward-looking statements.[10]

[10] Defendants' false and misleading statements and omissions alleged herein are not opinions, as defined in *Omnicare*. However, even if they contain statements of opinion, they would nevertheless be misleading because they could not fairly align with the information in Defendants' possession at the time – namely, that Defendants knew "all along" that the Company could not conduct tax-free spin-offs for five years after the Merger due to tax consequences of the Merger, which rendered the divestiture of the vehicle business economically unworkable during the Class Period. Similarly, they contain actionable omissions because they imply that nothing constrained Eaton from conducting spin-offs or other divestitures of the vehicle business after the Merger, which conflicts with what Defendants knew about such a divestiture being economically unworkable from a tax perspective, and conflicts with what a reasonable investor would take from Defendants' statements. Finally, any such statements of supposed opinion would be false because Defendants could not have sincerely believed them while making them.

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

265. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

266. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

267. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Eaton common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Eaton common stock and options on such common stock at artificially inflated prices.

268. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

269. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Eaton common stock and options during the Class Period.

270. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Eaton common stock and options, Lead Plaintiff and other members of the Class purchased Eaton common stock and options at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Eaton common stock and options at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Eaton common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Eaton common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth was disclosed.

271. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20(a) of the Exchange Act<br>Against Defendants Cutler and Fearon

272. Lead Plaintiff repeats, incorporates, and realleges each of the allegations set forth above as if fully set forth herein.

273. This Count is asserted pursuant to Section 20(a) of the Exchange Act against Defendants Cutler and Fearon.

274. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Eaton's common stock and options on such common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus, Eaton is primarily liable under Section 10(b) of the Exchange Act.

275. As set forth above, Defendants Cutler and Fearon were controlling persons of Eaton during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including the Merger and any related material tax consequences, including on the Company's ability to do a tax-free spin-off of any of its businesses following the Merger.

276. By virtue of the foregoing, Defendants Cutler and Fearon each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Eaton, including the content of its public statements with respect to the Company's ability to engage in a tax-free spin-off of any of its businesses following the Merger.

277. Defendants Cutler and Fearon acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased Eaton common stock and options during the Class Period.

278. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Eaton common stock and options, Lead Plaintiff and other members of the Class purchased Eaton common stock and options at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Eaton common stock and options at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Eaton common stock and options declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Eaton common stock and options at artificially inflated prices and the subsequent decline in the price of that stock and options when the truth began to be disclosed.

279. By reason of the foregoing, Defendants Cutler and Fearon are liable to Lead Plaintiff and the members of the Class as controlling persons of Eaton in violation of Section 20(a) of the Exchange Act.

## COUNT III
## Violation of § 20A of the Exchange Act
## (Against Defendant Cutler)

280. Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

281. This Count is asserted pursuant to Section 20A of the Exchange Act against Defendant Cutler, on behalf of Lead Plaintiff and all members of the Class who purchased Eaton stock contemporaneously with any of Cutler's sales of Eaton stock during the Class Period.

282. Cutler sold substantial numbers of shares of Eaton stock during the Class Period while in possession of material, adverse, nonpublic information. This conduct violated Section 20A of the Exchange Act.

283. As set forth in the amended PSLRA certification (*see* ECF No. 51-1), Lead Plaintiff purchased shares of Eaton stock on the same day as or close in time to sales of Eaton stock made by Cutler while he was in possession of material, adverse, nonpublic information. These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

284. Numerous other Class members also purchased Eaton stock contemporaneously with Cutler's sale of stock during the Class Period.

285. Cutler violated Section 10(b) of the Exchange Act by selling securities while in possession of material, nonpublic information, as described herein.

286. Accordingly, under Section 20A of the Exchange Act, Cutler is liable to Lead Plaintiff and the Class for all profits gained and losses avoided by him as a result of his stock sales.

287. Cutler is required to account for all such stock sales and disgorge his profits or ill-gotten gains.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Ordering an accounting of Defendant Cutler's insider trading proceeds;

D. Disgorgement of Defendant Cutler's insider trading proceeds;

E. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

F. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

G. Granting such other and further relief as the Court deems just and proper.

## XIII. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated: October 30, 2017

**LABATON SUCHAROW LLP**

By: *<u>/s/ Thomas A. Dubbs</u>*
Thomas A. Dubbs

Louis Gottlieb
Irina Vasilchenko
Jeffrey A. Dubbin
Wendy Tsang
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: lgottlieb@labaton.com
ivasilchenko@labaton.com
jdubbin@labaton.com
wtsang@labaton.com

***Lead Counsel for the Class***