USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: _7/25/18_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: EATON CORPORATION SECURITIES
LITIGATION

16-cv-5894 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

This is a securities action purportedly brought on behalf of a class of all purchasers of publicly traded common stock and/or exchange-traded options on such common stock of Eaton Corporation PLC ("Eaton" or the "Company") between May 21, 2012 and July 28, 2014 (the "class period"), so long as they purchased at least one share or option from November 13, 2013 through July 28, 2014, inclusive. The lead plaintiff, South Carolina Retirement Systems Group Trust, asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Eaton and two senior executives of the Company, namely, Alexander M. Cutler and Richard H. Fearon (collectively, the "individual defendants" and together with Eaton, the "defendants"). The plaintiff also asserted control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual defendants.

On January 13, 2017, the lead plaintiff, South Carolina Retirement Systems Group Trust (the "plaintiff"), filed a

Consolidated Class Action Complaint (the "CCAC").  In an Opinion and Order dated September 20, 2017, this Court dismissed the CCAC without prejudice for failure to plead any material misrepresentations or scienter.  In re: Eaton Sec. Litig., No. 16-cv-5894, 2017 WL 4217146 (S.D.N.Y. Sept. 20, 2017) ("Eaton I").

On June 8, 2018, the plaintiff filed a Second Amended Consolidated Class Action Complaint (the "SAC").  The defendants now move to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the following reasons, the motion is **granted**.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint should not be dismissed if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While factual allegations should be construed in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts

3

on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99.

The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted). The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99; see also City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 418-19 (S.D.N.Y. 2011) (same).

In order to plead scienter adequately, the plaintiff must allege facts supporting a strong inference with respect to each defendant. See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007). A

complaint sufficiently alleges scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324; see also Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010); Silsby v. Icahn, 17 F. Supp. 3d 348, 364-65 (S.D.N.Y. 2014). See also Eaton I, 2017 WL 4217146, at *11.

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). The Court can take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991); see also Schwab v. E*Trade Fin. Corp., 285 F. Supp. 3d 745, 749-50 (S.D.N.Y. 2018); In re Eletrobras Sec. Litig., 245 F. Supp. 3d 450, 457-58 (S.D.N.Y. 2017).

5

II.

The following facts are accepted as true for the purposes
of the defendants' motion to dismiss.  Familiarity with this
Court's decision on the prior motion to dismiss and the
underlying factual allegations is presumed.

Eaton is an Ireland-based manufacturer of engineered
products -- such as hydraulic equipment, fluid connectors,
electrical distribution equipment, and engine components -- that
are marketed to customers in the industrial, agricultural,
construction, aerospace, and vehicle markets.  SAC ¶ 2.  Cutler
was Eaton's Chairman and Chief Executive Officer ("CEO") from
August 2000 until his retirement in May 2016.  SAC ¶ 40.  Fearon
is Eaton's Vice Chairman and Chief Financial and Planning
Officer ("CFO").  SAC ¶ 41.

The plaintiff alleges that Eaton has historically been a
vehicle component manufacturer based in the United States, but
in the past few decades has been making strategic shifts away
from its vehicle and automotive business.  SAC ¶ 3.  On May 21,
2012, the Company announced plans to merge with
Irish-headquartered Cooper Industries plc. ("Cooper"), an
electrical products manufacturer, and reincorporate in Ireland.
SAC ¶ 4, 18.  Upon announcement of the merger, analysts began
speculating as to whether there would be a "potential, future

spin-off or other divestiture of Eaton's vehicle business."
SAC ¶ 90.

Generally, the CCAC alleged that Cutler and Fearon made misleading statements following the merger regarding whether Eaton was able to spin-off the vehicle business on a tax-free basis.  The CCAC alleged that Cutler and Fearon misled the market into believing that there were no restrictions on Eaton's ability to spin-off the automotive business when in reality Eaton could not complete a tax-free spin-off for five years following the merger.

In the SAC, the plaintiff asserts the same theory of fraud, namely that the defendants misled the plaintiff and the market when they failed to disclose that the automotive business could not be spun-off on a tax-free basis for five years following Eaton's merger with Cooper.  However, the SAC includes several new allegations, including additional alleged misstatements, additional references to analyst reports, and two expert opinions.

The plaintiff adds two statements that it alleges are material misstatements or omissions.  First, on a February 5, 2013 earnings call, Cutler was asked by an analyst: "[C]ould you just address big picture how to think about the portfolio going forward? . . . Anything you could share there about what's next for the Eaton portfolio?"  SAC ¶ 207.  Cutler responded:

7

"Nothing different . . . than I've said in numerous forums
really since we announced the Cooper transaction . . . . But it
doesn't presage any other moves at this point.  We like the
portfolio we're with."  SAC ¶ 207.

Second, on June 10, 2013, a news article titled "Eaton Said
to Consider Sale of Auto-Parts Business" reported that the
Company was "weighing a sale of its auto parts unit." SAC ¶ 212.
On June 12, 2013, the Company responded by issuing a press
release titled "Eaton Not in Discussions to Sell Its Automotive
Business." SAC ¶ 213.  It stated that "there was no basis for
published reports involving speculation on the sale of Eaton's
automotive business." SAC ¶ 213. The press release further
quoted Cutler as stating that the Company was "not, and ha[s]
not been in the process of discussions to sell [the] automotive
business," that Cutler had "answered this question repeatedly
since [Eaton] did the acquisition of Cooper," that the "vehicle
business" was "a very important part of Eaton," "a very strong
franchise," and that it was "a very strong profit-producing
portion of [the] [C]ompany." SAC ¶ 213.

The SAC also adds references to, and quotes from,
additional analyst reports discussing a potential spin-off of
the automotive business.  For example, the SAC alleges that a
news report issued on June 4, 2012 by Crain's Cleveland Business
discussing a May 12, 2012 conference call with Eaton explained

that Eaton "might turn to the sale of assets to help repay debt" and noted that the merger "le[ft] open the possibility that Eaton will need to sell pieces of its past as it pursues its future." SAC ¶¶ 100-101. The SAC also alleges additional statements from analyst reports issued by Wells Fargo, KeyBanc, MKM Partners, Vertical Research Partners, Morgan Stanley, and Deutsche Bank, which the plaintiff asserts demonstrate that the market "continued to believe that a divestiture of the vehicle business remained feasible throughout the Class Period." SAC ¶¶ 141-143, 158-160, 162.

The SAC also includes opinions from two experts regarding the economic viability of a taxable sale of the automotive business. The SAC alleges that a tax expert, Mark Baran, concluded that a sale of the vehicle business would likely have been subject to the highest statutory U.S. federal corporate tax rate of 35%, resulting in taxes of up to $2 billion. SAC ¶¶ 74-76. The SAC also alleges that a consulting investment banking expert, James Miller, conducted an analysis to determine the impacts of a taxable or tax-free sale of Eaton's vehicle business. SAC ¶ 77. Miller concluded that a tax-free spin-off would create an 8.8% increase in Eaton's value, but a taxable sale would cause a 7.9% decrease. SAC ¶ 81. Based on this analysis, Miller "concluded that the tax liability on a potential sale rendered the transaction economically

unworkable." SAC ¶ 77. Miller also reviewed the analysis in a report by Jefferies issued on February 5, 2013, which concluded that a sale of the automotive business taxed at 35% would result in a reduction in the value of Eaton by 7%. Miller concluded that this analysis was correct. SAC ¶¶ 69-72, 79.

The defendants move to dismiss the SAC on the grounds that the SAC does not state a claim on which relief can be granted.

## III.

As an initial matter, the defendants argue that the plaintiff cannot expand the class period to encompass misrepresentations that were made between May 21, 2012 and November 12, 2013 -- even though the plaintiff does not seek to add additional class members from that expanded class period -- because claims from the expanded class period are allegedly barred by the statute of limitations. The plaintiff attempts to avoid the bar of the statute of limitations by requiring that each class member have purchased at least one Eaton share or option in the original class period, namely between November 13, 2013 through July 28, 2014.

The plaintiff claims that the alleged fraud was disclosed on July 29, 2014. SAC ¶ 163. Accordingly, the two-year statute of limitations expired on July 29, 2016. The initial complaint in this action, filed on July 22, 2016, alleged a class period from November 13, 2013 through July 28, 2014.

10

In the CCAC, the plaintiff attempted to expand the class period to encompass claims by persons or entities who purchased Eaton securities between May 21, 2012 and November 13, 2013. CCAC ¶ 1.  The Court found that, because the plaintiff had not met the test under Federal Rule of Civil Procedure 15(c)(1)(C) for adding new parties, the CCAC did not relate back to the time the first complaint was filed, and therefore the claims by persons or entities who purchased Eaton securities in that time period were barred by the statute of limitations.

In the SAC, the plaintiff does not seek to add any additional parties.  Instead, the plaintiff seeks to expand the class period to include the time period between May 21, 2012 and November 13, 2013, without requesting the inclusion of any persons or entities who purchased stock only during that time period.[1]  The plaintiff seeks to rely on the misstatements made during that expanded time period to prove that the defendants

---

[1] The plaintiff requests that the class include all persons or entities that, during the period of May 21, 2012 through July 28, 2014, inclusive, purchased the publicly traded common stock of Eaton and/or exchange-traded options on such common stock, so long as they purchased at least one share or option from November 13, 2013 through July 28, 2014, inclusive.  This class definition does not add any new parties.  If the Court allows the expanded class period, it will allow a plaintiff who purchased stock in the original class period and also purchased stock in the expanded class period to recover damages for both stock purchases, but no plaintiff who was not a member of the original class by purchasing an Eaton security in the original class period would be included in the class in the SAC.

defrauded it and also to allow current class members who
purchased stock during that time period to recover damages for
those purchases.

The defendant argues that permitting the plaintiff to
expand the class period to encompass new misstatements even
without adding new class members from the expanded class period
would be contrary to law and that there is no precedent for such
a decision.

However, in Stevelman v. Alias Research Inc., 174 F.3d 79
(2d Cir. 1999), the Second Circuit Court of Appeals held that an
amended complaint which alleged additional misstatements from an
expanded class period[2] related back to the original complaint.
Id. at 87.  The Court found that, because the new allegations
"arose out of the same conduct, transaction, or occurrence" set
out in the original pleading and "the facts in the original
complaint clearly put [the defendants] on notice as to the
conduct and transactions at issue in th[e] action", the amended
complaint satisfied Rule 15(c)(2)[3] for relation back.

---

[2] While it is not clear from the decision of the Second Circuit
Court of Appeals that the newly alleged misstatements were from
an expanded class period, the defendants' brief in opposition
filed in the appeal makes clear that the misstatements were from
a different time period that extended beyond the time period
described in the original complaint.  Br. of Defendants-
Appellees, Stevelman v. Alias Research Inc., Case No. 97-9544,
1998 WL 35155442.

[3] Federal Rule of Civil Procedure 15(c)(2) became Rule
15(c)(1)(B) after the December 1, 2007 Amendment to the Federal

Id. at 86-87.   District courts in this Circuit have held the same.   See In re: Gilat Satellite Networks, Ltd., No. 02-cv-1510 (CPS), 2005 WL 2277476, at *21, *24 (E.D.N.Y. Sept. 19, 2005) (allowing the plaintiff to rely on new misstatements outside the original class period because the new claims alleged in the amended complaint arose out of the "same conduct, transaction, or occurrence" as the claims in the original complaint); Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., No. 05-cv-1898 (SAS), 2005 WL 2148919, at *1, *10 (S.D.N.Y. Sept. 6, 2005) (same).

Accordingly, the plaintiff may expand the class period to add new claims by current class members for purchases made during the expanded class period if the SAC meets the requirements of Federal Rule of Civil Procedure 15(c)(1)(B) for relation back.   Under Rule 15(c)(1)(B), an amended complaint "relates back" to the prior complaint if it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading . . . ."   "The central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation

---

Rules of Civil Procedure.   The rules are substantively identical.

alleged in the original pleading." <u>Slayton v. Am. Exp. Co.</u>, 460 F.3d 215, 228 (2d Cir. 2006).

Here, the theory of fraud alleged in the original complaint was that "Eaton executives falsely assured investors and the market of the continued feasibility of divesting the Company's automobile-part manufacturing business on a tax-free basis." Compl. ¶ 5 (Docket No. 1). The plaintiff alleged that the defendants made one misstatement or omission during the original class period in which Fearon, on November 13, 2013, stated in reference to the automotive business that "nothing is a sacred cow" and that "[w]e have a systematic process of looking at where [portfolio shifts] would benefit us and . . . we are continuing those processes. If we believe that a business is better owned by somebody else, we will not be afraid to act on it." Compl. ¶ 26. The complaint relied on this misstatement to allege that the defendants fraudulently misled the market into believing that a tax-free spin-off of the automotive business was possible.

The SAC alleges this same theory of fraud. Each of the additional misstatements alleged in the SAC relates to the ability of Eaton to spin-off its automotive business and each is alleged in support of the plaintiff's theory that Eaton misled the market with respect to the tax consequences of such a spin-off. In fact, three of the additional nine statements that

14

were made before November 13, 2013 were described in the fact section of the original complaint. Therefore, the defendants were on notice from the original complaint that they faced claims based on their representations regarding Eaton's ability to spin-off its automotive business after the Cooper merger. The additional misrepresentations alleged in the SAC during the expanded class period -- and the additional claims based on those misrepresentations -- relate to that same conduct.

Accordingly, the SAC relates back to the filing of the original complaint and claims by the current class members' based on purchases made during the expanded class period, May 21, 2012 through November 13, 2013, are timely.

However, the fact that the plaintiff has successfully expanded the class period does not affect the rationale for the dismissal of this action. In its original decision dismissing the CCAC, the Court found that all of the misstatements alleged, except for the November 13, 2013 alleged misstatement, were not actionable because they were not made during the class period. Eaton I, 2017 WL 4217146, at *7. Nevertheless the Court went on to consider the merits of all of the eight alleged misstatements and found that none of them was actionable. Id. Similarly, as explained below, none of the statements alleged in the SAC is actionable.

IV.

The defendants correctly argue that the amendments in the CCAC do not undermine the Court's finding that the defendants were under no duty to disclose the potential tax consequences of a spin-off of the automotive division because they had repeatedly stated that they did not intend to complete the spin-off and they never did spin-off that division.

In its prior decision, the Court held that "the defendants were under no duty to disclose the hypothetical tax consequences of a potential spin-off of Eaton's automotive business because the defendants themselves repeatedly made clear that the 'indicated probability' of such a spin-off was zero." In re Eaton, 2017 WL 4217146, at *8. Nothing in the SAC casts doubt on this finding. The SAC does not allege that Eaton made any public statements that it was considering a spin-off of the automotive business or any public statements indicating that the probability of such a spin-off was not zero. To the contrary, many of the additions to the CCAC in the SAC reinforce this finding by the Court.

As compared to the CCAC, Misstatement Nos. 1, 6, and 10[4] in the SAC include additional portions of the statements made by

_____

[4] The SAC identifies by number ten alleged misleading statements or omissions that were made between May 12, 2012 and November 13, 2013. The CCAC had identified eight alleged misstatements that occurred between May 21, 2012 and November 13, 2013. The

16

Cutler or Fearon. Those additional portions of the statements
all include denials by Cutler or Fearon of any intent by Eaton
to spin-off the automotive business. Misstatement No. 1 in the
SAC adds Cutler's statement that "[w]e have continued and will
continue to grow our two vehicle businesses primarily through
internal investment." SAC ¶ 188.  Misstatement No. 6 adds
Cutler's statement that changes in the portfolio are "not our
plan at this point" and that "[w]e really like the balance of
the businesses as we have and we've never been more bullish on
the prospects of our automotive and truck businesses."
SAC ¶ 204.  Misstatement No. 10 now includes Fearon's statements
that "we really think that the structure of the portfolio works.
The automotive business, for example, is a very high return
business and throws off a lot of cash and a lot of management,
talent and management, as well and we really don't see a strong
case to be made for changing right now, but we will continue to
follow that." SAC ¶ 215.  In each of the additional portions of
these misstatements, Cutler or Fearon reiterated that Eaton had
no intention to spin-off or sell the automotive division. These
additions thus underscore the Court's holding that "the
theoretical tax consequences of a hypothetical transaction that

---

original complaint had identified the November 13, 2013
statement as the only statement made during the class period but
referred to several previous statements in the statement of
factual allegations.

was never planned and never occurred is not material, and the defendants were under no duty to disclose them." Eaton I, 2017 WL 4217146, at *10.

Likewise, the new misstatements -- 7 and 9 -- are reiterations of what Cutler and Fearon previously said and exactly the type of statement that this Court found insufficient to create a duty to disclose. The new Misstatement No. 7 alleges that, on February 5, 2013, Cutler was asked "what's next for the Eaton portfolio?" and responded "[n]othing different . . . than I've said in numerous forums really since we announced the Cooper transaction . . . . We like the portfolio we're with." SAC ¶ 207. The new Misstatement No. 9 alleges that Eaton issued a press release on June 12, 2013 titled "Eaton Not in Discussions to Sell its Automotive Business", which reiterated that Eaton was not and had not been considering a sale of its automotive business. SAC ¶ 213. Both of these statements reiterate that Eaton was not considering a spin-off of its automotive business -- the very fact this Court found eliminated any duty to disclose the tax consequences of such a spin-off.

Moreover, the Court explicitly considered the two new misstatements, as well as the additions to Misstatement Nos. 1,

6, and 10, in its prior decision,[5] see Eaton I, 2017 WL 4217146, at *2-3 and, in fact, directly relied on several of them in finding that the defendants "made clear from the day the merger was announced that there were no plans to spin-off Eaton's automotive business." Id. at *8.

The plaintiff also argues that the SAC adequately pleads materiality by including "additional analyst reports and statements from a news article that discussed Eaton's continued ability to divest the Vehicle business as a valuable option in the near-term, despite Defendants' purported denials of any current plans to divest it." Pl.'s Mem. Opp. Mot. Dismiss 6.

But, as the plaintiff admits, nearly all of these analyst reports explicitly note that Cutler and Fearon had stated that Eaton had no intention of spinning off its automotive business. See SAC ¶ 142 (KeyBanc report noted that "[w]hile some market participants have speculated that Eaton might consider spinning out its newly formed Vehicles group, management reiterated its commitment to the businesses and long-term growth potential, while to some degree down playing the possibility."); ¶ 158 (Vertical Research Partners report noted that "[m]anagement adamantly denied [a spin-off of the Vehicle segment] was in the

---

[5] The Court is entitled to consider the entirety of the statements when analyzing an alleged misstatement on a motion to dismiss. See Eaton I, 2017 WL 4217146, at *2 n.1.

cards (in the near-term) in an attempt to appropriately set
expectations"); ¶ 159 (Morgan Stanley report noted that
"management has stated that while the Cooper transaction does
not have any covenants that prevent it from taking any further
strategic actions, it currently has no plans to make material
changes to Eaton's portfolio"); SAC ¶¶ 100-02 (quoting portions
of a Crain's article); SAC ¶¶ 160-62 (quoting portions of a
Deutsche Bank analyst report); see also Hammel Decl. Ex. 2, at 2
(Crain's article noted that "Eaton Spokesmen Gary Klasen . . .
wrote that Eaton, as stated during the teleconference, has 'at
this time no plans to (make) material changes to our portfolio
post closing of the transaction'")[6]; Hammel Decl. Ex. 3, at 4
(Deutsche Bank report noted that "the company has consistently
maintained that it is not considering a possible monetization or
separation of [the] Vehicle [business]")[7].

To the extent these analysts also commented that a vehicle
spin-off in the near future was likely or contemplated by the
Company, they chose to look past the clear, unequivocal
statements made by the defendants that a vehicle spin-off was
not planned or being considered. As this Court explained in its

---

[6] The plaintiff omitted this denial from its citation of the
Crain's article in the SAC.

[7] The plaintiff omitted this denial from its citation of the
Deutsche Bank report in the SAC.

original opinion, "while a company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company, [Eaton] attempted to do so . . . ." Eaton I, 2017 WL 4217146, at *9 (internal citations and quotation marks omitted).

The plaintiff also argues that the defendants' statements regarding their "continued, unconstrained ability" to divest the vehicle business were false.  See, e.g., SAC ¶ 5.  In support of this argument, the plaintiff offers opinions by two experts to the effect that a taxable transaction would have been prohibitively expensive compared to a non-taxable transaction and Eaton could not do a non-taxable transaction for five years after the Cooper transaction.  SAC ¶¶ 74-85.

But these expert opinions do not contradict the defendants' statements -- because the defendants never commented on the economic viability of a taxable sale of the vehicle business or whether such a sale would be value creating for the Company. Rather, the defendants stated that such a spin-off would be possible but further noted that they were not contemplating such a spin-off.  They said nothing about the expense of such a spin-off or sale, if it were to be completed.  The expert opinions offered in the SAC therefore do not show that the defendants' statements that a spin-off of the vehicle business was possible were false.

Lastly, the plaintiff argues that the fact that Eaton's
stock price dropped more than 8% on July 29, 2014, the day of
the disclosures, demonstrates the materiality of the
misrepresentations.  SAC ¶ 172.  The plaintiff alleges that this
stock drop was the largest in percentage terms experienced by
Eaton in the last six years.  SAC ¶ 173.  But this stock drop
cannot save the plaintiff's claims.  While a stock drop is
relevant to the question of materiality, it is not determinative
and cannot serve as the sole basis for finding materiality in a
complaint that is devoid of any other allegations supporting
such a finding.  See Geiger v. Solomon-Page Grp., Ltd., 933 F.
Supp. 1180, 1188 (S.D.N.Y. 1996) (noting "[e]vidence of stock
price movement may be relevant to the issue of materiality but
it is not determinative" and collecting cases).  Moreover, in
this case, there is reason to discount the relevance of the
stock drop to the materiality of the defendants' statements
because the drop occurred on a day when other negative news
regarding the Company's finances was published.  See Hammel
Decl. Exs. 5, 6 (describing negative news issued by the company
including that there were "lower 2015 [Earnings Per Share]
estimates" and that "margins in [Electrical Systems and
Services] were significantly below expectations at 12.7%"); see
also Geiger, 933 F. Supp. at 1188 ("The stock price may have
fallen for many reasons including other negative disclosures

22

included in the very same newspaper article which were not
alleged as the basis for a fraudulent omission in this case.").

In sum, the SAC fails to overcome the flaws of the CCAC
with respect to the pleading of material misstatements or
omissions.  Like the CCAC, the SAC does not allege plausibly
that the defendants made any material misstatements or that
Eaton was "subject to a duty to disclose" the hypothetical tax
consequences of a theoretical spin-off of Eaton's automotive
business that Eaton repeatedly disclaimed it had any intention
to complete, and never did.  See Eaton I, 2017 WL 4217146, at
*10.

V.

The defendants also argue that the SAC does not allege
facts supporting a strong inference of scienter.

In its prior opinion granting the motion to dismiss, this
Court held that the plaintiff had not established scienter
because "there was no reason for any executive to be dishonest
about the tax consequences of a hypothetical merger that the
Company repeatedly and explicitly stated it had no plans to do."
Eaton I, 2017 WL 4217146, at *11.  The Court also found that the
stock sales by the individual defendants did not give rise to an
inference of scienter because the sales during the class period
were not unusual or suspicious.  Id. at * 12.

On this motion, the plaintiff does not attempt to argue
that the defendants had a motive to commit fraud.  The plaintiff
does not attempt to argue that any stock sales supported an
inference of scienter.  When a plaintiff fails to allege
adequate motive, the strength of the circumstantial allegations
of conscious misbehavior must be correspondingly greater.
Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).  The
plaintiff has failed to make such a showing.

The scienter allegations in the SAC are substantively
identical to those in the CCAC which the Court has already found
insufficient.  Compare CCAC ¶¶ 154-75, with SAC ¶¶ 218-39.  But
the plaintiff argues that the other additions to the factual
allegations in the SAC support their arguments with respect to
scienter and justify a change in this Court's prior opinion.

First, the plaintiff argues that a July 29, 2014 statement
by Fearon -- which was added to the SAC -- directly contradicts
the defendants' prior statements and therefore demonstrates that
the prior statements were false and made recklessly.  In that
statement, Fearon stated that a spin-off of the automotive
business "has been difficult to make work economically" because
it "would be taxed higher than just an asset sale for some
complex reasons."  SAC ¶ 170.  The plaintiff argues that this
statement is an "admission" that "a sale of Eaton's Vehicle

24

business was not economically feasible." Pl.'s Mem. Supp. Mot. Dismiss 19.

But this statement is not inconsistent with any statements previously made by the defendants.  The defendants never spoke to the economic feasibility of a potential spin-off of the vehicle business, and they never stated that the transaction could be completed in an economically feasible way or as a tax free spin-off.  The defendants only stated that a vehicle spin-off was possible, without making any representations as to the economic workability of such a spin-off.  Fearon's July 29, 2014 statement was therefore not an admission that his prior statements were false.  Moreover, the fact that Fearon may have known at the time of the prior statements that the spin-off could not be completed on a tax-free basis is also not indicative of recklessness, given that he never made a statement contradictory to that fact and he was under no duty to disclose it.  As the Court previously held, the SAC does not allege any "reason for any executive to be dishonest about the tax consequences of a hypothetical merger that the Company repeatedly and explicitly stated it had no plans to do."  Eaton I, 2017 WL 4217146, at *11.

The plaintiff also argues that the allegations in the SAC that "15 analysts and business writers (in addition to investors) had the . . . incorrect belief during the class

period[] that Eaton had the ability to do a tax-free spin-off after the Merger" is evidence that the defendants purposefully misled those analysts.  Pl.'s Mem. Supp. Mot. Dismiss 20.  But allegations regarding the analysts' perceptions cannot substitute for allegations regarding actual misstatements by the defendants and the defendants' state of mind while making those statements.

The plaintiff also argues that the addition of new misstatements in the SAC bolsters its claim that the defendants made those statements recklessly.  But the number of times the defendants made representations regarding their ability to spin-off the vehicle business does not lead to an inference that those statements were made recklessly.  Those statements were not directly contradicted by a subsequent disclosure and the defendants were under no duty to disclose the tax consequences of a vehicle spin-off they repeatedly denied they were considering when they made those statements.  The Court previously rejected this theory of scienter, and the addition of new alleged misstatements -- which merely reiterate what was said in other statements and/or were already considered by the Court in its prior opinion -- does not change the Court's analysis.

Accordingly, the allegations in the SAC do not change the Court's finding that "[t]he compelling opposing inference is

26

that neither Cutler nor Fearon thought that they had any
obligation to discuss the possible tax consequences of a
theoretical spin-off that Eaton had no plans to make, and that
neither executive intended to deceive anyone about such tax
consequences." Eaton I, 2017 WL 4217146, at *12.  Therefore, the
SAC does not adequately plead a strong inference of scienter.

### VI.

The plaintiff also alleges that the individual defendants
are liable under Section 20(a) of the Exchange Act because they
controlled Eaton, which in turn violated Section 10(b) and Rule
10b-5.  However, because the plaintiff has not alleged a
plausible primary violation of Section 10(b) and Rule 10b-5, the
plaintiff has not satisfied the elements of a Section 20(a)
claim, and that claim must also be dismissed.  See Eaton I, 2017
WL 4217146, at *13.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, the arguments are either moot or without merit.  For all of the reasons explained in the Court's original opinion dismissing the CCAC, and the reasons explained above, the defendants' motion to dismiss is **granted**.  The Clerk of Court is directed to enter judgment dismissing this action and closing this case.

**SO ORDERED.**

Dated:      New York, New York
            July 25, 2018

_____
John G. Koeltl
United States District Judge

28